# Department of Health and Human Services

## OFFICE OF
## INSPECTOR GENERAL

# MOST CRITICAL ACCESS HOSPITALS WOULD NOT MEET THE LOCATION REQUIREMENTS IF REQUIRED TO RE-ENROLL IN MEDICARE



**Daniel R. Levinson**
**Inspector General**

**August 2013**
**OEI-05-12-00080**

**EXECUTIVE SUMMARY:  MOST CRITICAL ACCESS HOSPITALS WOULD NOT MEET THE LOCATION REQUIREMENTS IF REQUIRED TO RE-ENROLL IN MEDICARE OEI-05-12-00080**

## WHY WE DID THIS STUDY

The Critical Access Hospital (CAH) certification was created to ensure that rural beneficiaries are able to access hospital services.  Medicare reimburses CAHs at 101 percent of their reasonable costs, rather than at the rates set by prospective payment systems or fee schedules.

Currently, hospitals can be certified as CAHs if they meet a variety of regulatory requirements, including being located at least a certain driving distance from other hospitals (including CAHs) and being located in rural areas.  These two requirements are known as the distance requirement and the rural requirement, respectively.  Collectively, the two requirements are known as the location requirements.  Prior to 2006, States could exempt CAHs from the distance requirement by designating them as "necessary provider" (NP) CAHs.  NP CAHs are permanently exempt from meeting the distance requirement.

## HOW WE DID THIS STUDY

We plotted the locations of CAHs and other hospitals onto digital maps to determine whether CAHs would meet the location requirements if they were required to re-enroll in Medicare.  Additionally, we calculated (using 2011 claims data) the potential savings to Medicare and beneficiaries if the Centers for Medicare & Medicaid Services (CMS) were to decertify CAHs that would not meet the location requirements.

## WHAT WE FOUND

Nearly two-thirds of CAHs would not meet the location requirements if required to re-enroll.  The vast majority of these CAHs would not meet the distance requirement.  CMS does not have the authority to decertify most of these CAHs, as most of these CAHs are NP CAHs.  However, if CMS were authorized to reassess whether all CAHs should maintain their certifications and concluded that some should be decertified, Medicare and beneficiaries could realize substantial savings.  If CMS had decertified CAHs that were 15 or fewer miles from their nearest hospitals in 2011, Medicare and beneficiaries would have saved $449 million.

## WHAT WE RECOMMEND

Because the CAH certification results in increased spending for both Medicare and beneficiaries, CMS should ensure that the only CAHs to remain certified would be those that serve beneficiaries who would otherwise be unable to reasonably access hospital services.  We recommend that CMS (1) seek legislative authority to remove NP CAHs' permanent exemption from the distance requirement, thus allowing CMS to reassess these CAHs; (2) seek legislative authority to revise the CAH Conditions of Participation to include alternative location-related requirements; (3) ensure that it periodically reassesses CAHs for compliance with all location-related requirements; and (4) ensure that it applies its uniform definition of "mountainous terrain" to all CAHs.  CMS concurred with our first, third, and fourth recommendations, but did not concur with our second recommendation.

## TABLE OF CONTENTS

Objectives ............................................................................1

Background ...........................................................................1

Methodology ........................................................................7

Findings...............................................................................12

 Nearly two-thirds of CAHs would not meet the location
 requirements if required to re-enroll ...............................12

 Medicare and beneficiaries could realize substantial savings if
 CMS were to decertify some CAHs...................................16

Conclusion and Recommendations.........................................17

 Agency Comments and Office of Inspector General Response.....19

Appendixes .........................................................................21

 A:  Distance and Rural Requirements...........................21

 B:  Detailed Methodology.........................................25

 C:  Example of Critical Access Hospital Locations Relative to
 Those of Other Hospitals .........................................30

 D:  Agency Comments .............................................31

Acknowledgments.................................................................34

## OBJECTIVES

1. To determine the extent to which Critical Access Hospitals (CAH) would meet the location requirements if required to re-enroll in Medicare.

2. To calculate potential savings to Medicare and beneficiaries if CMS decertified CAHs that would not meet the location requirements if required to re-enroll in Medicare.

## BACKGROUND

### Critical Access Hospitals

In 1997, the Balanced Budget Act (BBA) created the CAH certification to ensure that hospital care is accessible to beneficiaries in rural communities.[1,2]  Small hospitals that meet specific requirements can qualify for the CAH certification and receive favorable Medicare reimbursements.  Medicare reimburses CAHs at 101 percent of their reasonable inpatient and outpatient costs.[3]

There are more than 1,300 CAHs in the United States.  CAHs are located in every State except Connecticut, Delaware, Maryland, New Jersey, and Rhode Island.  CAHs provided care for approximately 2.3 million beneficiaries in 2011.  Medicare and beneficiaries paid approximately $8.5 billion for this care.

### Medicare Requirements for CAH Certification

Facilities must meet the requirements set forth in the CAH Conditions of Participation to receive the CAH certification.  Conditions of Participation lay out health, safety, and location-related requirements that facilities must meet to participate in the Medicare program as CAHs.

Because the intent of the CAH certification is to ensure access to care in rural communities, CAHs must meet two location-related requirements.[4]  CAHs must be located at least a certain distance from hospitals (including acute-care, psychiatric, rehabilitation, long-term, and children's hospitals) and other CAHs, and they must be located in rural areas.  These

---

[1] Balanced Budget Act of 1997, P.L. 105-33 § 4201.  The BBA amended several sections of the Social Security Act, including sections 1820, 1861(mm), 1814(l) and 1834(g).

[2] Centers for Medicare & Medicaid Services (CMS), *State Operations Manual,* Pub. No. 100-07, ch. 2, § 2254A.  Accessed at http://cms.gov on July 7, 2011.

[3] Social Security Act, §§ 1814(l) and 1834(g), 42 U.S.C. §§ 1395f(l) and 1395m(g).

[4] Social Security Act, § 1820(c)(2), 42 U.S.C. § 1395i-4(c)(2); CMS, *State Operations Manual,* Pub. No. 100-07, ch. 2, § 2256F.  Accessed at http://cms.gov on July 7, 2011.

Exhibit A Page 7

two requirements are known as the distance and rural requirements, respectively.  Collectively, the two requirements are known as the location requirements.  Appendix A provides the official descriptions of the location requirements.

*Distance requirement*.  Facilities that wish to obtain the CAH certification can meet the distance requirement in one of two ways:  (1) by being located more than a 35-mile drive from a hospital or another CAH or (2) by being located more than a 15-mile drive from a hospital or another CAH in areas of mountainous terrain or areas where only secondary roads are available.[5]

CMS defines "secondary roads" as roads that are not primary roads.  Primary roads include Federal highways (including interstate highways), State highways with two or more lanes in one direction, and roads that—in accordance with U.S. Geological Survey (USGS) standards—are shown on maps as primary highways.[6]  Secondary roads typically are one-lane State highways and all other local roads.

Prior to 2013, CMS defined "mountainous terrain" as areas identified as such on any official maps or other documents published by the State agency responsible for highways in the State (typically a Department of Transportation or Highways) or by USGS.[7]

In April 2013, CMS published a uniform definition of "mountainous terrain" States are to use when certifying hospitals as CAHs.  According to this definition, roads that travel through mountainous terrain must be located in a mountain range and meet one of two additional requirements related to ease of travel or effort required to construct the roads.[8]

*Rural requirement*.  Facilities that wish to obtain the CAH certification can meet the rural requirement by being located either in rural areas or in areas that are treated as rural.[9]  CMS uses a formula based on multiple criteria to determine rural status.  Examples of these criteria include whether a CAH is located outside a metropolitan statistical area (MSA), located inside a

---

[5] 42 CFR § 485.610(c).

[6] CMS, *State Operations Manual,* Pub. No. 100-07, ch. 2, § 2256A.  Accessed at http://cms.gov on July 7, 2011.

[7] Ibid.  Accessed at http://cms.gov on July 7, 2011.

[8] CMS, *Clarification of the Critical Access Hospital (CAH) Criteria for Rural Location and Mountainous Terrain Distance Standard,* April 19, 2013 (S&C: 13-26-CAH).  Accessed at http://cms.gov on April 25, 2013.

