1   Esperanza Cervantes Anderson | SBN 197953
2   **LAW OFFICE OF ESPERANZA CERVANTES ANDERSON**
    1037 North Allen Avenue
    Pasadena, California 91104
3   Tel.:  (626) 219-6773
    Fax:   (626) 389-8911
4
    Attorney for Plaintiff Relator
5   FRANK ADOMITIS

6

7

8           UNITED STATES DISTRICT COURT

9       FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA          Case No. 17-06972 JGB (KKx)
    ex rel. FRANK ADOMITIS, an
12  individual,                        (Hon. Jesus G. Bernal)

13              Relator,               **PLAINTIFF/RELATOR'S
                                       NOTICE OF SUPPLEMENTAL
14      v.                             AUTHORITY**

15  OJAI VALLEY COMMUNITY
    HOSPITAL; DOES 1 through 20,
16  inclusive,

17              Defendants.

18

19

20        As supplemental authority in support of his Opposition to Defendant Ojai

21  Valley Community Hospital's ("Ojai Hospital") Rule 12(b)(6) Motion to Dismiss,

22  Plaintiff/Relator Frank Adomitis respectfully submits the attached decision issued

23  on July 9, 2018, in *United States ex rel. Anita Silingo v . Wellpoint, et al.*, No. 16-

24  56400 (9th Cir. 2018) ("Opinion").

25        In that case, defendants—multiple Medicare Advantage plans and a home

26  health assessment company—were alleged to have violated the False Claims Act

27  by inflating the sickness of patients through illegitimate in-home assessments and

28  a variety of improper business practices, including unacceptable electronic

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

- 1 -

1  signatures embedded in the template assessment documentation, in violation of the
2  *Medicare Program Integrity Manual* and submitted to CMS.

3      In its opinion, the district court granted in part and denied in part defendant
4  MedXM's motion to dismiss. The relator set forth a series of alleged business
5  practices supporting theories of factual falsity and express and implied certification.
6  Under the relator's factually false theory of liability, MedXM used fraudulent
7  practices to falsify medical diagnoses, rendering false the risk adjustment data the
8  health plans submitted to CMS for purposes of determining future reimbursement
9  rates. These business practices ranged from assessments performed by
10 nurses/physician assistants without physician supervision, to defendant MedXM
11 examiners diagnosing patients despite lacking the equipment to perform the tests
12 necessary to make such diagnoses. The district court denied MedXM's motion to
13 dismiss these claims, ruling that the relator "has set forth detailed allegations about
14 MedXM's business practices, which could have resulted in falsely inflated . . . risk
15 scores." However, the District court ruled that the relator's articulation of these
16 business practices failed to support theories of express or implied certification,
17 because the relator did not explain how they violated rules and regulations as to
18 which MedXM either expressly certified compliance, or that were conditions for
19 payment.

20     The Ninth Circuit disagreed. The panel placed weight on the representations
21 made to CMS.

22     "as part of their requests for payment, Medicare Advantage
23     organizations must certify that the data they submit are "accurate,
24     complete, and truthful." 42 C.F.R. § 422.504(l)(2). Taking [Relator's]
25     allegations as true, as we must, we see ample circumstantial evidence
26     from which to infer that the defendant organizations submitted
27     MedXM's risk adjustment data and certified the data's validity to
28     CMS."

PLAINTIFF/RELATOR'S NOTICE OF SUPPLEMENTAL AUTHORITY

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

…

"Rule 9(b) does not require a plaintiff to explain why a defendant committed fraud; the complaint simply must allege "the who, what, when, where, and *how* of the misconduct charged." *Cafasso*, 637 F.3d at 1055 (quoting *Ebeid*, 616 F.3d at 998) (emphasis in original). Whatever their internal processes, [Relator] alleges, the defendant organizations ultimately did submit false claims and certifications."

*Silingo* is as Medicare Advantage program case—not a Critical Access Hospital.  Medicare Advantage is governed in part by 42 C.F.R. § 422.504(l)(2) as noted in the attached decision.

The  Critical Access Hospital framework is governed in part by 42 C.F.R §485.608 ("Condition of participation: Compliance with Federal, State, and local laws and regulations") and 42 C.F.R §485.610 ("Condition of participation: Status and location").  Section 485.608 requires compliance with all applicable federal, state and local regulations. Section 485.610(c) addresses the distance requirement Ojai is obligated to satisfy to seek payment as a CAH.

