Esperanza Cervantes Anderson | SBN 197953
**LAW OFFICE OF ESPERANZA CERVANTES ANDERSON**
1037 North Allen Avenue
Pasadena, California 91104
Tel.:   (626) 219-6773
Fax:   (626) 389-8911

Attorney for Plaintiff Relator
FRANK ADOMITIS

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. FRANK ADOMITIS, an individual,<br><br>            Relator,<br><br>        v.<br><br>OJAI VALLEY COMMUNITY HOSPITAL; DOES 1 through 20, inclusive,<br><br>            Defendants. | Case No. CV 17-06972 JGB (KKx)<br><br>**SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT**<br>(31 U.S.C. §§ 3729 et seq.)<br><br>JURY TRIAL DEMANDED |

**LAW OFFICE OF ESPERANZA CERVANTES ANDERSON**
**PASADENA, CALIFORNIA**

## NATURE OF THE ACTION

1.     This is a civil action brought by the United States, as Plaintiff, against Defendants Community Memorial Health System, dba Ojai Valley Community Hospital (the "Hospital") and DOES 1-10 for Medicare fraud involving millions of dollars and both factually and legally false claims, since February 2014, and continuing at present. This suit seeks damages, civil money penalties, and other relief under the False Claims Act, 31 U.S.C. §§ 3729 et seq., as amended by the False Claims Act Amendments of 1986, the Fraud Enforcement and Recovery Act

- 1 -

of 2009, Pub L. 111-21 ("FERA"), and the Patient Protection and Affordable Care Act of 2010, Pub. L. 111-148.

2.      The FCA was originally enacted during the Civil War to address fraud against the Government. Congress substantially amended the Act in 1986 to enhance the Government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating Government fraud, was in need of modernization. Congress intended the amendments to create incentives for individuals with knowledge of fraud against the Government to disclose information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

3.      The FCA provides that any person who presents or causes to be presented false or fraudulent claims for payment or approval to the United States Government, or knowingly makes, uses, causes to be made or used false records and statements to induce the United States to pay or prove false and fraudulent claims, is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of damages sustained by the federal Government.

4.      The FCA allows any person having information about false or fraudulent claims to bring an action on behalf of the Government, and to share in any recovery. The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on the Defendants during that time) to enable the United States to: (a) conduct its own investigation without the Defendants' knowledge, and (b) determine whether to join the action.

5.      Based on the FCA, *qui tam* plaintiff and relator Frank Adomitis seeks to recover all available damages, civil penalties, and other relief for the federal violations alleged herein.

Second Amended Complaint for Damages / Demand For Jury

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

**PARTIES**

6.     Plaintiffs are the United States of America (United States or Government) and the relator, Frank Adomitis. The United States files this Second Amended Complaint on behalf of the Department of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"), on behalf of the Medicare program.

7.     Plaintiff/relator Frank Adomitis ("Relator") is an individual residing in the County of San Bernardino, State of California.

8.     Defendant Community Memorial Health System, dba Ojai Valley Community Hospital (the "Hospital") is a 91-bed facility located at 1306 Maricopa Highway, Ojai, California  93023. The Hospital has operated from 1960s to the present.

9.     Community Memorial Healthcare System ("CMHS") acquired the Hospital located in Ojai, California in 2006. CMHS already owned a 242-bed acute care hospital located Ventura, California. Included in this acquisition was a 33-bed acute care hospital and a 66-bed skilled nursing facility (SNF). The CEO then as is now is Gary Wilde. CMHS is a 501c3 nonprofit organization and is managed by a board of trustees. This board is currently made up of 19 members.

10.     Relator is ignorant of the true names and capacities, whether individual, corporate, or associate, of those defendants fictitiously sued as Does 1 through 20 inclusive and so Relator sues them by these fictitious names. Relator is informed and believes that each of the DOE defendants is in some manner responsible for the conduct alleged herein. Upon discovering the true names and capacities of these fictitiously named Defendants, Relator will amend this complaint to show the true names and capacities of these fictitiously named defendants.

///

- 3 -

Second Amended Complaint for Damages / Demand For Jury

11.    Unless otherwise alleged in this complaint, Relator is informed, and on the basis of that information and belief alleges, that at all times herein mentioned, each of the remaining codefendants, in doing the things hereinafter alleged, were acting within the course, scope, and under the authority of their agency, employment, or representative capacity, with the consent of her/his/its codefendants.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 31 U.S.C. § 3730. The Second Amended Complaint is not based upon allegations or transactions that have been publicly disclosed under 31 U.S.C. § 3730(e). In addition, the Relator has direct and independent knowledge of the information on which the allegations and transactions are based and voluntarily provided the information to the Government before filing this action.