[9] 42 CFR § 485.610(b).

rural census tract, or located in an area designated as rural by State law or regulation.[10]

*Additional CAH requirements*.  To be certified as CAHs, facilities must meet additional requirements beyond the location requirements described above.  For example, CAHs cannot have more than 25 beds that are used for acute care or "swing-bed" patients, they must offer 24-hour emergency services, and they must achieve an annual average length of stay for patients that does not exceed 96 hours.[11, 12, 13]

## Necessary Provider CAHs

Prior to January 1, 2006, States had discretion to designate hospitals that did not meet the distance requirement as "necessary provider" (NP) CAHs.[14]  NP CAHs had to comply with all of the other CAH Conditions of Participation at their certifications, including the rural requirement.[15]

At least 40 States identified specific location-related requirements other than distance that hospitals had to meet to receive the NP designation.[16]  Most of these States required CAHs to be located in areas where there was a shortage of health care resources or to be located in counties where the unemployment or poverty rates exceeded States' averages.

Existing NP CAHs are permanently exempt from meeting the distance requirement, unless they relocate.  Effective January 1, 2006, the Medicare Prescription Drug, Improvement, and Modernization Act prohibited the creation of new NP CAHs, but allowed existing NP CAHs to retain their NP designations indefinitely, as long as they continue to meet all other

---

[10] Ibid.  A metropolitan statistical area (MSA) is an urbanized area with at least 50,000 inhabitants.  A rural census tract is a census tract that does not have significant commuting ties to an area with 2,500 or more people.

[11] 42 CFR § 485.620(a).  A "swing bed" is a CAH bed that is reimbursed for skilled nursing services.

[12] 42 CFR § 485.618(a).

[13] 42 CFR § 485.620(b).

[14] Balanced Budget Act of 1997, P.L. 105-33 § 4201, Social Security Act, § 1820(c)(2)(B)(i)(II), 42 U.S.C. § 1395i-4(c)(2)(B)(i)(II).

[15] Balanced Budget Act of 1997, P.L. 105-33 § 4201, Social Security Act, § 1820(c)(2)(B) and (e)(3), 42 U.S.C. § 1395i-4(c)(2)(B) and (e)(3).

[16] Technical Assistance Center and Services Center, *Necessary Provider Definitions*, September 2012.  Accessed at http://www.ruralcenter.org/tasc/resources/necessary-provider-definitions on January 17, 2013.

CAH requirements.[17, 18]

Although States are no longer able to designate new NP CAHs, most CAHs are NP CAHs. At the time of this analysis, approximately 75 percent of all CAHs were NP CAHs.

## Participating in Medicare as a CAH

To participate in Medicare as CAHs, facilities must undergo a certification process. During this process, CMS verifies that facilities meet all of the requirements included in the CAH Conditions of Participation.[19, 20, 21] If CMS finds facilities to be compliant, it approves them for CAH certifications.[22]

*Evaluation of the location requirements during certification.* Since the creation of the CAH certification in 1997, there have been changes in how CMS evaluates the location requirements during the certification process. Currently, during the certification process, CMS verifies that prospective CAHs meet the distance and rural requirements.[23] Prior to 2006, when States were able to designate CAHs as NPs, CMS verified that prospective non-NP CAHs met the distance requirement and that both prospective NP and non-NP CAHs met the rural requirement.[24] As previously stated, NP CAHs were exempt from meeting the distance requirement at the time of their certifications.

## Maintaining the CAH Certification

CAHs are subject to periodic reassessments of their compliance with the CAH Conditions of Participation. According to CMS staff, these

---

[17] Medicare Prescription Drug, Improvement, and Modernization Act of 2003, P.L. 108-173 § 405(h), Social Security Act, § 1820(c)(2)(B)(i)(II), 42 U.S.C. § 1395i-4(c)(2)(B)(i)(II).

[18] Medicare Prescription Drug, Improvement, and Modernization Act of 2003, P.L. 108-173 §405(h), Social Security Act, § 1820(h), 42 U.S.C. § 1395i-4(h).

[19] CMS, *State Operations Manual*, Pub. No. 100-07, ch. 2, § 2256A. Accessed at http://cms.gov on July 7, 2011.

[20] In rare cases, CMS would also verify that hospitals meet all of the requirements included in the hospital Conditions of Participation.

[21] State agencies survey CAHs for compliance with the CAH Conditions of Participation prior to CMS verification. Accreditations from one of the three CMS-approved CAH Medicare accreditation programs can replace State agency survey and certification or reassessment for CAHs. Organizations that maintain CAH Medicare accreditation programs include the Joint Commission; the American Osteopathic Association; and Det Norske Veritas Healthcare, Inc.

[22] CMS, *State Operations Manual*, Pub. No. 100-07, ch. 2, §§ 2256 A–B. Accessed at http://cms.gov on July 7. 2011.

[23] CMS, *State Operations Manual*, Pub. No. 100-07, ch. 2, §§ 2256A. Accessed at http://cms.gov on April 29, 2013.

[24] Ibid. Accessed at http://cms.gov on July 7, 2011.

reassessments must take place every 3 years, on average.  For CAHs to maintain their certifications, CMS or a CMS-approved Medicare CAH accreditation program must verify that the CAHs continue to meet all CAH Conditions of Participation.[25]

*Further evaluation of the location requirements*.  Prior to 2013, CMS did not periodically reassess whether CAHs continued to meet the location requirements.  CMS guidance required that non-NP CAHs' compliance with the distance requirement and non-NP and NP CAHs' compliance with the rural requirement be verified only during the initial certification process.[26]  Because CMS did not routinely reassess whether CAHs continued to meet the location requirements, most CAHs that did not meet the requirements retained their critical access certifications.

In March 2013, CMS removed the limitation that it assess compliance with locations requirements only during the certification process.[27]  As a result, non-NP CAHs that do not meet the distance requirement and non-NP and NP CAHs that do not meet the rural requirement at the time of these reassessments can now be decertified and given the opportunity to convert to certified Medicare hospitals (after demonstrating compliance with the hospital Conditions of Participation).[28]  NP CAHs are statutorily exempt from meeting the distance requirement.

CMS reassesses whether CAHs meet the rural requirement (and in some cases, the distance requirement) if CAHs relocate or have changes of ownership and the new owners do not assume the existing provider agreement.[29, 30]  In the case of non-NP CAHs, CMS reassesses whether they meet both requirements.  In the case of NP CAHs, CMS reassesses whether they meet the rural requirement but does not reassess whether

---

[25] CMS, *State Operations Manual*, Pub. No. 100-07, ch. 2, §§ 2021A and 2022B. Accessed at http://cms.gov on July 7, 2011.

[26] CMS, *State Operations Manual, Appendix W – Survey Protocol, Regulations and Interpretive Guidelines for Critical Access Hospitals (CAHs) and Swing-Beds in CAHs*, § C-0160.  Accessed at http://cms.gov on July 7, 2011.

[27] CMS, *Guidance for Hospitals, Critical Access Hospitals (CAHs) and Ambulatory Surgical Centers (ASCs) Related to Various Rules Reducing Provider/ Supplier Burden,* March 15, 2013 ( S&C:  13-20-Acute Care), p. 119.  Accessed at http://cms.gov on April 25, 2013.

[28] Ibid.

[29] CMS, *State Operations Manual, Appendix W – Survey Protocol, Regulations and Interpretive Guidelines for Critical Access Hospitals (CAHs) and Swing-Beds in CAHs*, § C-0160.  Accessed at http://cms.gov on July 7, 2011.

[30] CMS, *State Operations Manual*, Pub. No. 100-07, ch. 2, § 2256.  Accessed at http://cms.gov on July 7, 2011.

they meet the distance requirement.[31]  CAHs must notify CMS of any changes in their location or ownership.[32]

## Payments for CAH Services

CMS pays CAHs under a system different from that for paying most other hospitals.  CAHs receive 101 percent of their "reasonable costs" for most services provided.[33, 34]  CMS determines these costs using information from CAHs' cost reports.[35]  CMS pays most other hospitals using inpatient and outpatient prospective payment systems (IPPS and OPPS), which pay predetermined rates for treating beneficiaries.[36, 37]  Inpatient services are paid on the basis of the patients' diagnoses, while outpatient services are paid on the basis of the services provided.

Like other Medicare beneficiaries, beneficiaries who receive services at CAHs are responsible for paying a deductible and coinsurance for inpatient services.[38]  However, the inpatient deductible and coinsurance are the same whether services were provided at a CAH or at a hospital paid under IPPS.[39]

Additionally, like other Medicare beneficiaries, beneficiaries who receive services at CAHs are responsible for paying a deductible and coinsurance for outpatient services.[40]  CAHs' cost-based reimbursement method results in coinsurance calculated from submitted charges rather than from final costs for services provided, making coinsurance a relatively high percentage of final total payments.  Medicare beneficiaries generally do not pay coinsurance for outpatient laboratory services and certain preventive outpatient services.[41]

## Proposed CAH Changes

Medicare payments to CAHs have come under increased scrutiny as part of ongoing deficit-reduction discussions.  In September 2011, the

---

[31] If an NP CAH relocates and will not continue to serve essentially the same service area, it will need to meet the distance requirement.  CMS, *State Operations Manual,* Pub. No. 100-07, ch. 2, § 2256F.