DATED:  July 14, 2018

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON

By: */s/ Esperanza Cervantes Anderson*
Esperanza Cervantes Anderson, Esq.
Attorney for Plaintiff/relator
FRANK ADOMITIS

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

**FOR PUBLICATION**

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

| | |
|---|---|
| UNITED STATES EX REL. ANITA SILINGO, | No. 16-56400 |
| *Plaintiff-Appellant*, | D.C. No. 8:13-cv-01348-FMO-JC |
| v. | |
| WELLPOINT, INC., an Indiana corporation; ANTHEM BLUE CROSS, business entity, form unknown; HEALTH NET, INC.; HEALTH NET OF CALIFORNIA, INC., a California corporation; HEALTH NET LIFE INSURANCE COMPANY, a California corporation; VISITING NURSE SERVICE CHOICE; MOLINA HEALTHCARE, INC., a Delaware corporation; MOLINA HEALTHCARE OF CALIFORNIA, a California corporation; MOLINA HEALTHCARE OF CALIFORNIA PARTNER PLAN, INC., a California corporation; ALAMEDA ALLIANCE FOR HEALTH, a business organization, form unknown; ANTHEM BLUE CROSS LIFE AND HEALTH INSURANCE COMPANY, a California corporation; BLUE CROSS OF CALIFORNIA, a California corporation, | OPINION |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Central District of California
Fernando M. Olguin, District Judge, Presiding

Argued and Submitted March 8, 2018
Pasadena, California

Filed July 9, 2018

Before:  Ronald M. Gould and Mary H. Murguia, Circuit
Judges, and Jack Zouhary,[*] District Judge.

Opinion by Judge Gould

---

## SUMMARY[**]

---

### False Claims Act

The panel affirmed in part and reversed in part the
district court's dismissal of a False Claims Act suit against
several Medicare Advantage organizations.

Under Medicare Advantage's "capitation" system,
private health insurance organizations provide Medicare
benefits in exchange for a fixed monthly fee per person
enrolled in the program.  These organizations pocket for
themselves or pay out to their enrollees' providers the

---

[*] The Honorable Jack Zouhary, United States District Judge for the
Northern District of Ohio, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It
has been prepared by court staff for the convenience of the reader.

difference between their capitation revenue and their
enrollees' medical expenses.  The Centers for Medicare and
Medicaid Services sets capitation rates based on risk
adjustment data, including enrollees' medical diagnoses,
reported by Medicare Advantage health insurance
organizations.   The plaintiff alleged that the defendant
Medicare Advantage organizations retained Mobile Medical
Examination Services, Inc. (MedXM) to fraudulently
increase, or at least maintain, their capitation payments for
enrollees whose risk scores were set to expire and revert to
the unadjusted Medicare beneficiary average.

The panel held that the district court erred in dismissing
charges of factually false claims, express false certifications,
and false records based on the plaintiff's use of group
allegations.  The panel concluded that the plaintiff satisfied
Federal Rule of Civil Procedure 9(b), which requires that the
circumstances constituting fraud be stated with particularity,
by pleading a wheel conspiracy-like fraud in which MedXM
was the "hub" and the defendant Medicare Advantage
organizations were "spokes" that largely engaged in the
same conduct.

The panel rejected the defendants' argument that it
should affirm the dismissal of the third amended complaint
on the grounds that (1) the complaint failed to allege a
sufficient factual basis to link MedXM's misconduct to
defendants' actual submissions of claims or certifications to
the Centers for Medicare and Medicaid Services; or (2) the
complaint's allegations about the Medicare Advantage
organizations' knowledge of the alleged fraud did not satisfy
Rule 8.

The panel affirmed the dismissal of a reverse false claim
count that the plaintiff did not defend in response to

4     UNITED STATES EX REL. SILINGO V. WELLPOINT

defendants' motions to dismiss.  The panel reversed the
dismissal on the pleadings of other counts and remanded for
further proceedings on the plaintiff's causes of action for
factually false claims, express false certifications, and false
records.

**COUNSEL**

Abram Jay Zinberg (argued), The Zinberg Law Firm A.P.C.,
Huntington Beach, California; William K. Hanagami, The
Hanagami Law Firm A.P.C., Woodland Hills, California; for
Plaintiff-Appellant.

David Jeffrey Leviss (argued) and Amanda M. Santella,
O'Melveny & Myers LLP, Washington, D.C.; Elizabeth M.
Bock, Sabrina Strong, and David Deaton, O'Melveny &
Myers LLP, Los Angeles, California; Poopak Nourafchan
and Michael M. Maddigan, Hogan Lovells LLP, Los
Angeles, California; David J. Schindler, Latham & Watkins
LLP, Los Angeles, California; Anne W. Robinson, Latham
& Watkins LLP, Washington, D.C.; Paul C. Burkholder and
David Jacobs, Epstein Becker & Green PC, Los Angeles,
California; Pamela A. Stone and Michael J. Daponde,
Daponde Szabo Rowe PC, Sacramento, California; for
Defendants-Appellees.

**OPINION**

GOULD, Circuit Judge:

*Qui tam* relator Anita Silingo appeals the dismissal of her False Claims Act suit against several Medicare Advantage organizations. We reverse in part, affirm in part, and remand.