13.    Personal jurisdiction and venue are proper in this judicial district pursuant to 28 U.S.C. §§ 139l(b) and 1395(a) and 31 U.S.C. § 3732(a), as the Defendants are found in, have or have had an agent or agents, have or have had contacts, and transact or have transacted business in this district.

## CRITICAL ACCESS HOSPITAL ("CAH") FRAMEWORK

14.    The United States, through HHS and its component agency, CMS, administers the Medicare program, including payments made on a beneficiary's behalf for inpatient and outpatient hospital services provided by a hospital that has entered into an agreement with the Secretary to participate in the Medicare program. Section 1814(1) of the Social Security Act (42 U.S.C. § 1395f(1)) provides for payment of Part A, inpatient CAH services, and Section 1834(g) (42 U.S.C.§ 1395m(g)) provides for payment of Part B, outpatient CAH Services. CMS pays Medicare bills, also called claims, received from hospitals such as the Hospital, and

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

- 4 -

all such claims are paid with federal funds.

15.    In 1997, the Balanced Budget Act ("BBA") created the CAH certification to ensure that hospital care is accessible to beneficiaries in rural communities.  CAH hospitals are typically small health care organizations with no more than 25 hospital beds that can be used for either inpatient or "swing bed" services,[1] and are generally located in rural communities with a limited employment and economic base.  In the United States, there are approximately 1,300 to 1,400 CAHs.[2]

16.    CAHs are reimbursed differently by Medicare than other acute care hospitals. CAHs receive federal reimbursement incentives designed to attract hospital providers to communities that would otherwise have difficulty receiving hospital care.  Specifically, CAHs receive 101 percent (101%) of Medicare's share of their reasonable and allowable costs for outpatient, inpatient, laboratory, and ambulance services, as well as for "swing bed" services). *See* 42 C.F.R. §§ 413.70, 413.114.  In contrast, traditional hospital facilities are paid under Prospective Payment Systems through which Medicare reimbursement is fixed and capped. Medicare generally pays for the same medical services provided by a CAH as by other acute care hospitals, but CAH payments are based on each CAH's reasonable and allowable costs and the share of those costs allocated to Medicare patients. Thus, as the costs increase, the Medicare reimbursement rates to CAHs also increase and, as these rates increase, so too do the Medicare reimbursements.

17.    The Medicare reimbursement rates for CAHs are computed for inpatient services as an average cost per day based on historical data multiplied by

---

[1]    "Swing beds" is a reimbursement term that reflects a CAH's ability to use its beds interchangeably for either acute-care or post-acute skilled nursing care.  They are designed to offer care to patients who no longer need acute care, but do require additional inpatient services. *See* 42 C.F.R. § 485.620.

[2]    *See also* OIG Report, *infra.*

Second Amended Complaint for Damages / Demand For Jury

Law Office of Esperanza Cervantes Anderson
Pasadena, California

101% and paid on an interim basis.  The Medicare reimbursement rates for CAHs are computed for outpatient services by multiplying the billed charge of each claim by the hospital's cost-to-charge ratio and then adding 1 percent (1%) to that amount.

18.    Hospitals must meet specific requirements in order to qualify for the CAH certification and receive the favorable Medicare reimbursements described above.  Specifically, hospitals must meet the requirements set forth in the CAH Conditions of Participation (which lay out health, safety, and location-related requirements) to receive the CAH certification.

19.    Because the intent of the CAH certification is to ensure access to care in rural communities, CAHs must meet two location-related requirements. 42 U.S.C. §1395i-4(c)(2). CAHs **must** be located at least a minimum distance from hospitals (including acute-care, psychiatric, rehabilitation, long-term, and children's hospitals) and other CAHs, and they **must** be located in rural areas. 42 U.S.C. §1395i-4(c)(2)(B)(i).[3]

20.    **Distance Requirement.**  Hospitals that wish to obtain the CAH certification can meet the distance requirement in one of two ways: (1) by being located more than a 35-mile drive from a hospital or another CAH or (2) by being located more than a 15-mile drive from a hospital or another CAH in areas of mountainous terrain[4] or areas where only secondary roads[5] are available. 42 CFR

---

[3] Department of Health and Human Services, Office of Inspector General,OEI- 05-12-00080, *Most Critical Access Hospitals Would Not Meet the Location Requirements if Required to Re-Enroll in Medicare,* (August 2013*)* (Retrieved from https://oig.hhs.gov/oei/reports/oei-05-12-00080.pdf on November 3, 2017*).*