[32] 42 CFR § 424.516(e).

[33] Social Security Act, §§ 1814(l) and 1834(g), 42 U.S.C. §§ 1395l and 1395m(g).

[34] "Reasonable costs" are the direct and indirect costs associated with providing services to Medicare beneficiaries.  42 CFR § 413.9(b)(1).

[35] 42 CFR § 413.20(a).

[36] Social Security Act, § 1886(d) and (g), 42 U.S.C. § 1395ww(d) and (g).

[37] Social Security Act, § 1833, 42 U.S.C. § 1395l.

[38] Social Security Act, § 1866(a)(2)(A), 42 U.S.C. § 1395cc(a)(2)(A).

[39] Social Security Act, § 1813(a)(1), 42 U.S.C. § 1395e(a)(1).  Inpatient coinsurance is a percentage of the inpatient deductible, which is a fixed amount set annually by law.

[40] Social Security Act, § 1866(a)(2)(A), 42 U.S.C. § 1395cc(a)(2)(A).

[41] Social Security Act, § 1833(a)(1), 42 U.S.C. § 1395l(a)(1).

President published his *Plan for Economic Growth and Deficit Reduction*.[42]  The Plan proposed reducing CAH reimbursements to 100 percent of reasonable costs and eliminating the critical access certification for CAHs fewer than 10 miles from another hospital.[43]  The President's proposed budget for fiscal year 2014 made the same recommendations and estimated the savings over 10 years to be $1.4 billion from reducing reimbursement to 100 percent of reasonable costs (from 101 percent) and $690 million from eliminating the critical access certifications of CAHs located fewer than 10 miles from another hospital.[44]

### Related Work

In 1996 and 2003, the Office of Inspector General (OIG) issued reports that focused on rural health clinic (RHC) program compliance.  Like the intent of CAHs, the intent of RHCs is to ensure accessible health care to Medicare beneficiaries in rural communities.  In both studies, OIG found numerous RHCs noncompliant with the requirements that they be located in rural and underserved areas.  Additionally, OIG found that the requirements did not effectively prevent RHC participation in areas with existing health care providers.[45, 46]

OIG is conducting a nationwide review of swing-bed services at CAHs.[47]  OIG is comparing the reimbursement for swing-bed services at CAHs to the reimbursement for the same level of care obtained at skilled nursing facilities for 2005–2010.

## METHODOLOGY

To determine the extent to which CAHs would meet the location requirements if required to re-enroll in Medicare, we plotted CAHs' and hospitals' locations onto digital maps using ArcGIS, a type of mapping and spatial analysis software.  We also surveyed CMS and State agencies to collect information about rural areas and mountainous terrain.

---

[42] Office of Management and Budget, *Living Within Our Means and Investing in the Future: The President's Plan for Economic Growth and Deficit Reduction*, September 2011.  Accessed at http://www.whitehouse.gov on October 24, 2011.

[43] Ibid., p. 36.

[44] OMB, *Fiscal Year 2014 Budget of the U.S. Government*, p. 196, 2013.

[45] OIG, *Rural Health Clinics:  Growth, Access, and Payment*, OEI-05-94-00040, July 1996.

[46] OIG, *Status of Rural Health Clinic Program*, OEI-05-03-00170, August 2005.

[47] OIG, *U.S. Department of Health and Human Services Office of Inspector General Work Plan:  Fiscal Year 2013*, Part 1, p. 7.  Accessed at http://oig.hhs.gov on July 23, 2013.

To calculate the potential savings to Medicare and beneficiaries if CMS were to decertify some CAHs that would not meet the location requirements if required to re-enroll, we analyzed 2011 claims data.

For a detailed description of the methodology, see Appendix B.

### Scope

We limited our review to the location requirements used by CMS to certify CAHs. We determined whether CAHs would meet the location requirements if required to re-enroll, but we did not determine whether they would meet the remaining CAH Conditions of Participation.

Further, we did not examine the types of services or quality of services provided by CAHs. We performed a limited review of emergency service availability—we determined whether nearby facilities provided emergency services, but we did not compare the complexity of the emergency services provided at these locations to the services provided at CAHs.

### Data Sources and Collection

*Hospital information*. To identify CAHs' and hospitals' locations, we used the Certification and Survey Provider Enhanced Reports (CASPER) database.[48] To identify CAHs and hospitals that had emergency departments, we used CMS's 2011 National Claims History (NCH) inpatient and outpatient files. Finally, CMS provided us a list of all NP CAHs.

*Distance requirement*. To determine whether CAHs would meet the distance requirement if required to re-enroll, we used CAHs' and hospitals' locations and two additional sources:

1. Roadway classification codes from the ArcGIS U.S. and Canada Streets dataset to identify primary and secondary roads.[49]

2. Survey of all States' Departments of Transportation regarding areas of mountainous terrain.

*Rural requirement*. To determine whether CAHs would meet the rural requirement if required to re-enroll, we used CAHs' locations, the U.S. Census Bureau's 2010 MSA files, the U.S. Department of Agriculture's list of rural census tracts, and documents from States' Departments of Rural Health that identify areas designated as rural by State law or regulation.

---

[48] The CASPER database includes data generated from certification surveys and includes information such as provider addresses and enrollment dates.

[49] Tom Tom, Data and Maps for ArcGIS, *U.S. and Canada Detailed Streets Metadata*, 2012.

*Potential savings*.  To calculate potential savings to Medicare and beneficiaries if CMS were to decertify CAHs that would not meet the location requirements, we used CMS's 2011 NCH inpatient and outpatient files.

## Data Analysis

*Hospital locations*.  To plot CAHs' and hospitals' locations, we first retrieved addresses for the 4,751 active hospitals and 1,329 active CAHs in the CASPER database.  We then plotted all of the hospitals' and CAHs' locations onto a digital map using ArcGIS.  This digital map served as the foundation of our analysis of whether CAHs would meet the location requirements if required to re-enroll.

*Distance requirement*.  To determine whether CAHs would meet the distance requirement if required to re-enroll, we first determined the driving distance from each CAH to the nearest hospital or other CAH using ArcGIS.  We stopped at this point for CAHs greater than 35 miles or 15 miles or fewer from the nearest hospital or other CAH, as driving distances alone were enough to determine that the first group of CAHs would meet the distance requirements and that the second group would not.  For each of the remaining CAHs—those more than 15 and up to 35 miles from the nearest hospital or other CAH—we analyzed routes to the nearest hospital or other CAH and survey responses from States' Departments of Transportation to determine the number of miles that were through mountainous terrain or on secondary roads.

*Emergency services at hospitals near CAHs*.  To determine whether CAHs were providing services that beneficiaries could not get at nearby hospitals, we determined whether CAHs that would not meet the distance requirement were located near hospitals or other CAHs that provided emergency services.  Emergency services are one of several types of services that CAHs are required to provide.

We used the 2011 NCH inpatient and outpatient files to identify CAHs and hospitals that Medicare paid for emergency services.  We then determined how many of the hospitals or CAHs nearest to the CAHs that would not meet the distance requirement Medicare had paid for emergency services in 2011.

*Rural requirement*.  To determine whether CAHs would meet the rural requirement if required to re-enroll, we used ArcGIS and the MSA files to determine whether CAHs were located outside MSAs.  Next, for CAHs that were located inside MSAs, we determined whether they were located in rural census tracts.  Finally, for CAHs that were located inside MSAs and not located in rural census tracts, we used States' documents to

determine whether they were located in areas designated as rural by the States.

*NP CAH analysis*.  We used the list of NP CAHs to determine how many CAHs that would not meet the location requirements were NPs.

*Compliance with location requirements not possible to determine*.  For some CAHs, we could not determine whether they would meet the location requirements.  We discuss the reason why a determination was not possible in a finding.