**I**

Medicare Advantage is a modern adaptation of the momentous 1960s-era program. Traditional Medicare uses a fee-for-service payment model, whereby the more services physicians perform, the more money they earn. After Medicare was enacted, however, experts came to realize that this payment structure encourages healthcare providers to order more tests and procedures than medically necessary. *See* Thomas L. Greaney, *Medicare Advantage, Accountable Care Organizations, and Traditional Medicare: Synchronization or Collision?*, 15 Yale J. Health Pol'y, L. & Ethics 37, 38, 41 (2015).

Medicare Advantage seeks to improve the quality of care while safeguarding the public fisc by employing a "capitation" payment system. Capitation means an amount is paid per person. *Capitation*, Black's Law Dictionary (10th ed. 2014). Under Medicare Advantage's capitation system, private health insurance organizations provide Medicare benefits in exchange for a fixed monthly fee per person enrolled in the program—regardless of actual healthcare usage. These organizations pocket for themselves or pay out to their enrollees' providers the difference between their capitation revenue and their enrollees' medical expenses, creating an incentive for the organizations to rein in costs. *See* Patricia A. Davis et al., Cong. Research Serv.,

R40425, *Medicare Primer* 20 (2017), https://fas.org/sgp/crs/misc/R40425.pdf.

Unfortunately, human nature being what it is, Medicare Advantage organizations also have some incentive to improperly inflate their enrollees' capitation rates, if these organizations fall prey to greed. By design, Medicare Advantage is supposed to compensate these organizations for expected healthcare costs, paying "less for healthier enrollees and more for less healthy enrollees." Establishment of the Medicare Advantage Program, 70 Fed. Reg. 4588, 4657 (Jan. 28, 2005). So capitation rates are based largely on an individual's "risk adjustment data," which reflect several factors that can affect healthcare costs. *See* 42 U.S.C. § 1395w-23(a)(1)(C)(i); 42 C.F.R. § 422.308(c). Chief among these data are individuals' medical diagnoses. *See* Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs, 74 Fed. Reg. 54,634, 54,673 (Oct. 22, 2009). Medicare Advantage organizations obtain diagnosis codes from healthcare providers after these providers have had medical visits with plan enrollees. *See* CMS, Pub. No. 100-16, *Medicare Managed Care Manual*, ch. 7, § 40 (2014), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/mc86c07.pdf. In turn, Medicare Advantage organizations report the diagnosis codes that they receive to the Centers for Medicare and Medicaid Services ("CMS") for use in the risk adjustment model that is the key to calculation of capitation rates. *Id.* The risk adjustment model deems a Medicare Advantage enrollee to be as healthy as the average Medicare beneficiary unless CMS receives updated diagnosis codes for the enrollee every year. *See id.* §§ 20, 70, 70.2.5, 120.2.4.

With data for millions of people being submitted each year, CMS is unable to confirm diagnoses before calculating capitation rates.  Instead, the agency accepts the diagnoses as submitted, and then audits some of the self-reported data a few years later to ensure that they are adequately supported by medical documentation.  *See* 42 C.F.R. §§ 422.310(e), 422.311; Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs, 79 Fed. Reg. 1918, 2001 (Jan. 10, 2014).  These audits have revealed excess payments for unsupported diagnoses steadily increasing over the last decade, reaching an estimated \$16.2 *billion*—nearly ten cents of every dollar paid to Medicare Advantage organizations—in 2016 alone.  *See* James Cosgrove, U.S. Gov't Accountability Office, GAO-17-761T, *Medicare Advantage Program Integrity: CMS's Efforts to Ensure Proper Payments and Identify and Recover Improper Payments* 1 (2017), https://www.gao.gov/assets/690/ 685934.pdf; James Cosgrove, U.S. Gov't Accountability Office, GAO-13-206, *Medicare Advantage: Substantial Excess Payments Underscore Need for CMS to Improve Accuracy of Risk Score Adjustments* 9–10 (2013), https://www.gao.gov/assets/660/651712.pdf.

To combat the "incentive for [Medicare Advantage] organizations to potentially over-report diagnoses," Medicare regulations require risk adjustment data to be produced according to certain best practices.  Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs, 79 Fed. Reg. 1918, 2001 (Jan. 10, 2014).  Every diagnosis code submitted to CMS must be based on a "face-to-face" visit that is documented in the medical record.  *Medicare Managed Care Manual*, ch. 7, §§ 40, 120.1.1.  Medical records must be validated by qualifying

"physician/practitioner signatures and credentials." Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs, 75 Fed. Reg. 19,678, 19,743 (Apr. 15, 2010). Further, electronic medical records must meet special signature requirements and use software that is "protected against modification." CMS, Pub. No. 100-08, *Medicare Program Integrity Manual*, ch. 3, § 3.3.2.4 (2018), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/PIM83c03.pdf.[1]