[4] Prior to 2013, CMS defined "mountainous terrain" as areas identified as such on any official maps or other documents published by the State agency responsible for highways in the State (typically a Department of Transportation or Highways) or by USGS. In April 2013, CMS published a uniform definition of "mountainous terrain" which States are to use when certifying hospitals as CAHs. According to this definition, roads that travel through mountainous terrain must be located in a mountain range and meet one of two additional requirements related to ease of travel or effort required to construct the roads. *See also* OIG Report, *supra.*

[5] CMS defines "secondary roads" as roads that are not primary roads. Primary roads include Federal highways (including interstate highways), state highways with two or more lanes in one direction, and roads that—in accordance with U.S. Geological

Second Amended Complaint for Damages / Demand For Jury

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

§485.610(c).

21. **Rural requirement.** Hospitals that wish to obtain the CAH certification can meet the rural requirement by being located either in rural areas or in areas that are treated as rural. 42 CFR §485.610(b). CMS uses a formula based on multiple criteria to determine rural status. Examples of these criteria include whether a CAH is located outside a metropolitan statistical area (MSA), located inside a rural census tract, or located in an area designated as rural by State law or regulation.[6]

22. **Additional CAH requirements.** Pursuant to the statute authorizing the CAH program, facilities must meet four additional requirements beyond the location requirements described above in order to be certified as CAHs. For example, CAHs must offer 24-hour emergency services (42 U.S.C. §1395i-4(c)(B)(ii)), CAHs cannot have more than 25 beds that are used for acute care or "swing-bed" patients (42 U.S.C. §1395i-4(c)(B)(iii)), and they must achieve an annual average length of stay for patients that does not exceed 96 hours. *Id*.

23. **Necessary Provider CAHs.** Prior to January 1, 2006, states had discretion to designate hospitals that did not meet the distance requirement as "necessary provider" (NP) CAHs. (42 U.S.C. §1395i-4(c)(B)(i)(I)) NP CAHs had to comply with all of the CAH Conditions of Participation at the time of their certification.

24. CAHs that were designated NP CAHs prior to January 1, 2006 are permanently exempt from meeting the distance requirement, unless they relocate. Effective January 1, 2006, the Medicare Prescription Drug, Improvement, and Modernization Act prohibited the creation of new NP CAHs, but allowed existing

Survey (USGS) standards—are shown on maps as primary highways. Secondary roads typically are one-lane State highways and all other local roads. 42 CFR §485.610(c). *See also* OIG Report, *supra*.
[6] A metropolitan statistical area (MSA) is an urbanized area with at least 50,000 inhabitants. A rural census tract is a census tract that does not have significant commuting ties to an area with 2,500 or more people. 42 U.S.C. §485.610(b). *See also* OIG Report, *supra*.

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

- 7 -

Second Amended Complaint for Damages / Demand For Jury

NP CAHs to retain their NP designations indefinitely, as long as they continue to meet all other CAH requirements.

25.     In August 2013, the Department of Health and Human Services Office of Inspector General issued a report, *Most Critical Access Hospitals (CAH) Would Not Meet The Location Requirements if Required to Re-Enroll in Medicare.* The basis for the report was to determine whether certified CAHs could meet the variety of regulatory requirements under re-certification today.

26.     The findings within the report are shocking. If CAHs were to undergo a re-certification examination today, nearly two-thirds would not meet the location requirement and 846 out of 1,329 would not meet the rural requirement. From the executive summary:

> "Nearly two-thirds of CAHs **would not meet the location requirements if required to re-enroll**. **The vast majority of these CAHs would not meet the distance requirement**. CMS does not have the authority to decertify most of these CAHs, as most of these CAHs are NP CAHs. However, if CMS were authorized to reassess whether all CAHs should maintain their certifications, and concluded that some should be decertified, Medicare and beneficiaries could realize substantial savings. If CMS had decertified CAHs that were 15 or fewer miles from their nearest hospitals in 2011, Medicare and beneficiaries would have saved $449 million." (emphasis added) Department of Health and Human Services, Office of Inspector General,OEI- 05-12-00080, Most Critical Access Hospitals Would Not Meet the Location Requirements if Required to Re-Enroll in Medicare, (August 2013) (Retrieved from https://oig.hhs.gov/oei/reports/oei-05-12-00080.pdf on November 3, 2017).

27.     The OIG report never identifies Hospital by name, or location. Notably, the list of 846 hospitals that do not meet the location requirement put together by the OIG *does not* include Hospital since Hospital had not yet been certified as a CAH.