*Potential savings*.  We used the 2011 inpatient and outpatient NCH files to calculate potential savings to Medicare and beneficiaries if CMS were to decertify some CAHs that would not meet the location requirements.  We included all inpatient services in this analysis, but only some outpatient services.  The outpatient services we selected include clinic and emergency department visits; significant outpatient procedures and services provided along with these procedures, such as pathology services and x-ray services; imaging services; services paid under a fee schedule or payment system other than the OPPS; and outpatient laboratory services. These services represent approximately 60 percent of all outpatient services provided at CAHs that would not meet the location requirements if required to re-enroll and 47 percent of the outpatient services for which beneficiaries paid coinsurance.  The payments to CAHs for these selected outpatient services represent approximately 67 percent of Medicare and beneficiary payments for all outpatient services provided at CAHs that would not meet the location requirements if required to re-enroll.

We calculated potential savings to Medicare and beneficiaries if CMS were to decertify some CAHs that would not meet the location requirements.  We did this by comparing what CMS paid for inpatient and selected outpatient services at these CAHs in 2011 to what they would have paid for these services under prospective payment systems and fee schedules (hereinafter known as the "base rates").  Table 1 describes the formulas we used to compute the savings to Medicare and beneficiaries for inpatient and selected outpatient services.

**Table 1:  Formulas Used To Compute Savings to Medicare and Beneficiaries If CMS Were To Decertify Some CAHs That Would Not Meet the Location Requirements If Required To Re-enroll in Medicare**

| Type of Service | Medicare Savings | Beneficiary Savings |
|---|---|---|
| Inpatient services | Medicare payments to CAHs that would not meet the location requirements *minus* base rates *minus* beneficiary inpatient deductibles | We did not attempt to calculate potential beneficiary savings for inpatient stays, as deductible and coinsurance amounts are the same for services received at a CAH and at a hospital paid under IPPS |
| Outpatient services with beneficiary coinsurance | Medicare payments to CAHs that would not meet the location requirements *minus* base rates *minus* beneficiary coinsurances | Coinsurance payments to CAHs that would not meet the location requirements *minus* coinsurance payments under the OPPS |
| Outpatient services with no beneficiary coinsurance | Medicare payments to CAHs that would not meet the location requirements *minus* base rates | N/A |

Source:  OIG analysis method.

## Limitations

We adopted a conservative definition of "primary roads" that likely resulted in an underestimate of the number of CAHs that would not meet the distance requirement if required to re-enroll.  We were not able to identify all primary roads because the dataset we used did not include the number of lanes each road contained.  Instead, we adopted a conservative definition of "primary roads," defining them only as interstate and Federal highways.  We classified all State highways, including those with two or more lanes in one direction, as secondary roads.

We used an older dataset for our distance analysis that may have resulted in a further underestimate of the number of CAHs that would not meet the distance requirement if required to re-enroll.  We used a dataset published in 2007 to find routes between CAHs and their nearest hospitals.  More recent datasets would contain newly constructed roads that might reduce the driving distances between CAHs and the hospitals closest to them.

Our figures for potential per-CAH savings for Medicare and beneficiaries are likely low and should be considered conservative estimates, given that our analyses did not include all services performed at the CAHs that would not meet the location requirements.  We included only inpatient services and some outpatient services in our calculations.

## Standards

This study was conducted in accordance with the *Quality Standards for Inspection and Evaluation* issued by the Council of the Inspectors General on Integrity and Efficiency.

## FINDINGS

## Nearly two-thirds of CAHs would not meet the location requirements if required to re-enroll

Overall, 849 of the 1,329 CAHs (64 percent) would not meet the location requirements if required to re-enroll in Medicare.  The vast majority of these CAHs would not meet the distance requirement, and only three of these CAHs would not meet the rural requirement.  Approximately 1.2 million beneficiaries received services at these CAHs in 2011.

### *Eight hundred forty-six CAHs would not meet the distance requirement*

Of the 846 CAHs that would not meet the distance requirement if required to re-enroll, 306 were located a drive of 15 or fewer miles from their nearest hospitals or other CAHs (and, therefore, had 15 or fewer miles of their routes going through mountainous terrain or on secondary roads.)  Figure 1 illustrates the distribution of driving distances for these CAHs.  Of these CAHs, 235 were between 10–14 miles from their nearest hospitals or other CAHs.  The other 71 CAHs were less than a 10-mile drive from their nearest hospitals or other CAHs.

**Figure 1:  The Distribution of Driving Distances for CAHs That Would Not Meet the Distance Requirement That Are a Drive of 15 or Fewer Miles From Their Nearest Hospitals or Other CAHs**



Source:  OIG analysis of CAHs' distances to their nearest hospitals or other CAHs.

The remaining 540 CAHs were located between 15 and up to 35 miles from their nearest hospitals or other CAHs.  These CAHs had 15 or fewer miles of their routes going through areas of mountainous terrain or

areas where only secondary roads were available.  Figure 2 illustrates the distribution of driving distances for these CAHs and the average number of miles of their routes that traveled though areas of mountainous terrain or were on secondary roads.  On average, the routes from these CAHs to their nearest hospitals or other CAHs traveled through approximately 5 miles of mountainous terrain or secondary roads.

**Figure 2:  The Distribution of Driving Distances for CAHs That Were Between 15 and up to 35 Miles From Their Nearest Hospitals or Other CAHs and the Average Numbers of Miles of Their Routes That Were Through Mountainous Terrain or on Secondary Roads**



Source:  OIG analysis of CAHs' distances to their nearest hospitals or other CAHs.

CAHs that would not meet the distance requirement if required to re-enroll were most often located near other CAHs.  Approximately 50 percent were located nearest to other CAHs; 43 percent were located nearest to acute-care hospitals; and the remaining 7 percent were located nearest to other types of hospitals, such as psychiatric or rehabilitation hospitals.  For an example of CAHs' locations relative to those of other CAHs and hospitals in an average State, see Appendix C.

Most of the CAHs and hospitals that were located near CAHs that would not meet the distance requirement if required to re-enroll provided emergency services in 2011.  Approximately 93 percent of CAHs and hospitals (including acute-care hospitals and other types of hospitals) located near these CAHs provided emergency services.  Most hospitals that were near CAHs and that did not provide emergency services were

psychiatric hospitals.  Table 2 provides the number of all CAHs and hospitals that were near CAHs and that did not provide emergency services.

**Table 2:  CAHs and Hospitals That Were Near CAHs and That Did Not Provide Emergency Services in 2011**

| Type of Hospital | Number That Did Not Provide Emergency Services |
|---|---:|
| Psychiatric hospital | 34 |
| Acute-care hospital | 15 |
| Long-term-care hospital | 4 |
| Rehabilitation hospital | 3 |
| CAH | 1 |

Source:  OIG analysis of CAHs and hospitals that are near CAHs and that do not provide emergency services.

### *Most CAHs that would not meet the location requirements are NP CAHs*

Of the 849 CAHs that would not meet the location requirements if required to re-enroll, 88 percent were NP CAHs.  NP CAHs did not have to meet the distance requirement when they were initially certified.  Further, NP CAHs are permanently exempt from meeting the distance requirement because of statutory provisions.  Table 3 provides the number of NP and non-NP CAHs that would not meet the location requirements if required to re-enroll.

**Table 3:  Number of NP and Non-NP CAHs That Would Not Meet the Location Requirements If Required to Re-enroll in Medicare**

| | Number of CAHs That Would Not Meet the Distance Requirement | Number of CAHs That Would Not Meet the Rural Requirement | Total |
|---|---:|---:|---:|
| NP CAHs (n=994) | 749 | 2 | 751 |
| Non-NP CAHs (n=335) | 97 | 1 | 98 |
| **Total** | 846 | 3 | 849 |

Source:  OIG analysis of NP and non-NP CAHs.

NP and non-NP CAHs that would not meet the location requirements if required to re-enroll differed in several ways.  NP CAHs were located closer and had shorter driving times to their nearest hospitals than non-NP

CAHs.  Most CAHs located in metropolitan areas were NP CAHs. Further, most CAHs that would not meet location requirements and were owned by private, for-profit organizations were NP CAHs.

Table 4 describes these differences between NP and non-NP CAHs that would not meet the location requirements if required to re-enroll.

**Table 4:  Differences Between NP and Non-NP CAHs That Would Not Meet the Location Requirements If Required To Re-enroll**

|  | NP CAHs | Non-NP CAHs |
|---|---|---|
| Average distance to nearest hospital | 18.8 miles | 20.7 miles |
| Average time to nearest hospital | 29.3 minutes | 31.1 minutes |
| Located in metropolitan areas (n= 173) | 151 (87%) | 22 (13%) |
| Owned by private, for-profit entities (n= 49) | 40 (82%) | 9 (18%) |

Source:  OIG analysis of differences between NP and non-NP CAHs.