Medicare regulations also establish several data certification requirements. Most important here, it is an express condition of payment that a Medicare Advantage organization "certify (based on best knowledge, information, and belief) that the [risk adjustment] data it submits . . . are accurate, complete, and truthful." 42 C.F.R. § 422.504(l)(2). We have explained that a certification is thus false "when the Medicare Advantage organization has actual knowledge of the falsity of the risk adjustment data *or* demonstrates either 'reckless disregard' or 'deliberate ignorance' of the truth or falsity of the data." *United States ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1169 (9th Cir. 2016) (citing Medicare+Choice Program, 65 Fed. Reg. 40,170, 40,268 (June 29, 2000)). The organization also is required to "[a]dopt and implement an effective compliance program, which must include measures that prevent, detect, and correct non-compliance with CMS' program requirements," such as written standards of conduct, the designation of a compliance

---

[1] Though this chapter was recently updated, the relevant section has existed in the same form for several years. *See, e.g.*, CMS, Pub. No. 100-08, *Medicare Program Integrity Manual*, ch. 3, § 3.3.2.4 (2012), https://web.archive.org/web/20120410201053/https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/PIM83c03.pdf.

officer, and other listed minimum requirements. 42 C.F.R.
§ 422.503(b)(4)(vi).     The importance of accurate data
certifications and effective compliance programs is obvious:
if enrollee diagnoses are overstated, then the capitation
payments to Medicare Advantage organizations will be
improperly inflated.

The Medicare Advantage capitation payment system is
subject to the False Claims Act.  Originally enacted during
the Civil War, the False Claims Act was intended to
"forfend[] widespread fraud by government contractors."
*United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1265
(9th Cir. 1996).  The Act's *qui tam* provisions allow a
person—called a "relator"—to bring suit on the federal
government's behalf, and then share the recovered damages
and civil penalties with the government.  *See United States
ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 745–47 (9th Cir.
1993).  Liability attaches upon proof that a false claim for
payment was made, regardless of whether the government
suffered actual damage.  *United States ex rel. Aflatooni v.
Kitsap Physicians Serv.*, 314 F.3d 995, 1002 (9th Cir. 2002).

## II

Anita Silingo is a former Compliance Officer and
Director of Provider Relations for Mobile Medical
Examination Services, Inc. ("MedXM").  MedXM employs
physicians, nurse practitioners, and physician assistants to
conduct in-home health assessments of Medicare
beneficiaries.  Silingo alleges that from 2010 to 2014,
MedXM contracted with the defendant Medicare Advantage
organizations to provide up-to-date diagnosis codes and
medical documentation for enrollees who otherwise may not
have had an eligible medical encounter during a calendar
year.

10    UNITED STATES EX REL. SILINGO V. WELLPOINT

In August 2013, Silingo filed an initial complaint against MedXM and the defendant Medicare Advantage organizations under the False Claims Act. In May 2014, Silingo filed her first amended complaint. The United States then declined to intervene, and in January 2015 Silingo filed a second amended complaint.

The crux of the complaint is that the defendant Medicare Advantage organizations retained MedXM to fraudulently increase, or at least maintain, their capitation payments for enrollees whose risk scores were set to expire and revert to the unadjusted Medicare beneficiary average.

First, Silingo claims that MedXM used inappropriate software so that it could edit health records to exaggerate medical diagnoses. Silingo alleges that MedXM's in-home health assessment reports were prepared in Microsoft Word templates that are not "protected against modification," and were signed by merely typing in the medical examiner's name, which is not an acceptable electronic signature. *Medicare Program Integrity Manual*, ch. 3, § 3.3.2.4. Once in the hands of MedXM's coders, these reports were allegedly modified to delete information showing little risk and insert new information to support diagnoses with higher risk scores. According to Silingo, MedXM then saved these reports as PDF files and submitted them to Medicare Advantage organizations as support for inflated risk adjustment data. Silingo asserts that all of MedXM's health assessment reports violated CMS's requirements for electronic medical records, and that more than half of them had been tampered with in this manner.

Next, Silingo claims that MedXM's fleet of mostly nurse practitioners and physician assistants were not legally authorized to make conclusive medical diagnoses, so their

examinations could not support the risk adjustment data that was submitted. Before 2012, MedXM allegedly contracted directly with these healthcare providers without ensuring that they practiced under the supervision of licensed physicians. From 2012 to 2014, MedXM allegedly had contract physicians fraudulently sign standard care agreements with these non-physician providers without properly supervising their work.

Silingo also claims MedXM systematically fabricated complex diagnoses that its medical examiners could not have possibly confirmed during an in-home assessment. The complaint identifies a variety of ailments—such as chronic obstructive pulmonary disease, hepatitis, and inflammatory bowel disease—that allegedly cannot be diagnosed without a spirometry test, biopsy, follow-up blood test, or other invasive procedure that MedXM's examiners were unequipped and unauthorized to perform in a person's home. Instead, Silingo alleges, MedXM's medical examiners and coders simply recycled prior diagnoses and medical histories in the updated health assessment reports.