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

Second Amended Complaint for Damages / Demand For Jury

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

**FRAUDULENT PRACTICES**

28.     As noted above, the Hospital includes a 33-bed acute care hospital and a 66-bed skilled nursing facility (SNF). SNF patients require less clinical resources than do patients in a general acute care hospital but their lengths of stay are generally much longer.  In addition, reimbursement for SNF patients is lower than for patients at an acute care hospital, and the amount CMS pays is not based on the cost of providing services but on a predetermined amount based on the patient's condition.

29.     Prior to becoming a CAH in 2014, the Hospital was facing two significant challenges. First, the acute care portion of the Hospital was far underutilized.  In 2013 according to the hospital's annual financial disclosure report submitted to the Office of Statewide Health Planning & Development (OSHPD) for the State of California the Hospital only needed to staff 8 of 33 licensed beds because of the lack of inpatients. But on the other hand, the SNF was operating at near capacity. Based on the number of staffed beds the SNF was operating at 100% capacity. Therefore, the hospital needed more SNF beds and had to generate more revenue for the small patient population in the acute care hospital. These two problems were mitigated by becoming a CAH. First, CMS pays 101% of the cost providing inpatient and outpatient services to Medicare recipients. This guarantees the hospital cannot lose money on Medicare patients.

30.     Second, a CAH utilizes what is called a "swing bed." These beds are used to provide patients with SNF services and any bed in a CAH can be utilized as a swing bed. In other words, the same bed used as an acute bed can be converted, i.e. "swung," as needed to be used as a SNF bed. There are no additional physical beds needed.  Swing beds are truly needed in communities where there is a CAH but no SNF. Another advantage to swing beds is they are not included in the four (4) day length of stay limit required of CAHs.  There is no length of stay limit for swing beds.

Second Amended Complaint for Damages / Demand For Jury

31.     Since February 2014, when it was certified as a CAH, the Hospital has held itself out to be a CAH serving a rural area in Ojai Valley, California, even though it does not qualify as a CAH.  First, the Hospital is not designated as an NP CAH by the State of California, and as such was not designated as an NP CAH before January 1, 2006. In a phone call by Relator with Ms. Jennifer Brooks, the Program Coordinator of the Medicare Rural Hospital Flexibility/Critical Access Hospital (FLEX/CAH) Program at (916) 324-7942 confirmed that there are only three necessary providers in the State of California, and the Hospital is not among them.

32.     Second, the Hospital does not meet the distance requirements for CAH certification. The nearest hospital is Community Memorial Hospital, 147 N. Brent Street, Ventura, California 93003. This facility is a large 242-bed non-profit acute care hospital with the latest technology and advanced services, from family care to cardiac surgery. Notably this facility has served the community in Ventura County for many years, dating all the way back to the early 1900s. With the continuous existence of Community Memorial Hospital, the ability for Hospital to obtain CAH status for any date in which CMS considered the designation is simply non-existent.

33.     The Hospital was aware of the existence of CMHS and its location when it applied for CAH status in 2014 because the Hospital had merged with CMHS in or about June 2006.

34.     According to Google Maps, the most direct route between the two facilities results in a geographic distance between the two hospitals of 18.3 miles. That route travels over California state highway 33. Because the total distance is less than 35 miles, 15 or more miles of this route must be either "mountains terrain" or "secondary roads." *See* 42 U.S.C. §1395i-4(c)(2)(B)(i)(I). *See also*, 42 CFR § 485.610, "Condition of participation: Status and location."

Law Office of Esperanza Cervantes Anderson
Pasadena, California

Second Amended Complaint for Damages / Demand For Jury

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

a.  To be eligible for the lesser distance standard due to the secondary road criteria under §485.610(c) the CAH must document that there is a drive of more than 15 miles between the CAH and any hospital. CMS' State Operations Manual (Chapter 2, "Certification Process" Rev. 154, 6-10-16, p. 259)[7] expressly defines a "primary road" as "[a] numbered State highway with 2 or more lanes each way." Here, California State Highway 33 has 2 or more lanes each way for most of the way. Thus, there is not more than 15 miles on a secondary road sufficient to trigger this exception.

b.  Being located within a mountain range in and of itself does not without more trigger the "mountainous terrain" exception. The roads on the travel route from the CAH to any other hospital or CAH must have either of the following characteristics:

 i.  Extensive sections of roads with steep grades (i.e., greater than 5 percent), continuous abrupt and frequent changes in elevation or direction, or any combination of horizontal and vertical alignment that causes heavy vehicles to operate at crawl speeds for significant distances or at frequent intervals. *Alternatively*, the route can be considered mountainous terrain by the State Transportation or Highway agency, based on significantly more complicated than usual construction techniques that were originally required to achieve compatibility between the road alignment and surrounding rugged terrain. For example, because the changes in elevation and direction are abrupt in mountainous terrain, roadbeds may require frequent benching,

---

[7] URL https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/som107c02.pdf

Second Amended Complaint for Damages / Demand For Jury

side hill excavations, and embankment fills. The route does not satisfy this criterion under either option. The majority of the route is flat and reasonably straight. On information and belief, the route has not been designated by CalTrans, which does not use "mountainous terrain" as a defined road designation.