### *For 62 CAHs, it was not possible to determine whether they would meet the location requirements if required to re-enroll*

For 62 CAHs, it was not possible to determine whether they would meet the distance requirement if required to re-enroll because CMS's guidance at the time of our analysis did not reference a uniform definition of "mountainous terrain" and not all States have a definition of "mountainous terrain."  USGS's Web site stated that the agency does not have an official definition despite CMS's naming USGS as a source of this information in guidance to State survey agencies.  Additionally, Department of Transportation staff of at least one State that did not have a definition would not provide OIG a subjective determination of what they consider to be mountainous terrain.

## Medicare and beneficiaries could realize substantial savings if CMS were to decertify some CAHs

Medicare and beneficiaries could realize substantial savings if CMS decertified some CAHs that would not meet the location requirements if required to re-enroll in Medicare.  Medicare would reimburse decertified CAHs at the rates set by prospective payment systems and fee schedules rather than at 101 percent of costs.  Rates set by the prospective payment systems and fee schedules are typically lower than the rates that CAHs receive for most services.

### Medicare could realize substantial savings if CMS were to decertify some CAHs

Because services provided at CAHs are typically reimbursed at rates that are higher than the base rates, Medicare could realize substantial savings if CMS were to decertify some CAHs that would not meet the location requirements.  For example, if CMS had decertified all CAHs located 15 or fewer miles from their nearest hospitals or other CAHs, Medicare could have saved an estimated $268 million in 2011.  Additionally, if CMS had decertified half of all CAHs that would not meet the location requirements, Medicare could have saved an estimated $373 million in 2011.  On average, Medicare could have saved approximately $860,000 per decertified CAH in 2011.[50]

### Beneficiaries could realize substantial savings in coinsurance if CMS were to decertify some CAHs

Because coinsurance amounts for services provided at CAHs are calculated on the basis of charges rather than final costs, beneficiaries pay more for services at these facilities than they likely would for the same services at acute-care hospitals.  For example, if CMS had decertified all CAHs located 15 or fewer miles from their nearest hospitals or other CAHs, beneficiaries could have saved an estimated $181 million in coinsurance in 2011.  Additionally, if CMS had decertified half of the CAHs that would not meet the location requirements, beneficiaries could have saved an estimated $200 million in coinsurance in 2011.  On average, beneficiaries could have saved an estimated $485,000 in coinsurance per decertified CAH, or approximately $400 per CAH beneficiary who received outpatient services, in 2011.[51]

---

[50] This amount includes payments for inpatient and selected outpatient services.
[51] This amount includes coinsurance for selected outpatient services.

## CONCLUSION AND RECOMMENDATIONS

Sixty-four percent of CAHs would not meet the location requirements if required to re-enroll in Medicare.  Most of these CAHs are NP CAHs that would not meet the distance requirement.  CMS is not authorized to decertify these CAHs because NP CAHs are statutorily exempt from meeting the distance requirement.  Further, prior to April 2013, CMS did not evaluate whether non-NP CAHs continued to meet the location requirements after they enrolled in Medicare.

Medicare and beneficiaries could realize substantial savings if CMS were authorized to reassess whether all CAHs should retain their certifications and concluded that some should be decertified.  For example, we calculated that Medicare and beneficiaries could have saved more than $1.3 million per decertified CAH in 2011.  These savings would come from paying the decertified CAH at the rates set by prospective payment systems and fee schedules.  These CAHs would have the option to remain enrolled in Medicare as acute-care hospitals.

Because the CAH certification results in increased spending for both Medicare and beneficiaries, CMS should ensure that the only CAHs to retain the critical access certification are those that continue to serve beneficiaries who would otherwise be unable to reasonably access hospital services.

To do this, we recommend that CMS:

### Seek Legislative Authority To Remove Necessary Provider CAHs' Permanent Exemption From the Distance Requirement, Thus Allowing CMS To Reassess These CAHs

NP CAHs' permanent exemption from the distance requirement prevents CMS from periodically reassessing these CAHs.  NP CAHs may have provided beneficiaries needed access to hospital services when originally certified, and many of them may continue to do so now.  However, CMS should periodically reassess whether these CAHs are still providing this access and are deserving of increased financial support from Medicare and beneficiaries.

### Seek Legislative Authority to Revise the CAH Conditions of Participation To Include Alternative Location-Related Requirements

The CAH Conditions of Participation currently include two location-related requirements:  the distance and rural requirements. However, most CAHs are NPs that were granted their CAH certifications because they met State-defined location-related requirements.  To ensure

Exhibit A Page 23

that CMS can evaluate whether these and other CAHs serve beneficiaries who would otherwise be unable to reasonably access hospital services, CMS should include alternative location-related Conditions of Participation by which to further evaluate CAHs that would otherwise lose their certifications because they did not meet the distance or rural requirements.  For example, CMS could allow CAHs to keep their certifications if they serve communities with high poverty rates, even if they don't meet the location requirements.

Including these alternative location-related requirements would allow CMS to make better-informed decisions about which CAHs should retain their certifications.  We strongly encourage CMS to include only requirements that it can assess in a uniform manner on a national level. For guidance on alternative location-related requirements, CMS could reference States' NP criteria.

Under separate cover, we have referred to CMS the CAHs that would not meet the location requirements if required to re-enroll.  CMS could prioritize reassessing these CAHs after it updates the CAH Conditions of Participation.  CMS could also conduct an evaluation of these CAHs, outside the current reassessment schedule, to determine whether these CAHs should retain their certifications.

### Ensure That It Periodically Reassesses CAHs' Compliance With All Location-Related Conditions of Participation

In March 2013, CMS began requiring that CAHs submit to periodic reassessment of the distance and location requirements.  CMS should ensure that these periodic reassessments continue and that these reassessments include any additional location-related requirements that it may add to the CAH Conditions of Participation in the future.

While performing these periodic reassessments, CMS may determine that some CAHs should be decertified.  CMS could grant a transition period during which decertified CAHs would gradually move from cost-based payments to the prospective payment systems and fee schedules.

### Ensure That It Applies Its Uniform Definition of "Mountainous Terrain" to All CAHs

In April 2013, CMS published a uniform definition of "mountainous terrain."  CMS should ensure that it uses this definition during periodic reassessments of CAHs' compliance with the CAH Conditions of Participation, as well as during the certification of new CAHs.

## AGENCY COMMENTS AND OFFICE OF INSPECTOR GENERAL RESPONSE

CMS concurred with our first, third, and fourth recommendations, but did not concur with our second recommendation. CMS's responses to our recommendations indicate a desire to balance preserving beneficiary access to care with promoting payment efficiency. OIG also believes that future management of CAHs should balance these competing objectives and urges CMS to take all of the actions described in our recommendations.

CMS concurred with our first recommendation—seek legislative authority to remove necessary provider CAHs' permanent exemptions—thus allowing CMS to reassess whether these CAHs should retain their critical access certifications. However, the actions described by CMS did not address the main point of our recommendation, which was to remove the permanent exemption status from all NP CAHs. CMS indicated that it supports the plan outlined in the President's FY 2014 budget to decertify all CAHs that are fewer than 10 miles from the nearest hospital or CAH. If CMS took only this action, it would have authority to reassess only 71 of the NP CAHs. We continue to recommend that CMS seek legislative authority to remove the necessary provider exemption from the remaining NP CAHs so it could reassess whether these CAHs should retain their certifications as well.

CMS did not concur with our second recommendation, which originally read "revise the CAH Conditions of Participation to include additional location-related requirements." CMS noted that the existing distance and rural requirements have been uniformly applied to all CAHs certified since January 2006 and stated that establishing new criteria could be duplicative and overly burdensome to implement. CMS also stated that it believes the CAH certification should not be tied to criteria that have the potential to change rapidly, such as the types of services offered.

We have revised our second recommendation to better reflect our intent and to acknowledge that creating alternative location requirements would require a legislative change. We now recommend that CMS seek legislative authority to revise the CAH Conditions of Participation to include alternative location-related requirements. Beneficiary access may depend on factors other than distance to another provider or rural location. CAHs that are providing important access to beneficiaries but are not meeting the current distance or rural requirements could possibly retain their certifications by meeting alternative location-related requirements. These requirements could be tied to stable characteristics, as opposed to rapidly fluctuating criteria, of nearby hospitals or the surrounding

communities.  Examples of such stable characteristics could include whether the nearby hospital was a specialty hospital or an acute-care hospital or whether the surrounding community had a high poverty rate. We continue to encourage CMS to reference States' NP criteria when developing additional location-related requirements.