Further, Silingo claims that MedXM regularly produced diagnostic information that was not the result of face-to-face medical encounters. By her estimation, in-home health assessments took about 45 minutes plus travel time and could be performed only within an 11-hour window, so MedXM's medical examiners realistically could not perform more than 13 in-home health assessments per day. But Silingo alleges that many examiners consistently reported more than 15 assessments per day, with some reporting as many as 25. Silingo contends that these examiners boosted their assessment numbers by sometimes submitting identical vital statistics (age, weight, sex, and so on) for hundreds of enrollees, and only "correcting" these suspicious data entries

when requested by Medicare Advantage organizations, by collecting information over the phone or having MedXM's coders forge new data.

A company offering in-home health assessment services has no intrinsic reason to overstate its findings. Rather, as Silingo alleges, MedXM went to the trouble of editing and forging medical records to provide its clients with more lucrative diagnosis codes—earning the Medicare Advantage organizations higher than warranted capitation payments.

Silingo contends that the defendant Medicare Advantage organizations made false claims for payment by submitting MedXM's risk adjustment data to CMS for several years, either with actual knowledge that the data were invalid or with reckless disregard or deliberate ignorance as to their validity. In doing so, the organizations allegedly violated the certification requirements of 42 C.F.R. § 422.504(l)(2), which is an express condition of payment. And Silingo contends that the failure to catch MedXM's widespread fraud is evidence that these organizations did not have the effective compliance programs required by 42 C.F.R. § 422.503(b)(4)(vi), which is not an express condition of payment.

Silingo advanced six theories of liability under the False Claims Act. She first charged that defendants violated 31 U.S.C. § 3729(a)(1)(A) by making, or causing to be made, a claim for payment that is "factually false." *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001), *abrogated on other grounds by Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016). A factually false claim is one in which "the claim for payment is itself literally false or fraudulent," *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1170 (9th Cir. 2006), such as when

the claim "involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided," *Mikes*, 274 F.3d at 697.

In addition, Silingo contended that defendants violated § 3729(a)(1)(A) by making claims that were "legally false." *Id.* There are two cognizable theories of liability for legally false claims: express false certification and implied false certification. Express false certification involves an entity's representation of compliance with the law as part of the process for submitting a claim when it is actually not compliant. *United States ex rel. Ebeid v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010). By contrast, "[i]mplied false certification occurs when an entity has previously undertaken to expressly comply with a law, rule, or regulation, and that obligation is implicated by submitting a claim for payment even though a certification of compliance is not required in the process of submitting the claim." *Id.*; *see also Escobar*, 136 S. Ct. 1989 (validating the implied false certification theory).

Silingo next raised a false records claim under the following subparagraph, § 3729(a)(1)(B). Such a claim imposes liability where a party "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

Silingo also alleged a violation of the False Claims Act's "reverse false claim" provision, § 3729(a)(1)(G). That provision "is designed to cover Government money or property that is knowingly retained by a person even though they have no right to it." S. Rep. No. 111-10, at 13–14 (2009), *reprinted in* 2009 U.S.C.C.A.N. 430, 441.

Finally, Silingo accused defendants of conspiring to violate the False Claims Act. *See* 31 U.S.C. § 3729(a)(1)(C).

In February 2015, defendants separately moved to dismiss Silingo's claims. Silingo opposed defendants' motions, but did not defend her count for reverse false claims. The district court held that the factually false claim cause of action against MedXM was well-pleaded under Federal Rules of Civil Procedure 8 and 9(b) because Silingo sufficiently alleged that MedXM caused false claims to be submitted to CMS. But the court dismissed Silingo's abandoned reverse false claim count and conspiracy claim with prejudice, and dismissed her four remaining claims against the defendant Medicare Advantage organizations without prejudice. In the district court's view, the latter claims were defective for using an impermissible "group-pleading."

Silingo filed a third amended complaint in October 2015. This time, Silingo separately pleaded her allegations against the Medicare Advantage organizations seriatim. Defendants promptly moved to dismiss the new complaint, and while these motions were pending, MedXM settled out of the case. The district court then dismissed Silingo's claims against the Medicare Advantage organizations with prejudice on the ground that the allegations "remain undifferentiated." Silingo timely appealed the dismissal of her causes of action for factually false claims, express false certifications, false records, and reverse false claims.

**III**

We review *de novo* a district court's dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6), "accepting as true all well-pleaded allegations of fact in the complaint and construing them in the light most favorable to

the Relator[]." *United States v. Corinthian Colleges*, 655 F.3d 984, 991 (9th Cir. 2011) (citation and alterations omitted).  We review for abuse of discretion a district court's denial of leave to amend a complaint.  *Id.* at 995.