35.    Third, for a hospital to be designated as a CAH, it must meet certain Medicare conditions of payment. Some of these CoP requirements include: (1) either being at a certain distance from other hospitals or being grandfathered as a State-designated NP, and (2) having 25 or fewer beds used for inpatient care or swing-bed services.

36.    However, Defendant has nearly 3 times *too many* beds allowable under Medicare's CoP. In the filings submitted to the State of California's Office of Statewide Health Planning and Development, Defendant maintained 91 beds. As noted on Paragraphs 28 above, swing beds are valuable because they can be used for other purposes including for SNF. Using swing beds as SNF beds when a hospital is also a CAH is valuable because the hospital can recover 101% of the costs associated with patients in those beds – a much higher rate than if the hospital were not a CAH.

37.    For this reason, Defendants have been using swing beds as additional beds for their SNF and have been receiving 101% of the cost of providing SNF services for Medicare patients in the swing beds.  Based on the information in the Hospital's annual cost reports submitted to CMS for years ending 12/31/2014, 12/31/2015, 12/31/2016, and 12/31/2017 this is the number of days Medicare patients stayed in swing beds receiving SNF services out of the total patients receiving SNF services in swing beds:

///

///

///

Second Amended Complaint for Damages / Demand For Jury

| Year Ending | Days In Swing Beds by SNF Medicare Patients | Days In Swing Bed by SNF All Patients | Percent of Medicare Patient in Swing Beds |
|---|---|---|---|
| 12/31/2014 | 747 | 897 | 83% |
| 12/31/2015 | 1,450 | 1,516 | 96% |
| 12/31/2016 | 1,870 | 1,967 | 95% |
| 12/31/2017 | 1,557 | 1,648 | 94% |

As can easily be seen by the chart above, CMHS has been using the SNF beds as an extension to its SNF unit.

38.    Additionally, the Hospital has submitted the following number and amount of bills to CMS for payment:

| | Number Medicare Bills Submitted | Amount Medicare Bills Submitted |
|---|---|---|
| 12/31/2017 | 10,126 | 19,179,125 |
| 12/31/2016 | 11,456 | 23,274,967 |
| 12/31/2015 | 11,690 | 25,745,538 |
| 12/31/2014 | 11,121 | 24,873,580 |
| Total | 44,393 | 93,073,210 |

39.    The financial benefits shown above show why, from 2014 to the present, the Hospital has filed cost reports with Medicare for reimbursement available only to CAHs wherein the Hosptial certified qualification as a CAH, even though it did not qualify as a CAH.

40.    Standard reimbursement for health care services and provided to Medicare beneficiaries is paid for by Medicare upon receipt from hospitals of CMS Form 837. All hospitals who are providers and participants in the Medicare program

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

Second Amended Complaint for Damages / Demand For Jury

are eligible to receive this reimbursement if they file CMS Form 837. These reimbursement rates are standard and are capped. Thus, if a procedure cost a hospital more money than the maximum reimbursement rate for the procedure, then the hospital incurs a loss in performing the procedure. This loss is not reimbursed by Medicare.

41.     As the Hospital is aware, hospitals who qualify as CAHs, on the other hand, are able to obtain payment from CMS for the cost of the procedure that exceeded the standard reimbursement rate plus 1%. In order to obtain this additional payment, CAHs submit CMS Form 2552-10 to receive the additional reimbursement available **only** to hospitals that **qualify** as CAHs.  CMS Forms 2552-10 are submitted on an annual basis, within five to six months of the end of the fiscal year which ends in June of each year.

42.     Because current CAH qualification is important and material to the government's decision to make the additional payment, CMS Form 2552-10 specifically requires a hospital to verify whether it (presently) qualifies as a CAH. Specifically, CMS Form 2552-10 contains question 105 which asks:

**"105.  Does this hospital qualify as a Critical Access Hospital (CAH)?"**

43.     Answering this question in the affirmative is necessary to obtain the enhanced CAH funding. If a hospital answers this question by stating no, it will not be paid the enhanced CAH funding. Since its certification as a CAH in 2014, Hospital has filed cost reports affirmatively representing that it qualifies as a CAH even though it does not, as explained above.