CMS concurred with our third and fourth recommendations—to periodically reassess CAHs' compliance with all location-related Conditions of Participation and to apply its uniform definition of "mountainous terrain" to all CAHs.  CMS noted that it had recently issued two memorandums on these issues, one requiring that all non-NP CAHs be recertified periodically on the distance and rural requirements and one that establishes a uniform definition of "mountainous terrain."  CMS stated that these memorandums now represent CMS policy to which CMS regional offices, State survey agencies, and accrediting organizations with CMS-approved Medicare CAH accreditation programs will be expected to adhere when certifying and recertifying CAHs.  We look forward to seeing CMS's plans for ensured compliance with both of these new policies.

For the full text of CMS's comments, see Appendix D.

# APPENDIX A

## Distance and Rural Requirements

The material in this appendix is quoted verbatim from the sources listed in the footnotes.

(b) *Standard:  Location in a rural area or treatment as rural*. The critical access hospital (CAH) meets the requirements of either paragraph (b)(1) or (b)(2) of this section or the requirements of either (b)(3) or (b)(4) of this section:

(1) The CAH meets the following requirements:

(i) The CAH is located outside any area that is a Metropolitan Statistical Area, as defined by the Office of Management and Budget, or that has been recognized as urban under the regulations in § 412.64(b), excluding paragraph (b)(3) of this chapter.[52]

- The term *urban area* means—

(A) A Metropolitan Statistical Area or a Metropolitan division (in the case where a Metropolitan Statistical Area is divided into Metropolitan Divisions), as defined by the Executive Office of Management and Budget; or

(B) For discharges occurring on or after October 1, 1983, and before October 1, 2007, the following New England counties are deemed to be parts of urban areas under section 601(g) of the Social Security Amendments of 1983 (Pub. L. 98-21, 42 U.S.C. 1395ww (note); Litchfield County, Connecticut; York County, Maine; Sagadahoc County, Maine; Merrimack County, New Hampshire; and Newport County, Rhode Island.[53]

(ii) The CAH has not been classified as an urban hospital for purposes of the standardized payment amount by the Centers for Medicare & Medicaid Services or the Medicare Geographic Classification Review Board under § 412.230(e) of this chapter, and is not among a group of

---

[52] 42 CFR 485.610(b).
[53] 42 CFR 412.64 (b)(ii).

hospitals that have been redesignated to an adjacent urban area under § 412.232 of this chapter.[54]

(2) The CAH is located within a Metropolitan Statistical Area (MSA), as defined by the Office of Management and Budget (OMB), but is being treated as being located in a rural area in accordance with § 412.103 of this chapter.[55]

- A prospective payment hospital that is located in an urban area (as defined in subpart D of this part) may be reclassified as a rural hospital if it submits an application in accordance with paragraph (b) of this section and meets any of the following conditions:

  (A) The hospital is located in a rural census tract of a MSA as determined under the most recent version of the Goldsmith Modification, the Rural-Urban Commuting Area codes, as determined by the Office of Rural Health Policy (ORHP) of the Health Resources and Services Administration, which is available via the ORHP Web site at:  http://www.ruralhealth.hrsa.gov or from the U.S. Department of Health and Human Services, Health Resources and Services Administration, Office of Rural Health Policy, 5600 Fishers Lane, Room 9A–55, Rockville, MD 20857.

  (B) The hospital is located in an area designated by any law or regulation of the State in which it is located as a rural area, or the hospital is designated as a rural hospital by State law or regulation.

  (C) The hospital would qualify as a rural referral center as set forth in § 412.96, or as a sole community hospital as set forth in § 412.92, if the hospital were located in a rural area.

  (D) For any period after September 30, 2004 and before October 1, 2006, a CAH in a county that, in FY 2004, was not part of a MSA as defined by the Office of Management and Budget, but as of FY 2005 was included as part of an

---

[54] 42 CFR 485.610(b).
[55] Ibid.

MSA as a result of the most recent census data and implementation of the new MSA definitions announced by OMB on June 6, 2003, may be reclassified as being located in a rural area for purposes of meeting the rural location requirement in § 485.610(b) of this chapter if it meets any of the requirements in paragraphs (a)(1), (a)(2), or (a)(3) of this section.[56]

(3) Effective for October 1, 2004 through September 30, 2006, the CAH does not meet the location requirements in either paragraph (b)(1) or (b)(2) of this section and is located in a county that, in FY 2004, was not part of a Metropolitan Statistical Area as defined by the Office of Management and Budget, but as of FY 2005 was included as part of such a Metropolitan Statistical Area as a result of the most recent census data and implementation of the new Metropolitan Statistical Area definitions announced by the Office of Management and Budget on June 3, 2003.[57]

(4) Effective for October 1, 2009 through September 30, 2011, the CAH does not meet the location requirements in either paragraph (b)(1) or (b)(2) of this section and is located in a county that, in FY 2009, was not part of a Metropolitan Statistical Area as defined by the Office of Management and Budget, but, as of FY 2010, was included as part of such a Metropolitan Statistical Area as a result of the most recent census data and implementation of the new Metropolitan Statistical Area definitions announced by the Office of Management and Budget on November 20, 2008.[58]

(c) *Standard: Location relative to other facilities or necessary provider certification.*  The CAH is located more than a 35-mile drive (or, in the case of mountainous terrain or in areas with only secondary roads available, a 15-mile drive) from a hospital or another CAH, or before January 1, 2006, the CAH is certified by the State as being a necessary provider of health care services to residents in the area.  A CAH that is designated as a necessary provider on or before December 31, 2005, will maintain its necessary provider designation after January 1, 2006.[59]

---

[56] 42 CFR 412.103.
[57] 42 CFR 485.610(b).
[58] Ibid.
[59] 42 CFR 485.610(c).

- *Mountainous terrain* is –

  (A) Located in a mountain range; and
  (B) Has either of the following characteristics:
      a. Consists of extensive sections of roads with steep grades (i.e., greater than 5 percent), continuous abrupt and frequent changes in elevation or direction, or any combination of horizontal and vertical alignment that causes heavy vehicles to operate at crawl speeds for significant distances or at frequent intervals; or
      b. The roads on the travel route are considered by the State Transportation or Highway agency to be located in mountainous terrain based on significantly more complicated than usual construction techniques required to achieve compatibility between the road alignment and surrounding rugged terrain.
  (C) A letter from the State Transportation or Highway agency specific to the travel route(s) in question is required to support the claim of mountainous terrain.[60]

- A *primary road* is -

  (A) A numbered federal highway, including interstates, intrastates, expressways or any other numbered federal highway; or
  (B) A numbered State highway with 2 or more lanes each way; or
  (C) A road shown on a map prepared in accordance with the U.S. Geological Survey's Federal Geographic Data Committee (FGDC) Digital Cartographic Standard for Geologic Map Symbolization as a "primary highway, divided by median strip."[61]

---

[60] CMS, *Clarification of the Critical Access Hospital (CAH) Criteria for Rural Location and Mountainous Terrain Distance Standard,* April 19, 2013 (S&C:  13-26-CAH). Accessed at http://cms.gov on April 25, 2013.

[61] CMS, *State Operations Manual*, Pub. No. 100-07, ch. 2, § 2256A.  Accessed at http://cms.gov on July 7, 2011.

# APPENDIX B

## Detailed Methodology

## Determining Whether CAHs Would Meet the Distance and Rural Requirements

Critical Access Hospitals (CAH) would meet the distance requirement by being located:

- a drive of more than 35 miles from a hospital or another CAH or

- a drive of more than 15 miles from a hospital or another CAH in areas of mountainous terrain or areas where only secondary roads are available.

CAHs that would not meet the distance requirement are located:

- a drive of 15 or fewer miles from a hospital or another CAH or

- a drive of 35 or fewer miles from a hospital or another CAH, with 15 or fewer miles of the drive through mountainous terrain or on secondary roads.

CAHs would meet the rural requirements by:

- being located outside Metropolitan Statistical Areas (MSA),

- being located in rural census tracts of MSAs,

- being located in areas designated by State law or regulation as rural or by being designated as rural hospitals by State law or regulation, or

- qualifying as rural referral centers or sole community hospitals if they were located in rural areas.

CAHs that would not meet the rural requirements are located in MSAs and:

- are not located in areas designated as rural by State law or regulation and are not designated as rural hospitals by State law or regulation or

- would not qualify as rural referral centers or sole community hospitals if they were located in rural areas.