In the usual case involving dismissal of a complaint, we must evaluate whether the factual allegations, together with all reasonable inferences, state a plausible claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Rule 9(b), however, requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  To satisfy this requirement, a pleading must identify "the who, what, when, where, and how of the misconduct charged," as well as "what is false or misleading about [the purportedly fraudulent] statement, and why it is false." *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (quoting *Ebeid*, 616 F.3d at 998).  This heightened pleading standard serves two main purposes.  First, allegations of fraud "must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong."  *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (quotation marks and citation omitted).  Second, the rule serves "to deter the filing of complaints as a pretext for the discovery of unknown wrongs, to protect [defendants] from the harm that comes from being subject to fraud charges, and to prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis."  *Id.* at 1018 (quotation marks and citation omitted).

## IV

To satisfy Rule 9(b), a fraud suit against differently situated defendants must "identify the role of each defendant in the alleged fraudulent scheme." *Swartz v. KPMG LLP*, 476 F.3d 756, 765 (9th Cir. 2007) (citation and alterations omitted).   In other words, when defendants engage in different wrongful conduct, plaintiffs must likewise "differentiate their allegations." *Id.* at 764 (citation omitted).

This rule is illustrated by *Destfino v. Reiswig*, 630 F.3d 952 (9th Cir. 2011).   There, plaintiffs alleged that 29 individuals, 10 businesses, and a church formed an intricate tax avoidance scheme, but the complaint did not "set out which of the defendants made which of the fraudulent statements/conduct." *Id.* at 954, 958.   We explained that in a situation like that in *Destfino*, with different actors playing different parts, it is not enough to "lump" together the dissimilar defendants and assert that "everyone did everything." *Id.* at 958 (quoting *Swartz*, 476 F.3d at 764–65).   More is required to plead the circumstances of a fraud with particularity.

On the other hand, a complaint need not distinguish between defendants that had the exact same role in a fraud. We recently addressed this issue in *United States ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161 (9th Cir. 2016), which we decided a few months after the district court dismissed Silingo's complaint.   *Swoben* involved allegations of Medicare Advantage organizations— including several of the defendant organizations here— submitting false certifications of the accuracy, completeness, and truthfulness of the risk adjustment data they provided to CMS. *Id.* at 1166–67.   In a bit of *deja vu*, these Medicare Advantage organizations faulted the

complaint there for using "collective allegations to refer to
the defendants rather than differentiating among them." *Id.*
at 1184. We dispensed with this argument, holding: "There
is no flaw in a pleading . . . where collective allegations are
used to describe the actions of multiple defendants who are
alleged to have engaged in precisely the same conduct." *Id.*
A good claim against one defendant did not become
inadequate simply because a co-defendant was alleged to
have committed the same wrongful acts.

To better understand *Swoben*'s ruling, consider an
analogy. In the taxonomy of conspiracy theories, a "chain
conspiracy" is one in which "each person is responsible for
a distinct act within the overall plan," while a "wheel
conspiracy" involves "a single member or group (the 'hub')
separately agree[ing] with two or more other members or
groups (the 'spokes')." *Conspiracy*, Black's Law Dictionary
(10th ed. 2014). Broadly speaking, if a fraudulent scheme
resembles a chain conspiracy, then a complaint must
separately identify which defendant was responsible for
what distinct part of the plan. By contrast, if a fraudulent
scheme resembles a wheel conspiracy, then any parallel
actions of the "spokes" can be addressed by collective
allegations.

Applying Swoben here in light of these related
principles, we observe that Silingo has pleaded a wheel
conspiracy-like fraud in which MedXM was the "hub" and
the defendant Medicare Advantage organizations were the
"spokes." Each of the defendant organizations allegedly had
separate contracts with MedXM, and each of them allegedly
passed on MedXM's inflated diagnosis information in the
same way. These organizations thus miss the mark when
they implore us to consider that they are "unrelated,
dissimilar defendants with no relevant business connections

to one another and that [they] differ in size, geography, and member populations." Because the Medicare Advantage organizations are largely "alleged to have engaged in precisely the same conduct," there was no reason (and no way) for Silingo to differentiate among those allegations that are common to the group. *Swoben*, 848 F.3d at 1184. Silingo's charges of factually false claims, express false certifications, and false records should not have been dismissed due to her use of group allegations.

**V**

The defendant Medicare Advantage organizations contend that we should nevertheless affirm the dismissal of the third amended complaint based on arguments that the district court did not reach. We may affirm the dismissal on any ground supported by the record, even if the district court did not rely on that ground. *Corinthian Colleges*, 655 F.3d at 992. The defendant organizations offer two such grounds: (1) that the complaint did not allege a sufficient factual basis to link MedXM's misconduct to their actual submission of claims or certifications to CMS; and (2) that Silingo's allegations about their knowledge of the fraud did not satisfy Rule 8.**[2]** We address these points in turn.