44.     The Hospital is familiar with the laws and regulations governing the Medicare Program, including requirements relating to the completion of cost reports and specifically with the rural and distance requirements to seek reimbursement of 101% of costs as a CAH. Thus, by answering question 105 of the cost report CMS Form 2552-10 in the affirmative, the Hospital certified that it complied with

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

Second Amended Complaint for Damages / Demand For Jury

requirements of the CAH program, including the rural and distance requirements of the CAH framework discussed *infra*, and as such, qualified as a CAH.

45.   In addition, CMS Form 2552-10 contains a certification, as follows:

"MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT" (emphasis in original).

46.   CMS Form 2552-10, which is presented by CAHs also contain an additional certification, in accord with 42 C.F.R. § 413.24 (f)(4)(iv), entitled "Certification By Officer Or Administrator Of Provider(s)," which states as follows:

"I HEREBY CERTIFY that I have read the above certification statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by [name of facility, ID number of facility] for the cost reporting period beginning [date] and ending [date] and to the best of my knowledge and belief, this report and statement are true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations

Second Amended Complaint for Damages / Demand For Jury

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

regarding the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations" (emphasis in original).

47.    In submitting CMS Form 2552-10 to Medicare for reimbursement, the Hospital affirmed that it presently qualified as a CAH. Additionally, the Hospital also affirmed that the information provided therein (including that it qualified as a CAH) was truthful and honest.

48.    Moreover, as a Medicare provider and participant in the Medicare Program, the Hospital was required to enter into agreements with CMS through "Medicare Enrollment Applications" on a form known as a "CMS-855A" wherein the Hospital, through an authorized responsible officer, swore that it "understand(s) that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with (Medicare) laws, regulations, and program instructions . . . and on the provider's compliance with all applicable conditions of participation in Medicare."

49.    Thus, the representations as to the costs reflected in the Medicare cost reports were presumed by Medicare to be truthful, accurate, and allowable under the applicable Medicare laws and regulations. These representations were and are material to, and indeed (via the certifications listed above) are a condition of Medicare reimbursement.

50.    Medicare relied on the information disclosed in the Medicare cost reports in determining the reimbursement rates and the amounts paid to the Hospital. CMS Form 2552-10 makes this clear by stating

"This report is required by law (42 U.S.C. 1395g; 42 CFR 413.20(b)). Failure to report can result in all interim payments made since the beginning of the cost reporting period being deemed overpayments (42 U.S.C. 1395g)" (parentheticals in

Second Amended Complaint for Damages / Demand For Jury

original).

51.   At all times relevant to the allegations in this Second Amended Complaint, Hospital has filed cost reports affirmatively representing that it qualifies as a CAH even though it does not, as explained above. As a result, HHS, through CMS, provided enhanced Medicare reimbursements for health care services provided to Medicare patients at the Hospital based on the CMS Form 2552-10 cost reports submitted by the Hospital.

52.   By purposefully filing CMS Form 2552-10 and therein affirming it qualified as a CAH even though Defendants knew that they did not meet the distance requirement and were not deemed a Necessary Provider (and as such did not qualify as a CAH), the Defendants substantially overcharged, or caused others to overcharge, the Government for inpatient and outpatient services provided to Medicare beneficiaries. As a result of this misrepresentation, the Government overpaid for such services.

53.   Defendants were aware or should have been aware that they did not meet the distance requirements given the absence of evidence to trigger the "mountainous terrain" exception, the presence of primary roads leading to the Hospital and the Hospital's proximity to Community Memorial Hosptial in Ventura, California.

54.   Indeed, CMHS has its own compliance policy which states this:

"Community Memorial Health System (CMHS) has a long-standing tradition of high ethical standards in the conduct of its business affairs and in the provision of health care services. These ethical standards are supported by the CMHS mission statement: *CMHS is dedicated to providing the finest quality health services in a caring and efficient manner*. Within the meaning of our mission statement, it remains the policy of the CMHS organization to comply with all federal, state and local laws,

Second Amended Complaint for Damages / Demand For Jury

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

regulations and statutes applicable to its operations and business dealings with the public and at all governmental levels. This policy applies to all Employees of the CMHS organization and must be strictly observed. CMHS has an established, well maintained and effective compliance program. This compliance program was designed, implemented, and enforced with the purpose of preventing fraud and abuse within the Medicare and Medicaid programs as well as with all third party payors. The establishment and enforcement of this compliance program is the responsibility of the President's Council, Executive Leadership Team, Board of Directors, and all other Department Heads, Managers, and Supervisors throughout the CMHS organization."