**Data Sources and Collection**
*Rural requirement*.

1. We identified MSAs using the U.S. Census Bureau's 2010 Topologically Integrated Geographic Encoding and Referencing system's (TIGER) MSA files.[62]  These files are available online at http://www.census.gov/geo/www/tiger/shp.html.

2. We identified rural census tracts using the U.S. Department of Agriculture's Economics Research Service's Rural-Urban Commuting Areas (RUCA) codes.  These codes are available online at http://www.ers.usda.gov/data/ruralurbancommutingareacodes/.

3. We identified areas or CAHs that are designated as rural because of State laws or regulations by surveying States' Departments of Rural Health.

4. We identified CAHs that would meet the rural requirement by meeting the rural referral center or sole community hospital criteria by conducting structured interviews with States' Departments of Rural Health.

**Data Analysis**
*Hospital locations*.  We included 6,080 CAHs and hospitals in our analysis.  Before plotting CAHs' and hospitals' locations, we "cleaned" each address to remove redundant characters and typographical errors. When we encountered ambiguities in the addresses, we relied on CAHs' and hospitals' Web sites to determine their correct addresses.  When we were unable to confirm CAHs' or hospitals' addresses online, we called them directly.

To convert the CAHs' and hospitals' addresses into geographic coordinates, we used Texas A&M Geoservice's geocoder.[63]  Geospatial software, like ArcGIS, does not recognize traditional street addresses. Instead, data must be entered into the software as geographic coordinates (i.e., latitude and longitude).

The geocoder was not able to accurately geocode the addresses of 363 CAHs and 820 hospitals, most of which are located in remote areas. We searched for these CAHs' and hospitals' names and addresses in

---

[62] TIGER files are digital spatial representations of census data.
[63] Texas A&M University Geoservices, *Geoservice's Geocoder*.  Accessed at http://www.geoservices.tamu.edu/Services/Geocode/Default.aspx on October 23, 2012.

Google Maps and then visually confirmed their locations on the satellite images.  Once we confirmed a CAH's or hospital's location, we recorded the geographic coordinates of its main entrance (or, if we could not identify the main entrance, what appeared to be the middle of the length of road in front of the CAH or hospital) as provided by Google Maps.

*Distance requirement*.  To find the driving distances between CAHs and their nearest hospitals or other CAHs, we used ArcGIS's Network Analyst tool.  We identified multiple routes from each CAH to its nearest hospitals or other CAHs.  For analysis purposes, we selected either the shortest route that caused a CAH to not meet the distance requirement or the shortest overall route if all of the routes showed that a CAH would meet the distance requirement.

We used the North America Equidistant Conic coordinate system to conduct the analysis in ArcGIS.  North America Equidistant Conic was appropriate for our analysis because it reduces shape distortions far better than other geographic systems by accounting for the curvature of the earth.  Limiting distortions is an important consideration when conducting a distance analysis, as they can lead to inaccuracies in distance measurements.

Additionally, to differentiate between primary and secondary roads, we used Shield Codes.  Shield Codes are numbers assigned to roadways that describe the type of road.  Because we defined "secondary road" as any road that is not a numbered Federal highway (including interstates, intrastates, expressways, or any other numbered Federal highway), we categorized primary roads as those roads with Shield Codes 1 or 2, which represent interstates and Federal highways.[64]

To identify CAHs that have more than 15 miles of their routes through mountainous terrain, we surveyed States' Departments of Transportation.  We sent them detailed maps of all routes within their States that were more than 15 and up to 35 miles and had 15 or fewer miles on secondary roads.  We asked States' Departments of Transportation to inspect each route and to identify the number of miles that travel through mountainous terrain.

*Emergency services at hospitals near CAHs*.  To determine whether CAHs that would not meet the distance requirement were located near hospitals or other CAHs with emergency departments, we used the 2011 NCH inpatient and outpatient file to identify CAHs and hospitals that had been

---

[64] Tom Tom, Data and Maps for ArcGIS, *U.S. and Canada Detailed Streets Metadata*, 2012.

paid for claims submitted under an emergency department revenue center (0450, 0451, 0452, 0456, and 0459).

*Rural requirement*.  To identify CAHs that are located in rural census tracts, we identified the census tract that each CAH is located in using Texas A&M Geoservice's geocoder.  We then matched census tracts to RUCA codes to identify CAHs located in rural census tracts.  Any census tract with a RUCA code between 4 and 10 is classified as rural.[65]

Finally, we identified CAHs that:  (1) are located in areas designated as rural by State law or regulation,  (2) are designated as rural hospitals by State law or regulation, or (3) were granted the certification because they proved that they would qualify as rural referral centers or sole community hospitals if they were located in rural areas.  We used the results from our surveys and structured interviews with States' Departments of Rural Health to identify CAHs that would meet one of these criteria.

*Potential savings*.  We removed all professional services from the CAH outpatient claims.[66]  To do this, we removed all services with revenue center codes in the 095X, 096X, 097X, and 098X series.  We were not able to remove professional services from the CAH inpatient claims, as payment amounts for individual services are not available on the claims.  Approximately 31 percent of CAHs that would not meet the location requirements had professional claims in their outpatient, and therefore presumably inpatient, claims.

We used status indicator codes to identify outpatient clinic or emergency department visits, significant procedures, services that were provided along with significant procedures, imaging services, and services paid under a fee schedule or payment system other than the outpatient prospective payment system (OPPS).[67]  Specifically, we analyzed all outpatient services with status indicators V, S, T, N, X, Q3, and A.[68]

The Centers for Medicare & Medicaid Services (CMS) pays outpatient services with status indicator T at half of their regular rate when provided

---

[65] University of Washington, Rural Health Research Center, *RUCA Data*.  Accessed at http://www.depts.washington.edu/uwruca/ruca-codes.php on October 23, 2012.
[66] We removed professional services from CAH outpatient claims to allow for more accurate comparisons to the base rates for outpatient services.  Payments made under the OPPS do not include professional services.
[67] Most of the services paid under a fee schedule or payment system other than the OPPS were paid under the physicians' fee schedule.  We excluded any services that were subject to carrier judgment (i.e., for which the Healthcare Common Procedure Coding System coverage code was C).
[68] CMS, *Medicare Claims Processing Manual*, Pub. No. 100-04, ch. 4, §§ 10.1 and 10.4. Accessed at http://cms.gov on January 3, 2011.

with other significant procedures (status indicators S or T) under the OPPS.[69]  To account for this in our analysis, we identified all services with a status indicator T that were part of a claim that included another significant procedure.  For claims that included services with status indicators S and T, we reduced the base rates by 50 percent for all services with status indicator T.  For claims that included only multiple services with status indicator T, we reduced the base rates by 50 percent for all services except the service with the highest reimbursements.  For this service, the base rate was not adjusted.

CMS pays outpatient services with status indicator Q3 either at the regular base rate or at a composite base rate, depending on the other services provided during the visit.[70]  For claims that had only one Q3 claim, we included them in our analysis at their regular base rates.  For claims that had more than one Q3 claim, when feasible, we applied the appropriate grouping logic to determine the composite base rate for those claims.

We used Current Procedural Terminology codes to identify outpatient laboratory services.[71]

Finally, when estimating the savings that Medicare and beneficiaries would have realized if Medicare had decertified half of all CAHs that would not meet the location requirements in 2011, we selected a random sample of 425 CAHs to include in the analysis.

---

[69] CMS, *Medicare Claims Processing Manual*, Pub. No. 100-04, ch. 4, §§ 10.4–10.5. Accessed at http://cms.gov on January 3, 2011.
[70] CMS, *Medicare Claims Processing Manual*, Pub. No. 100-04, ch. 4, § 10.2.1. Accessed at http://cms.gov on January 3, 2011.
[71] Current Procedural Terminology codes describe medical services and procedures.

## APPENDIX C

### Example of Critical Access Hospital Locations Relative to Those of Other Hospitals

We selected one representative region of the country to provide a visual example of critical access hospitals' (CAH) location relative to those of other hospitals.  The map below identifies all CAHs and hospitals in Missouri and surrounding States.  Missouri has 36 CAHs; 69 percent of them would not meet the location requirements if required to re-enroll in Medicare.  CAHs that would meet the location requirements are shown on the map as green checkmarks.  CAHs that would not meet the location requirements are shown as red "X" symbols.  Non-CAH hospitals are shown as black dots.



Source:  Office of Inspector General analysis of CAHs' and hospitals' locations, 2012.