---

**[2]** The defendant Medicare Advantage organizations also argue that as to the implied false certification claim, Silingo did not plead facts with the requisite particularity to show that the organizations lacked the compliance programs required by 42 C.F.R. § 422.503(b)(4)(vi). We need not address this argument, however, because Silingo has abandoned this claim on appeal by not challenging its dismissal "clearly and distinctly in the opening brief." *McKay v. Ingleson*, 558 F.3d 888, 891 n.5 (9th Cir. 2009).

**A**

The defendant Medicare Advantage organizations first contend that the complaint provides inadequate detail of their submission of false claims. When alleging a scheme to submit false claims, a plaintiff must provide "reliable indicia that lead to a strong inference that claims were actually submitted." *Ebeid*, 616 F.3d at 998–99 (quoting *United States ex rel. Grubbs v. Ravikumar Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)). We do not require the complaint to identify representative examples of actual false claims, though that is one way to satisfy the heightened pleading requirement. *Id.*

We agree with the district court, in its analysis of the claims against MedXM, that Silingo has carried her burden here. The complaint asserts that the defendant Medicare Advantage organizations contracted with MedXM to provide health assessment reports and diagnosis codes for at least four years. Silingo details "first-hand experience of the scheme unfolding," describing MedXM's in-home assessments targeting Medicare Advantage enrollees who would otherwise lack risk adjustment data for a given year. *Grubbs*, 565 F.3d at 192. For this population, the Medicare Advantage organizations would face lower capitation payments if they did not procure and submit updated data. *See Medicare Managed Care Manual*, ch. 7, §§ 20, 70, 70.2.5. Conversely, if they submitted data that overstated health problems in the diagnosis codes given, that would result in higher capitated payments to them. And as part of their requests for payment, Medicare Advantage organizations must certify that the data they submit are "accurate, complete, and truthful." 42 C.F.R. § 422.504(l)(2). Taking Silingo's allegations as true, as we must, we see ample circumstantial evidence from which to

infer that the defendant organizations submitted MedXM's risk adjustment data and certified the data's validity to CMS.

Indeed, "[i]t would stretch the imagination to infer the inverse." *Grubbs*, 565 F.3d at 192. Perhaps it would be possible that some Medicare Advantage organization, after paying for MedXM's services, might have discovered the fraud and then cut ties with the company and thrown out its data. But the organizations here are alleged to have had multi-year relationships with MedXM, apparently encompassing thousands of examinations. There is no reason to believe that these companies consistently paid MedXM for data that they desperately needed but, time after time, did not actually use.

The defendant Medicare Advantage organizations counter that Silingo did not sufficiently plead the "who, what, when, where, why" of their false claims, omitting allegations about their "claims filtering, verification, or submission processes or outcomes." But these omissions do not justify dismissing the complaint for inadequate pleading. Rule 9(b) does not require a plaintiff to explain *why* a defendant committed fraud; the complaint simply must allege "the who, what, when, where, and *how* of the misconduct charged." *Cafasso*, 637 F.3d at 1055 (quoting *Ebeid*, 616 F.3d at 998) (emphasis added). Whatever their internal processes, Silingo alleges, the defendant organizations ultimately did submit false claims and certifications.

**B**

The next argument of the defendant Medicare Advantage organizations is that Silingo's allegations about their knowledge of the alleged fraud are not plausible under Rule 8.

To plead the element of knowledge under the False Claims Act, a relator must allege that a defendant knew a claim for payment was false, or that it acted with reckless disregard or deliberate indifference as to the truth or falsity of the claim. *Corinthian Colleges*, 655 F.3d at 996; *see also* 31 U.S.C. § 3729(b)(1) (defining the terms "knowing" and "knowingly"). Although the circumstances of a fraud must be pleaded with particularity, knowledge may be pleaded generally. Fed. R. Civ. P. 9(b); *see also Corinthian Colleges*, 655 F.3d at 996. A complaint therefore must set out sufficient factual matter from which a defendant's knowledge of a fraud might reasonably be inferred. *See Iqbal*, 556 U.S. at 678.

Here, Silingo plausibly pleads that the defendant Medicare Advantage organizations submitted false claims and certifications and used false records with actual knowledge, reckless disregard, or deliberate ignorance of their falsity. The complaint details a variety of ways in which the defendant organizations knew, or reasonably should have known, that MedXM's risk adjustment data were invalid.

For one thing, Silingo claims that every health assessment report contained a typewritten signature only, violating the requirements for medical records underlying risk adjustment data. *See Medicare Program Integrity Manual*, ch. 3, § 3.3.2.4 (describing requirements for handwritten and electronic signatures); *see also* Policy and Technical Changes, 75 Fed. Reg. at 19,742 ("Medical records with missing signatures or credentials are scored as errors under [risk adjustment data validation] audit procedures."). Similarly, Silingo contends that these errant signatures should have tipped off the defendant

organizations that MedXM was editing its examiners' unsecured reports.