Thus, Defendnats have no excuse for making the misrepresentations on CMS Form 2552.

55.   Thus, each Medicare cost report (CMS Form 2552) filed by Defendants in the applicable limitations period constitutes a false statement supported a false claim for payment.

## MATERIALITY

56.   CMS has determined the location requirements for CAH status to be material for payment of the enhanced rates. See *Baylor County Hospital District v. Burwell*, 163 F.Supp.3d 372, 375 (N.D. Tex. 2016) affirmed *Baylor County Hospital District v. Price*, 850 F.3d 257 (5th Cir. 2017) (CAH status denied to hospital that did not meet the distance requirement as clarified in DHHS State Operations Manual). CMS responded to the OIG Report by agreeing to revise the state Operations Manual so that the CAH location criteria would be evaluated as part of the periodic re-evaluations of a CAH's compliance with Conditions of Participation.

Second Amended Complaint for Damages / Demand For Jury

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

CMS need not continuously re-evaluate the distance requirement, as the Hospital's geographic location has been fixed, and unchanging. Instead CMS relied on the affirmative representations of Hospital as to CAH compliance to address new circumstances (e.g., such as the addition of a new hospital construction within a 35 mile radius, changes in access to Hospital shortening the distance to the adjacent facilities, or the like). The burden is on Hospital to establish and maintain compliance with the CAH requirements. CMS required hospitals such as the Hospital Defendants here to inform it of changes in its qualifications when filing CMS Cost Report form 2552-10 for the enhanced payment. Indeed, by including question 105 which expressly requires a hospital to state whether or not it qualifies as a CAH at the time the cost report is submitted, CMS is requesting hospitals such as Defendants to notify it of any change in the qualifications. Where, as here, the certification of qualification to the CAH program are made by misleading the government as to the distance requirement, CMS required Hospital to inform it of the misrepresentation and to report any overpayments. (Indeed, Relator is aware that there are other routes from CMHS to the Hospital that would require travel over more than 15 miles of secondary roads if the person traveling the distance took the long way.) The Hospital never informed CMS that it did not qualify with the distance requirement.

57.    Location is material for payment. The distance requirement is the first of five conditions of participation contained in the CAH statute codified at 42 U.S.C. §1395i-4(c)(2)(B)(i)(I). If Hospital had affirmed it did not meet the distance requirement, the government would not pay Hospital the enhanced rate available only to CAHs.  Indeed, since the OIG's Report in August 2013, CMS publicly identified certain CAHs and released in the Federal Register a list of counties and parishes that will lose their rural designation that allows acute care facilities within their boundaries to receive extra payments as critical access hospitals. The CMS list

Second Amended Complaint for Damages / Demand For Jury

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

includes 72 counties and parishes in more than 30 states or Puerto Rico. Refer to the table "Counties That Will Lose Rural Status and Become Urban" on pages 49953 through 49955 of the August 22, 2014 Federal Register (79 FR 49953 through 49955) for a list of counties that would lose rural status and become urban effective October 1, 2014." Because CMS does not resurvey all hospitals on an annual basis – given the lack of sufficient resources to do so – and because decertification is not automatic but CMS allows hospitals to appeal the decision and present information disputing the original findings, more decertifications will follow as CMS re-certification process continues.

58.    While the False Claims Act imposes liability only when the claimant acts "knowingly," it does not require that the person submitting the claim have actual knowledge that the claim is false. A person who acts in reckless disregard or in deliberate ignorance of the truth or falsity of the information, also can be found liable under the Act. 31 U.S.C. 3729(b)[8]. The fact that CMHS has a robust compliance program in place to ensure compliance with all federal, state and local laws, CMHS cannot claim it was unaware of the distance requirement.

**COUNT I**
**KNOWINGLY PRESENTING FALSE CLAIMS**
**in violation of 31 U.S.C. § 3729(a)(1)(A)**
**Claim By and on Behalf of the United States under the False Claims Act**
**Against All Defendants**

59.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 58 as though fully set forth herein.

60.    By virtue of the wrongful acts described herein, from 2014 through the

---

[8] (b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

Law Office of Esperanza Cervantes Anderson
Pasadena, California

present, Defendants, with actual knowledge, reckless disregard, or deliberate ignorance, presented, or caused to be presented, to Medicare false or fraudulent claims for reimbursement in violation of 31 U.S.C. § 3729(a)(1)(A). In particular, Defendants presented and caused to be presented to Medicare false, fraudulent, misleading, and incomplete information in the Hospital's Medicare cost reports.

61.    Medicare relied on these fraudulent cost reports in determining the Medicare reimbursement rates and the amount of reimbursements to be paid to the Hospital, which resulted in the payment of millions more dollars to the Hospital than that to which it was legally entitled.