Exhibit A Page 36

## APPENDIX D

## Agency Comments

 DEPARTMENT OF HEALTH & HUMAN SERVICES

Centers for Medicare & Medicaid Services

JUN 1 7 2013

*Administrator*
Washington, DC 20201

TO:     Daniel R. Levinson
           Inspector General

FROM:   Marilyn Tavenner  /S/
           Administrator

SUBJECT:  Office of Inspector General (OIG) Draft Report: "Most Critical Access Hospitals Would Not Meet the Location Requirements" (OEI-05-12-00080)

Thank you for the opportunity to review and comment on the above-subject draft report. The OIG conducted an analysis of whether or not facilities currently certified as CAHs meet the location requirements specified in Section 1820 of the Social Security Act. OIG found that 849 CAHs, or 64 percent of all CAHs, would not meet the current location requirements if required to re-enroll. Eighty-eight percent of these 849 CAHs are necessary provider (NP), CAHs; (i.e., CAHs that were exempted from meeting the distance requirements on the basis of designation by their state as an NP). The NP designation was removed by law effective January 1, 2006 by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA). However, the MMA allowed existing NP CAHs to retain their NP designations indefinitely, as long as they continue to meet all other CAH requirements. OIG's report also notes that the President, in his September *2011 Plan for Economic Growth and Deficit Reduction* proposed eliminating the critical access certification for CAHs fewer than 10 miles from another hospital, and the President's proposed budget for FY 2014 includes this proposal.

The OIG estimated savings that the Medicare program and beneficiaries would realize if CAH status were removed for all CAHs, including NP CAHs, which do not meet the statutory location criteria. Basing its estimate on a review of 2011 Medicare claims data, the OIG estimates that Medicare and beneficiaries could have saved on average over $1.3 million per de-certified CAH in 2011 if payments were based on the inpatient and outpatient prospective payment systems fee schedules rather than the CAH payment methodology, which is based on 101 percent of a CAH's reasonable costs.

It also examined the availability of emergency services in the hospitals and CAHs nearest to those CAHs which would not satisfy the location requirements. It found that emergency services were available in 93 percent of these other facilities.

The OIG recommendations and CMS's responses to those recommendations are discussed below.

Page 2 – Daniel R. Levinson

**OIG Recommendation #1**

Seek legislative authority to remove necessary provider CAHs' permanent exemption from the distance requirement, thus allowing CMS to reassess these CAHs.

**CMS Response**

The CMS concurs.  The President's proposed FY 2014 budget would de-certify any CAHs located fewer than 10 miles from another hospital or CAH, and would also reduce Medicare payments to all remaining CAHs to 100 percent of their reasonable costs (down from the current 101 percent of reasonable costs).  If these changes were adopted, the President's budget estimated the savings over 10 years to be $1.4 billion from reducing reimbursement to 100 percent of reasonable costs and $690 million from eliminating the critical access certifications of CAHs located fewer than 10 miles from another hospital.

The CMS believes this proposal preserves beneficiary access to care while promoting payment efficiency.  This recommendation represents targeted reductions in cost-based reimbursement only to those CAHs that are not the sole providers of inpatient and emergency care in their communities. Specifically, this recommendation ensures that the basic cost-based reimbursement structure for CAHs is preserved, and that only hospitals that are the sole source of emergency and basic inpatient care for their communities maintain CAH status.  Current CAHs that do not meet the distance criteria could convert to a Medicare-participating hospital and be paid under the same system as other Medicare participating hospitals.

**OIG Recommendation #2**

Revise the CAH conditions of participation to include additional location-related requirements.

**CMS Response**

We do not concur.  We note that the existing location and distance criteria already represent a uniform standard to which all CAHs certified since January 2006 have been subjected. Establishing new criteria such as those that have been recommended could not only be duplicative of existing criteria, but could be administratively burdensome to implement. Additionally, establishing criteria that are based on the services offered by other providers could be very challenging to implement since hospitals and CAHs exercise considerable flexibility in adding or removing services.  We believe a facility's Medicare certification as a CAH versus a hospital should not be tied to rapidly fluctuating criteria.

Finally, we note that a statutory change would be necessarily to eliminate the statutory grandfathered status of all NP CAHS, and also allow CMS to continue to exempt some existing NP CAHs from the distance requirement through rulemaking.

Page 3 – Daniel R. Levinson

### OIG Recommendation #3

Ensure that [CMS] periodically reassesses CAHs' compliance with all location-related conditions of participation.

### CMS Response

The CMS concurs. On March 15, 2013 we issued a memorandum, Survey and Certification (S&C-13-20), which among other things removed language from the state Operations Manual that indicated that assessment of compliance with the CAH location criteria would be made only for initial applicants for CAH status. The revised guidance now represents standard CMS policy which CMS regional offices, state survey agencies and accrediting organizations with CMS-approved Medicare CAH accreditation programs will all be expected to adhere to when conducting their periodic re-evaluations of a CAH's compliance with the Conditions of Participation. We also agree with OIG that a CAH which faces de-certification needs lead time in order to prepare for and effect an orderly transition to hospital certification.

### OIG Recommendation #4

Ensure that [CMS] applies its uniform definition of mountainous terrain to all CAHs.

### CMS Response

The CMS concurs. On April 19, 2013, we issued a memorandum (S&C-13-26), which revised the interpretive guidelines in the state Operations Manual for the CAH Condition of Participation standard that permits application of a shorter distance standard in those cases where more than 15 miles of the roads to a hospital or other CAHs that are in a mountain range and exhibit certain characteristics. The revised guidance now represents standard CMS policy which CMS regional offices, state survey agencies, and accrediting organizations with CMS-approved Medicare CAHs accreditation programs will all be expected to adhere to when conducting their review of initial applications for CAH status as well as their periodic re-evaluations of a CAH's compliance with the Conditions of Participation.

We appreciate the opportunity to comment on this draft report, and we will review carefully the list of CAHs the OIG has identified which may not meet the location requirements. We understand this list will be sent to us under a separate cover. We look forward to working with OIG on this and other issues.

## ACKNOWLEDGMENTS

This report was prepared under the direction of Ann Maxwell, Regional Inspector General for Evaluation and Inspections in the Chicago regional office; Thomas Komaniecki, Deputy Regional Inspector General; and Laura Kordish, Deputy Regional Inspector General.

Lisa Minich served as the team leader for this study, and Elliot Curry and Brian Jordan served as the lead analysts.  Central office staff who provided support include Clarence Arnold, Meghan Kearns, Christine Moritz, and Tasha Trusty.

# Office of Inspector General
## http://oig.hhs.gov

The mission of the Office of Inspector General (OIG), as mandated by Public Law 95-452, as amended, is to protect the integrity of the Department of Health and Human Services (HHS) programs, as well as the health and welfare of beneficiaries served by those programs. This statutory mission is carried out through a nationwide network of audits, investigations, and inspections conducted by the following operating components:

### Office of Audit Services

The Office of Audit Services (OAS) provides auditing services for HHS, either by conducting audits with its own audit resources or by overseeing audit work done by others. Audits examine the performance of HHS programs and/or its grantees and contractors in carrying out their respective responsibilities and are intended to provide independent assessments of HHS programs and operations. These assessments help reduce waste, abuse, and mismanagement and promote economy and efficiency throughout HHS.

### Office of Evaluation and Inspections

The Office of Evaluation and Inspections (OEI) conducts national evaluations to provide HHS, Congress, and the public with timely, useful, and reliable information on significant issues. These evaluations focus on preventing fraud, waste, or abuse and promoting economy, efficiency, and effectiveness of departmental programs. To promote impact, OEI reports also present practical recommendations for improving program operations.

### Office of Investigations

The Office of Investigations (OI) conducts criminal, civil, and administrative investigations of fraud and misconduct related to HHS programs, operations, and beneficiaries. With investigators working in all 50 States and the District of Columbia, OI utilizes its resources by actively coordinating with the Department of Justice and other Federal, State, and local law enforcement authorities. The investigative efforts of OI often lead to criminal convictions, administrative sanctions, and/or civil monetary penalties.

### Office of Counsel to the Inspector General

The Office of Counsel to the Inspector General (OCIG) provides general legal services to OIG, rendering advice and opinions on HHS programs and operations and providing all legal support for OIG's internal operations. OCIG represents OIG in all civil and administrative fraud and abuse cases involving HHS programs, including False Claims Act, program exclusion, and civil monetary penalty cases. In connection with these cases, OCIG also negotiates and monitors corporate integrity agreements. OCIG renders advisory opinions, issues compliance program guidance, publishes fraud alerts, and provides other guidance to the health care industry concerning the anti-kickback statute and other OIG enforcement authorities.