For another, Silingo alleges that other parts of MedXM's health assessment reports provided additional reasons for suspicion. According to the complaint, MedXM's frequent use of nurse practitioners and physician assistants as examiners was a "serious red flag" because these practitioners are commonly known to be limited by law in their ability to make diagnoses. MedXM's diagnosis codes themselves could have revealed the fraud because, as Silingo alleges, many complex diagnoses cannot be confirmed during brief and non-invasive in-home assessments. And Silingo claims that duplicative patient data were sometimes sent to the defendant organizations before being "corrected," which would suggest that something was amiss.

Taking all reasonable inferences in Silingo's favor, *see Iqbal*, 566 U.S. at 678, there are still further grounds for concluding that the allegations of the defendant organizations' knowledge, reckless disregard, or deliberate ignorance of the fraud is plausible. Even without the concrete signs detailed above, one would expect that a sophisticated company would notice when its contractor's work is too good to be true. MedXM was allegedly obtaining worse-than-average diagnostic information from enrollees who did not otherwise visit a healthcare provider during a calendar year, and thus would not seem to be in such dire health. The defendant organizations' materials show that the use of in-home assessments is controversial, with CMS repeatedly expressing interest in forbidding their use on the ground that they "contribute[] to increased risk scores and differences in coding patterns" between Medicare

Advantage and traditional Medicare.**³**   And all of these
organizations had an incentive to pass along fraudulent data
because, by overstating diagnoses, they could yield more
revenue and profit under the capitated payment system—and
it was not certain that they would get caught.  That may not
have been what was going on here, but the third amended
complaint certainly states a plausible claim for knowingly
participating in fraud, even as to the well-respected
companies who are defending here.

It is no defense that Silingo's core allegations against the
defendant Medicare Advantage organizations are all alike.
If a group pleading against similarly situated defendants can
satisfy Rule 9(b), then it can also satisfy the lesser notice
pleading standard of Rule 8. *See Swoben*, 848 F.3d at 1184.
Silingo simply claims that all of the defendant organizations
were equally put on notice by the warning signs that
allegedly infected MedXM's health assessment reports.
These allegations, if true, give rise to the reasonable
inference that the defendant organizations knowingly
submitted false claims and used false records, or else acted

---

**³** CMS, Advance Notice of Methodological Changes for Calendar
Year (CY) 2015 for Medicare Advantage (MA) Capitation Rates, Part C
and Part D Payment Policies and 2015 Call Letter 20 (Feb. 21, 2014),
https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRate
Stats/downloads/Advance2015.pdf; see also CMS, Advance Notice of
Methodological Changes for Calendar Year (CY) 2014 for Medicare
Advantage (MA) Capitation Rates, Part C and Part D Payment
Policies and 2014 Call Letter 22–23 (Feb. 15, 2013),
https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRate
Stats/Downloads/Advance2014.pdf; CMS, Announcement of Calendar
Year (CY) 2016 Medicare Advantage Capitation Rates and Medicare
Advantage and Part D Payment Policies and Final Call Letter 144–45
(Apr. 6, 2015), https://www.cms.gov/Medicare/Health-Plans/
MedicareAdvtgSpecRateStats/Downloads/Announcement2016.pdf.

with reckless disregard or deliberate indifference of the falsity of these claims and records. *See Corinthian Colleges*, 655 F.3d at 996.     Because each Medicare Advantage organization must certify the validity of its data "based on best knowledge, information, and belief," these same allegations also support Silingo's express false certification claim. 42 C.F.R. § 422.504(l)(2); *Swoben*, 848 F.3d at 1169.

## VI

Silingo also appeals the dismissal of her second amended complaint's count for a reverse false claim. But she did not defend this claim in response to the motions to dismiss, so she may not revive it on appeal. *See Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 888 (9th Cir. 2010). And the district court did not abuse its discretion in denying leave to amend here because amendment could not have revived this abandoned claim. *See Corinthian Colleges*, 655 F.3d at 995.

## VII

For the reasons set forth above, we conclude that this case was mistakenly dismissed on the pleadings.     Our decision rests on Silingo's group pleadings, the primary focus of the district court decision and the parties' appellate briefing and oral arguments.     Although the defendant organizations also challenge Silingo's additional allegations that are specific to each defendant, we see nothing to undermine our conclusion that the group pleadings alone are adequate.**[4]**

---

**[4]** At most, the defendant organizations contend that the allegations specific to Molina Healthcare, Inc. "*contradicted* [Silingo's] more

Some discovery appears to have already taken place, but Silingo is entitled to continue taking discovery before her claims are resolved on summary judgment or at trial. We assuredly do not hold now that Silingo showed enough to get to trial, but rather only that her complaint is adequate to proceed to discovery. Accordingly, we **REVERSE** in part, **AFFIRM** in part, and **REMAND** for further proceedings on Silingo's causes of action for factually false claims, express false certifications, and false records.

---

general allegations elsewhere . . . for lack of oversight." But the alleged contradiction concerns Silingo's implied false certification claim, which is not at issue on appeal. *See supra*, note 2.