62.    The false representations, records, statements, reports, and certifications described herein were material to Medicare's decision to provide reimbursement to the Hospital and had a natural tendency to influence and did influence those decisions.

63.    As a result of the false claims presented, and/or caused to be presented, the United States has suffered actual damages and is entitled to recover three times the amount by which it has been damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented, or caused to be presented, and other monetary relief as appropriate.

### COUNT II
### USING FALSE RECORDS OR STATEMENTS MATERIAL TO FALSE CLAIMS in violation of 31 U.S.C. § 3729(a)(1)(B)
### Claim By and on Behalf of the United States under the False Claims Act Against All Defendants

64.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 63 as though fully set forth herein.

65.    By virtue of the wrongful acts described herein, from 2014 through the present, Defendants, with actual knowledge, reckless disregard, or deliberate ignorance, made, used, and/or caused to be made or used, false records, statements,

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

Second Amended Complaint for Damages / Demand For Jury

and certifications material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B). In particular, Defendants made, used, and caused to be made or used, false records, statements, and certifications in the Medicare cost reports of the Hospital.

66.     Medicare relied on these fraudulent records, statements, and certifications in determining the Medicare reimbursement rates and the amount of Medicare reimbursements paid to the Hospital, which resulted in the payment of millions more dollars to the Hospital than that to which it was legally entitled.

67.     The false representations, records, statements, reports, and certifications described herein were material to Medicare's decision to provide reimbursement to the Hospital and had a natural tendency to influence and did influence those decisions.

68.     As a result of these false records, statements, reports, and certifications, the United States has suffered actual damages and is entitled to recover three times the amount by which it has been damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false records, statements, and certifications made to the Medicare program and other monetary relief as appropriate.

### COUNT III
### FAILING TO REFUND OVERPAYMENTS OWED TO THE GOVERNMENT in violation of 31 U.S.C. § 3729(a)(1)(G)
### Claim By and on Behalf of the United States under the False Claims Act Against All Defendants

69.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 68 as though fully set forth herein.

70.     By virtue of the wrongful acts described herein, from 2014 through the present, Defendants, with actual knowledge, reckless disregard, or deliberate ignorance, received millions of dollars from Medicare to which they were not entitled and which they had an obligation to refund, but Defendants, with actual knowledge,

Second Amended Complaint for Damages / Demand For Jury

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

reckless disregard, or deliberate ignorance, failed to return this wrongfully-obtained money to Medicare. Defendants also concealed the false, misleading, and incomplete information included in the Hospital's Medicare cost reports, and never refunded, or offered to refund, any of the money wrongfully obtained. These actions violated 31 U.S.C. § 3729(a)(1)(G).

71.     The false representations, records, statements, reports, and certifications described herein were material to Medicare's decision to provide reimbursement to the Hospital and had a natural tendency to influence and did influence those decisions. In addition, Defendants' concealment of the false and fraudulent expenses impaired Medicare's ability to pursue refunds of the improperly paid amounts.

72.     As a result of these matters, the United States has suffered actual damages and is entitled to recover three times the amount by which it has been damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims, and other monetary relief as appropriate.

## PRAYER

WHEREFORE, Relator prays judgment against Hospital and Does 1 through 50, and each of them, as follows:

1.     That Defendants cease and desist from violating 31 U.S.C. § 3279 et seq.;

2.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. § 3279 et seq.; for claims accruing after November 2, 2015, civil penalties increase of not less than $10,781.40 and $21,562.80 per violation of 31 U.S.C. § 3279 et seq.

3.     That the Relator be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act;

- 23 -

Second Amended Complaint for Damages / Demand For Jury

4.      That Relator be awarded all costs of this action, including attorneys'
fees and expenses;

5.      That Relator recover other and further relief as the court shall deem
appropriate.


DATED:  Sept. 4, 2018.      **LAW OFFICE OF ESPERANZA CERVANTES ANDERSON**


By: /s/*Esperanza Cervantes Anderson*_____
Esperanza Cervantes Anderson, Esq.
Attorney for Plaintiff/relator
FRANK ADOMITIS



## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules Of Civil Procedure, Relator hereby
demands a trial by jury.


DATED:  Sept. 4, 2018.      **LAW OFFICE OF ESPERANZA CERVANTES ANDERSON**


By: /s/*Esperanza Cervantes Anderson*_____
Esperanza Cervantes Anderson, Esq.
Attorney for Plaintiff/relator
FRANK ADOMITIS

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

Second Amended Complaint for Damages / Demand For Jury