JEFFREY R. MAKIN (SBN 252426)
jeffrey.makin@arentfox.com
ALEXANDER S. BIRKHOLD (SBN 304334)
alexander.birkhold@arentfox.com
**ARENT FOX LLP**
555 West Fifth Street, 48th Floor
Los Angeles, California 90013-1065
Telephone: 213.629.7400
Facsimile:  213.629.7401

Attorneys for Defendant
OJAI VALLEY COMMUNITY HOSPITAL, a
d/b/a of COMMUNITY MEMORIAL HEALTH
SYSTEM, a California Nonprofit Public Benefit
Corporation

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. FRANK ADOMITIS, an individual,<br><br>Plaintiff,<br><br>v.<br><br>OJAI VALLEY COMMUNITY HOSPITAL; DOES 1 through 20, inclusive,<br><br>Defendant. | Case No.  CV17-06972 JGB (KKx)<br><br>**DEFENDANT OJAI VALLEY COMMUNITY HOSPITAL'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF ITS MOTION TO DISMISS SECOND AMENDED COMPLAINT AND INDEX OF EXHIBITS THERETO**<br><br>[Defendant's Notice of Motion and Motion to Dismiss Second Amended Complaint, and [Proposed] Order filed concurrently herewith]<br><br>Judge:    Hon. Jesus G. Bernal<br>Date:     November 5, 2018<br>Time:     9:00 a.m.<br>Crtrm:    1 |

Pursuant to Federal Rule of Evidence 201, Defendant Ojai Valley Community Hospital ("OVCH") respectfully requests that the Court take judicial notice of the following exhibits in support of its concurrently filed Motion to Dismiss Second Amended Complaint Pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(1), and 12(b)(6). Rule 201 of the Federal Rules of Evidence provides for judicial notice of any fact "not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

| Index of Exhibits | |
| --- | --- |
| Exhibit A | August 2013, OIG Report, Most Critical Access Hospitals Would Not Meet the Location Requirements if Required to Re-enroll in Medicare |
| Exhibit B | Selected Portions of the Centers for Medicare & Medicaid Services State Operations Manual, Chapter 2 – the Certification Process |
| Exhibit C | February 12, 2016, CMS Policy, Critical Access Hospital (CAH) Recertification Checklist for Evaluation of Compliance with the Location and Distance Requirements |
| Exhibit D | 2013 Transcript for audio podcast: Critical Access Hospital Designations, available at https://oig.hhs.gov/newsroom/podcasts/2013/location-trans.asp. |
| Exhibit E | March 2015, OIG Report, Medicare Could Have Saved Billions at Critical Access Hospitals If Swing-Bed Services Were Reimbursed Using the Skilled Nursing Facility Prospective Payment System Rates |
| Exhibit F | Selected Portions of the State Operations Manual, Appendix W - Survey Protocol, Regulations and Interpretive Guidelines for |

| | Critical Access Hospitals (CAHs) and Swing-Beds in CAHs, available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/som107ap_w_cah.pdf. |
|---|---|

Exhibits A-F are official publications made publicly available by the government. This Court previously took Judicial Notice of Exhibits A-D. *See* Dkt. No. 24 at n1. All of the exhibits provide facts capable of accurate and ready determination by referring to sources whose accuracy cannot reasonably be questioned. "Under Rule 201, the court can take judicial notice of '[p]ublic records and government documents available from reliable sources on the Internet,' such as websites run by governmental agencies." *U.S., ex rel. Modglin v. DJO Glob. Inc.*, 114 F. Supp. 3d 993, 1008 (C.D. Cal. 2015), *aff'd sub nom. U.S. v. DJO Glob., Inc.*, 678 F. App'x 594 (9th Cir. 2017). Therefore, these exhibits meet the requirements of Fed. R. Evid. 201(b). For these reasons, OVCH respectfully requests that the Court take judicial notice of the documents referenced above in support of OVCH's Motion.

Dated:          September 18, 2018          **ARENT FOX LLP**


By: /s/ Jeffrey R. Makin
JEFFREY R. MAKIN
ALEXANDER S. BIRKHOLD
Attorneys for Defendant
OJAI VALLEY COMMUNITY
HOSPITAL, a d/b/a of COMMUNITY
MEMORIAL HEALTH SYSTEM, a
California Nonprofit Public Benefit
Corporation

# EXHIBIT A

# Department of Health and Human Services

## OFFICE OF
## INSPECTOR GENERAL

# MOST CRITICAL ACCESS HOSPITALS WOULD NOT MEET THE LOCATION REQUIREMENTS IF REQUIRED TO RE-ENROLL IN MEDICARE



**Daniel R. Levinson**
**Inspector General**

**August 2013**
**OEI-05-12-00080**

**EXECUTIVE SUMMARY:  MOST CRITICAL ACCESS HOSPITALS WOULD NOT MEET THE LOCATION REQUIREMENTS IF REQUIRED TO RE-ENROLL IN MEDICARE OEI-05-12-00080**

**WHY WE DID THIS STUDY**

The Critical Access Hospital (CAH) certification was created to ensure that rural beneficiaries are able to access hospital services.  Medicare reimburses CAHs at 101 percent of their reasonable costs, rather than at the rates set by prospective payment systems or fee schedules.

Currently, hospitals can be certified as CAHs if they meet a variety of regulatory requirements, including being located at least a certain driving distance from other hospitals (including CAHs) and being located in rural areas.  These two requirements are known as the distance requirement and the rural requirement, respectively.  Collectively, the two requirements are known as the location requirements.  Prior to 2006, States could exempt CAHs from the distance requirement by designating them as "necessary provider" (NP) CAHs.  NP CAHs are permanently exempt from meeting the distance requirement.

**HOW WE DID THIS STUDY**

We plotted the locations of CAHs and other hospitals onto digital maps to determine whether CAHs would meet the location requirements if they were required to re-enroll in Medicare.  Additionally, we calculated (using 2011 claims data) the potential savings to Medicare and beneficiaries if the Centers for Medicare & Medicaid Services (CMS) were to decertify CAHs that would not meet the location requirements.

**WHAT WE FOUND**

Nearly two-thirds of CAHs would not meet the location requirements if required to re-enroll.  The vast majority of these CAHs would not meet the distance requirement.  CMS does not have the authority to decertify most of these CAHs, as most of these CAHs are NP CAHs.  However, if CMS were authorized to reassess whether all CAHs should maintain their certifications and concluded that some should be decertified, Medicare and beneficiaries could realize substantial savings.  If CMS had decertified CAHs that were 15 or fewer miles from their nearest hospitals in 2011, Medicare and beneficiaries would have saved $449 million.

**WHAT WE RECOMMEND**

Because the CAH certification results in increased spending for both Medicare and beneficiaries, CMS should ensure that the only CAHs to remain certified would be those that serve beneficiaries who would otherwise be unable to reasonably access hospital services.  We recommend that CMS (1) seek legislative authority to remove NP CAHs' permanent exemption from the distance requirement, thus allowing CMS to reassess these CAHs; (2) seek legislative authority to revise the CAH Conditions of Participation to include alternative location-related requirements; (3) ensure that it periodically reassesses CAHs for compliance with all location-related requirements; and (4) ensure that it applies its uniform definition of "mountainous terrain" to all CAHs.  CMS concurred with our first, third, and fourth recommendations, but did not concur with our second recommendation.

EXHIBIT A

5

## TABLE OF CONTENTS

Objectives ............................................................................................1

Background ..........................................................................................1

Methodology .......................................................................................7

Findings................................................................................................12

    Nearly two-thirds of CAHs would not meet the location
requirements if required to re-enroll ................................................12

    Medicare and beneficiaries could realize substantial savings if
CMS were to decertify some CAHs..................................................16

Conclusion and Recommendations........................................................17

    Agency Comments and Office of Inspector General Response.....19

Appendixes ..........................................................................................21

    A: Distance and Rural Requirements...........................................21

    B: Detailed Methodology............................................................25

    C: Example of Critical Access Hospital Locations Relative to
Those of Other Hospitals ...............................................30

    D: Agency Comments ................................................................31

Acknowledgments...................................................................................34

## OBJECTIVES

1. To determine the extent to which Critical Access Hospitals (CAH) would meet the location requirements if required to re-enroll in Medicare.

2. To calculate potential savings to Medicare and beneficiaries if CMS decertified CAHs that would not meet the location requirements if required to re-enroll in Medicare.

## BACKGROUND

### Critical Access Hospitals

In 1997, the Balanced Budget Act (BBA) created the CAH certification to ensure that hospital care is accessible to beneficiaries in rural communities.[1, 2]  Small hospitals that meet specific requirements can qualify for the CAH certification and receive favorable Medicare reimbursements.  Medicare reimburses CAHs at 101 percent of their reasonable inpatient and outpatient costs.[3]

There are more than 1,300 CAHs in the United States.  CAHs are located in every State except Connecticut, Delaware, Maryland, New Jersey, and Rhode Island.  CAHs provided care for approximately 2.3 million beneficiaries in 2011.  Medicare and beneficiaries paid approximately $8.5 billion for this care.

### Medicare Requirements for CAH Certification

Facilities must meet the requirements set forth in the CAH Conditions of Participation to receive the CAH certification.  Conditions of Participation lay out health, safety, and location-related requirements that facilities must meet to participate in the Medicare program as CAHs.

Because the intent of the CAH certification is to ensure access to care in rural communities, CAHs must meet two location-related requirements.[4]  CAHs must be located at least a certain distance from hospitals (including acute-care, psychiatric, rehabilitation, long-term, and children's hospitals) and other CAHs, and they must be located in rural areas.  These

---

[1] Balanced Budget Act of 1997, P.L. 105-33 § 4201.  The BBA amended several sections of the Social Security Act, including sections 1820, 1861(mm), 1814(l) and 1834(g).

[2] Centers for Medicare & Medicaid Services (CMS), *State Operations Manual,* Pub. No. 100-07, ch. 2, § 2254A.  Accessed at http://cms.gov on July 7, 2011.

[3] Social Security Act, §§ 1814(l) and 1834(g), 42 U.S.C. §§ 1395f(l) and 1395m(g).

[4] Social Security Act, § 1820(c)(2), 42 U.S.C. § 1395i-4(c)(2); CMS, *State Operations Manual,* Pub. No. 100-07, ch. 2, § 2256F.  Accessed at http://cms.gov on July 7, 2011.

EXHIBIT A

7

two requirements are known as the distance and rural requirements, respectively. Collectively, the two requirements are known as the location requirements. Appendix A provides the official descriptions of the location requirements.

*Distance requirement*. Facilities that wish to obtain the CAH certification can meet the distance requirement in one of two ways: (1) by being located more than a 35-mile drive from a hospital or another CAH or (2) by being located more than a 15-mile drive from a hospital or another CAH in areas of mountainous terrain or areas where only secondary roads are available.[5]

CMS defines "secondary roads" as roads that are not primary roads. Primary roads include Federal highways (including interstate highways), State highways with two or more lanes in one direction, and roads that—in accordance with U.S. Geological Survey (USGS) standards—are shown on maps as primary highways.[6] Secondary roads typically are one-lane State highways and all other local roads.

Prior to 2013, CMS defined "mountainous terrain" as areas identified as such on any official maps or other documents published by the State agency responsible for highways in the State (typically a Department of Transportation or Highways) or by USGS.[7]

In April 2013, CMS published a uniform definition of "mountainous terrain" States are to use when certifying hospitals as CAHs. According to this definition, roads that travel through mountainous terrain must be located in a mountain range and meet one of two additional requirements related to ease of travel or effort required to construct the roads.[8]

*Rural requirement*. Facilities that wish to obtain the CAH certification can meet the rural requirement by being located either in rural areas or in areas that are treated as rural.[9] CMS uses a formula based on multiple criteria to determine rural status. Examples of these criteria include whether a CAH is located outside a metropolitan statistical area (MSA), located inside a

---

[5] 42 CFR § 485.610(c).
[6] CMS, *State Operations Manual,* Pub. No. 100-07, ch. 2, § 2256A. Accessed at http://cms.gov on July 7, 2011.
[7] Ibid. Accessed at http://cms.gov on July 7, 2011.
[8] CMS, *Clarification of the Critical Access Hospital (CAH) Criteria for Rural Location and Mountainous Terrain Distance Standard,* April 19, 2013 (S&C: 13-26-CAH). Accessed at http://cms.gov on April 25, 2013.
[9] 42 CFR § 485.610(b).

EXHIBIT A

8

rural census tract, or located in an area designated as rural by State law or regulation.[10]

*Additional CAH requirements*.  To be certified as CAHs, facilities must meet additional requirements beyond the location requirements described above.  For example, CAHs cannot have more than 25 beds that are used for acute care or "swing-bed" patients, they must offer 24-hour emergency services, and they must achieve an annual average length of stay for patients that does not exceed 96 hours.[11, 12, 13]

## Necessary Provider CAHs

Prior to January 1, 2006, States had discretion to designate hospitals that did not meet the distance requirement as "necessary provider" (NP) CAHs.[14]  NP CAHs had to comply with all of the other CAH Conditions of Participation at their certifications, including the rural requirement.[15]

At least 40 States identified specific location-related requirements other than distance that hospitals had to meet to receive the NP designation.[16]  Most of these States required CAHs to be located in areas where there was a shortage of health care resources or to be located in counties where the unemployment or poverty rates exceeded States' averages.

Existing NP CAHs are permanently exempt from meeting the distance requirement, unless they relocate.  Effective January 1, 2006, the Medicare Prescription Drug, Improvement, and Modernization Act prohibited the creation of new NP CAHs, but allowed existing NP CAHs to retain their NP designations indefinitely, as long as they continue to meet all other

---

[10] Ibid.  A metropolitan statistical area (MSA) is an urbanized area with at least 50,000 inhabitants.  A rural census tract is a census tract that does not have significant commuting ties to an area with 2,500 or more people.

[11] 42 CFR § 485.620(a).  A "swing bed" is a CAH bed that is reimbursed for skilled nursing services.

[12] 42 CFR § 485.618(a).

[13] 42 CFR § 485.620(b).

[14] Balanced Budget Act of 1997, P.L. 105-33 § 4201, Social Security Act, § 1820(c)(2)(B)(i)(II), 42 U.S.C. § 1395i-4(c)(2)(B)(i)(II).

[15] Balanced Budget Act of 1997, P.L. 105-33 § 4201, Social Security Act, § 1820(c)(2)(B) and (e)(3), 42 U.S.C. § 1395i-4(c)(2)(B) and (e)(3).

[16] Technical Assistance Center and Services Center, *Necessary Provider Definitions*, September 2012.  Accessed at http://www.ruralcenter.org/tasc/resources/necessary-provider-definitions on January 17, 2013.

EXHIBIT A

CAH requirements.[17, 18]

Although States are no longer able to designate new NP CAHs, most CAHs are NP CAHs. At the time of this analysis, approximately 75 percent of all CAHs were NP CAHs.

### Participating in Medicare as a CAH

To participate in Medicare as CAHs, facilities must undergo a certification process. During this process, CMS verifies that facilities meet all of the requirements included in the CAH Conditions of Participation.[19, 20, 21] If CMS finds facilities to be compliant, it approves them for CAH certifications.[22]

_Evaluation of the location requirements during certification_. Since the creation of the CAH certification in 1997, there have been changes in how CMS evaluates the location requirements during the certification process. Currently, during the certification process, CMS verifies that prospective CAHs meet the distance and rural requirements.[23] Prior to 2006, when States were able to designate CAHs as NPs, CMS verified that prospective non-NP CAHs met the distance requirement and that both prospective NP and non-NP CAHs met the rural requirement.[24] As previously stated, NP CAHs were exempt from meeting the distance requirement at the time of their certifications.

### Maintaining the CAH Certification

CAHs are subject to periodic reassessments of their compliance with the CAH Conditions of Participation. According to CMS staff, these

---

[17] Medicare Prescription Drug, Improvement, and Modernization Act of 2003, P.L. 108-173 § 405(h), Social Security Act, § 1820(c)(2)(B)(i)(II), 42 U.S.C. § 1395i-4(c)(2)(B)(i)(II).

[18] Medicare Prescription Drug, Improvement, and Modernization Act of 2003, P.L. 108-173 §405(h), Social Security Act, § 1820(h), 42 U.S.C. § 1395i-4(h).

[19] CMS, _State Operations Manual_, Pub. No. 100-07, ch. 2, § 2256A. Accessed at http://cms.gov on July 7, 2011.

[20] In rare cases, CMS would also verify that hospitals meet all of the requirements included in the hospital Conditions of Participation.

[21] State agencies survey CAHs for compliance with the CAH Conditions of Participation prior to CMS verification. Accreditations from one of the three CMS-approved CAH Medicare accreditation programs can replace State agency survey and certification or reassessment for CAHs. Organizations that maintain CAH Medicare accreditation programs include the Joint Commission; the American Osteopathic Association; and Det Norske Veritas Healthcare, Inc.

[22] CMS, _State Operations Manual_, Pub. No. 100-07, ch. 2, §§ 2256 A–B. Accessed at http://cms.gov on July 7. 2011.

[23] CMS, _State Operations Manual_, Pub. No. 100-07, ch. 2, §§ 2256A. Accessed at http://cms.gov on April 29, 2013.

[24] Ibid. Accessed at http://cms.gov on July 7, 2011.

reassessments must take place every 3 years, on average.  For CAHs to maintain their certifications, CMS or a CMS-approved Medicare CAH accreditation program must verify that the CAHs continue to meet all CAH Conditions of Participation.[25]

*Further evaluation of the location requirements*.  Prior to 2013, CMS did not periodically reassess whether CAHs continued to meet the location requirements.  CMS guidance required that non-NP CAHs' compliance with the distance requirement and non-NP and NP CAHs' compliance with the rural requirement be verified only during the initial certification process.[26]  Because CMS did not routinely reassess whether CAHs continued to meet the location requirements, most CAHs that did not meet the requirements retained their critical access certifications.

In March 2013, CMS removed the limitation that it assess compliance with locations requirements only during the certification process.[27]  As a result, non-NP CAHs that do not meet the distance requirement and non-NP and NP CAHs that do not meet the rural requirement at the time of these reassessments can now be decertified and given the opportunity to convert to certified Medicare hospitals (after demonstrating compliance with the hospital Conditions of Participation).[28]  NP CAHs are statutorily exempt from meeting the distance requirement.

CMS reassesses whether CAHs meet the rural requirement (and in some cases, the distance requirement) if CAHs relocate or have changes of ownership and the new owners do not assume the existing provider agreement.[29, 30]  In the case of non-NP CAHs, CMS reassesses whether they meet both requirements.  In the case of NP CAHs, CMS reassesses whether they meet the rural requirement but does not reassess whether

---

[25] CMS, *State Operations Manual*, Pub. No. 100-07, ch. 2, §§ 2021A and 2022B. Accessed at http://cms.gov on July 7, 2011.

[26] CMS, *State Operations Manual, Appendix W – Survey Protocol, Regulations and Interpretive Guidelines for Critical Access Hospitals (CAHs) and Swing-Beds in CAHs*, § C-0160.  Accessed at http://cms.gov on July 7, 2011.

[27] CMS, *Guidance for Hospitals, Critical Access Hospitals (CAHs) and Ambulatory Surgical Centers (ASCs) Related to Various Rules Reducing Provider/ Supplier Burden,* March 15, 2013 ( S&C:  13-20-Acute Care), p. 119.  Accessed at http://cms.gov on April 25, 2013.

[28] Ibid.

[29] CMS, *State Operations Manual, Appendix W – Survey Protocol, Regulations and Interpretive Guidelines for Critical Access Hospitals (CAHs) and Swing-Beds in CAHs*, § C-0160.  Accessed at http://cms.gov on July 7, 2011.

[30] CMS, *State Operations Manual*, Pub. No. 100-07, ch. 2, § 2256.  Accessed at http://cms.gov on July 7, 2011.

they meet the distance requirement.[31]  CAHs must notify CMS of any
changes in their location or ownership.[32]

## Payments for CAH Services

CMS pays CAHs under a system different from that for paying most other
hospitals.  CAHs receive 101 percent of their "reasonable costs" for most
services provided.[33, 34]  CMS determines these costs using information
from CAHs' cost reports.[35]  CMS pays most other hospitals using inpatient
and outpatient prospective payment systems (IPPS and OPPS), which pay
predetermined rates for treating beneficiaries.[36, 37]  Inpatient services are
paid on the basis of the patients' diagnoses, while outpatient services are
paid on the basis of the services provided.

Like other Medicare beneficiaries, beneficiaries who receive services at
CAHs are responsible for paying a deductible and coinsurance for
inpatient services.[38]  However, the inpatient deductible and coinsurance are
the same whether services were provided at a CAH or at a hospital paid
under IPPS.[39]

Additionally, like other Medicare beneficiaries, beneficiaries who receive
services at CAHs are responsible for paying a deductible and coinsurance
for outpatient services.[40]  CAHs' cost-based reimbursement method results
in coinsurance calculated from submitted charges rather than from final
costs for services provided, making coinsurance a relatively high
percentage of final total payments.  Medicare beneficiaries generally do
not pay coinsurance for outpatient laboratory services and certain
preventive outpatient services.[41]

## Proposed CAH Changes

Medicare payments to CAHs have come under increased scrutiny as part
of ongoing deficit-reduction discussions.  In September 2011, the

---

[31] If an NP CAH relocates and will not continue to serve essentially the same service
area, it will need to meet the distance requirement.  CMS, *State Operations Manual,*
Pub. No. 100-07, ch. 2, § 2256F.

[32] 42 CFR § 424.516(e).

[33] Social Security Act, §§ 1814(l) and 1834(g), 42 U.S.C. §§ 1395(l) and 1395m(g).

[34] "Reasonable costs" are the direct and indirect costs associated with providing services
to Medicare beneficiaries.  42 CFR § 413.9(b)(1).

[35] 42 CFR § 413.20(a).

[36] Social Security Act, § 1886(d) and (g), 42 U.S.C. § 1395ww(d) and (g).

[37] Social Security Act, § 1833, 42 U.S.C. § 1395l.

[38] Social Security Act, § 1866(a)(2)(A), 42 U.S.C. § 1395cc(a)(2)(A).

[39] Social Security Act, § 1813(a)(1), 42 U.S.C. § 1395e(a)(1).  Inpatient coinsurance is a
percentage of the inpatient deductible, which is a fixed amount set annually by law.

[40] Social Security Act, § 1866(a)(2)(A), 42 U.S.C. § 1395cc(a)(2)(A).

[41] Social Security Act, § 1833(a)(1), 42 U.S.C. § 1395l(a)(1).

EXHIBIT A

12

President published his *Plan for Economic Growth and Deficit Reduction*.[42]  The Plan proposed reducing CAH reimbursements to 100 percent of reasonable costs and eliminating the critical access certification for CAHs fewer than 10 miles from another hospital.[43]  The President's proposed budget for fiscal year 2014 made the same recommendations and estimated the savings over 10 years to be $1.4 billion from reducing reimbursement to 100 percent of reasonable costs (from 101 percent) and $690 million from eliminating the critical access certifications of CAHs located fewer than 10 miles from another hospital.[44]

**Related Work**

In 1996 and 2003, the Office of Inspector General (OIG) issued reports that focused on rural health clinic (RHC) program compliance.  Like the intent of CAHs, the intent of RHCs is to ensure accessible health care to Medicare beneficiaries in rural communities.  In both studies, OIG found numerous RHCs noncompliant with the requirements that they be located in rural and underserved areas.  Additionally, OIG found that the requirements did not effectively prevent RHC participation in areas with existing health care providers.[45, 46]

OIG is conducting a nationwide review of swing-bed services at CAHs.[47] OIG is comparing the reimbursement for swing-bed services at CAHs to the reimbursement for the same level of care obtained at skilled nursing facilities for 2005–2010.

# METHODOLOGY

To determine the extent to which CAHs would meet the location requirements if required to re-enroll in Medicare, we plotted CAHs' and hospitals' locations onto digital maps using ArcGIS, a type of mapping and spatial analysis software.  We also surveyed CMS and State agencies to collect information about rural areas and mountainous terrain.

---

[42] Office of Management and Budget, *Living Within Our Means and Investing in the Future:  The President's Plan for Economic Growth and Deficit Reduction*, September 2011.  Accessed at http://www.whitehouse.gov on October 24, 2011.

[43] Ibid., p. 36.

[44] OMB, *Fiscal Year 2014 Budget of the U.S. Government*, p. 196, 2013.

[45] OIG, *Rural Health Clinics:  Growth, Access, and Payment*, OEI-05-94-00040, July 1996.

[46] OIG, *Status of Rural Health Clinic Program*, OEI-05-03-00170, August 2005.

[47] OIG, *U.S. Department of Health and Human Services Office of Inspector General Work Plan:  Fiscal Year 2013*, Part 1, p. 7.  Accessed at http://oig.hhs.gov on July 23, 2013.

To calculate the potential savings to Medicare and beneficiaries if CMS
were to decertify some CAHs that would not meet the location
requirements if required to re-enroll, we analyzed 2011 claims data.

For a detailed description of the methodology, see Appendix B.

## Scope

We limited our review to the location requirements used by CMS to certify
CAHs.  We determined whether CAHs would meet the location
requirements if required to re-enroll, but we did not determine whether
they would meet the remaining CAH Conditions of Participation.

Further, we did not examine the types of services or quality of services
provided by CAHs.  We performed a limited review of emergency service
availability—we determined whether nearby facilities provided emergency
services, but we did not compare the complexity of the emergency
services provided at these locations to the services provided at CAHs.

## Data Sources and Collection

*Hospital information*.  To identify CAHs' and hospitals' locations, we used
the Certification and Survey Provider Enhanced Reports (CASPER)
database.[48]  To identify CAHs and hospitals that had emergency
departments, we used CMS's 2011 National Claims History (NCH)
inpatient and outpatient files.  Finally, CMS provided us a list of all NP
CAHs.

*Distance requirement*.  To determine whether CAHs would meet the
distance requirement if required to re-enroll, we used CAHs' and
hospitals' locations and two additional sources:

1.  Roadway classification codes from the ArcGIS U.S. and Canada
    Streets dataset to identify primary and secondary roads.[49]

2.  Survey of all States' Departments of Transportation regarding areas
    of mountainous terrain.

*Rural requirement*.  To determine whether CAHs would meet the rural
requirement if required to re-enroll, we used CAHs' locations, the U.S.
Census Bureau's 2010 MSA files, the U.S. Department of Agriculture's
list of rural census tracts, and documents from States' Departments of
Rural Health that identify areas designated as rural by State law or
regulation.

---

[48] The CASPER database includes data generated from certification surveys and includes
information such as provider addresses and enrollment dates.
[49] Tom Tom, Data and Maps for ArcGIS, *U.S. and Canada Detailed Streets Metadata*,
2012.

*Potential savings*.  To calculate potential savings to Medicare and beneficiaries if CMS were to decertify CAHs that would not meet the location requirements, we used CMS's 2011 NCH inpatient and outpatient files.

## Data Analysis

*Hospital locations*.  To plot CAHs' and hospitals' locations, we first retrieved addresses for the 4,751 active hospitals and 1,329 active CAHs in the CASPER database.  We then plotted all of the hospitals' and CAHs' locations onto a digital map using ArcGIS.  This digital map served as the foundation of our analysis of whether CAHs would meet the location requirements if required to re-enroll.

*Distance requirement*.  To determine whether CAHs would meet the distance requirement if required to re-enroll, we first determined the driving distance from each CAH to the nearest hospital or other CAH using ArcGIS.  We stopped at this point for CAHs greater than 35 miles or 15 miles or fewer from the nearest hospital or other CAH, as driving distances alone were enough to determine that the first group of CAHs would meet the distance requirements and that the second group would not.  For each of the remaining CAHs—those more than 15 and up to 35 miles from the nearest hospital or other CAH—we analyzed routes to the nearest hospital or other CAH and survey responses from States' Departments of Transportation to determine the number of miles that were through mountainous terrain or on secondary roads.

*Emergency services at hospitals near CAHs*.  To determine whether CAHs were providing services that beneficiaries could not get at nearby hospitals, we determined whether CAHs that would not meet the distance requirement were located near hospitals or other CAHs that provided emergency services.  Emergency services are one of several types of services that CAHs are required to provide.

We used the 2011 NCH inpatient and outpatient files to identify CAHs and hospitals that Medicare paid for emergency services.  We then determined how many of the hospitals or CAHs nearest to the CAHs that would not meet the distance requirement Medicare had paid for emergency services in 2011.

*Rural requirement*.  To determine whether CAHs would meet the rural requirement if required to re-enroll, we used ArcGIS and the MSA files to determine whether CAHs were located outside MSAs.  Next, for CAHs that were located inside MSAs, we determined whether they were located in rural census tracts.  Finally, for CAHs that were located inside MSAs and not located in rural census tracts, we used States' documents to

determine whether they were located in areas designated as rural by the States.

_NP CAH analysis_.  We used the list of NP CAHs to determine how many CAHs that would not meet the location requirements were NPs.

_Compliance with location requirements not possible to determine_.  For some CAHs, we could not determine whether they would meet the location requirements.  We discuss the reason why a determination was not possible in a finding.

_Potential savings_.  We used the 2011 inpatient and outpatient NCH files to calculate potential savings to Medicare and beneficiaries if CMS were to decertify some CAHs that would not meet the location requirements.  We included all inpatient services in this analysis, but only some outpatient services.  The outpatient services we selected include clinic and emergency department visits; significant outpatient procedures and services provided along with these procedures, such as pathology services and x-ray services; imaging services; services paid under a fee schedule or payment system other than the OPPS; and outpatient laboratory services. These services represent approximately 60 percent of all outpatient services provided at CAHs that would not meet the location requirements if required to re-enroll and 47 percent of the outpatient services for which beneficiaries paid coinsurance.  The payments to CAHs for these selected outpatient services represent approximately 67 percent of Medicare and beneficiary payments for all outpatient services provided at CAHs that would not meet the location requirements if required to re-enroll.

We calculated potential savings to Medicare and beneficiaries if CMS were to decertify some CAHs that would not meet the location requirements.  We did this by comparing what CMS paid for inpatient and selected outpatient services at these CAHs in 2011 to what they would have paid for these services under prospective payment systems and fee schedules (hereinafter known as the "base rates").  Table 1 describes the formulas we used to compute the savings to Medicare and beneficiaries for inpatient and selected outpatient services.

**Table 1:  Formulas Used To Compute Savings to Medicare and Beneficiaries If CMS Were To Decertify Some CAHs That Would Not Meet the Location Requirements If Required To Re-enroll in Medicare**

| Type of Service | Medicare Savings | Beneficiary Savings |
|---|---|---|
| Inpatient services | Medicare payments to CAHs that would not meet the location requirements *minus* base rates *minus* beneficiary inpatient deductibles | We did not attempt to calculate potential  beneficiary savings for inpatient stays, as deductible and coinsurance amounts are the same for services received at a CAH and at a hospital paid under IPPS |
| Outpatient services with beneficiary coinsurance | Medicare payments to  CAHs that would not meet the location requirements *minus* base rates *minus* beneficiary coinsurances | Coinsurance payments to CAHs that would not meet the location requirements *minus* coinsurance payments under the OPPS |
| Outpatient services with no beneficiary coinsurance | Medicare payments to  CAHs that would not meet the location requirements *minus* base rates | N/A |

Source:  OIG analysis method.

## Limitations

We adopted a conservative definition of "primary roads" that likely resulted in an underestimate of the number of CAHs that would not meet the distance requirement if required to re-enroll.  We were not able to identify all primary roads because the dataset we used did not include the number of lanes each road contained.  Instead, we adopted a conservative definition of "primary roads," defining them only as interstate and Federal highways.  We classified all State highways, including those with two or more lanes in one direction, as secondary roads.

We used an older dataset for our distance analysis that may have resulted in a further underestimate of the number of CAHs that would not meet the distance requirement if required to re-enroll.  We used a dataset published in 2007 to find routes between CAHs and their nearest hospitals.  More recent datasets would contain newly constructed roads that might reduce the driving distances between CAHs and the hospitals closest to them.

Our figures for potential per-CAH savings for Medicare and beneficiaries are likely low and should be considered conservative estimates, given that our analyses did not include all services performed at the CAHs that would not meet the location requirements.  We included only inpatient services and some outpatient services in our calculations.

## Standards

This study was conducted in accordance with the *Quality Standards for Inspection and Evaluation* issued by the Council of the Inspectors General on Integrity and Efficiency.

EXHIBIT A

**17**

## FINDINGS

## Nearly two-thirds of CAHs would not meet the location requirements if required to re-enroll

Overall, 849 of the 1,329 CAHs (64 percent) would not meet the location requirements if required to re-enroll in Medicare. The vast majority of these CAHs would not meet the distance requirement, and only three of these CAHs would not meet the rural requirement. Approximately 1.2 million beneficiaries received services at these CAHs in 2011.

### *Eight hundred forty-six CAHs would not meet the distance requirement*

Of the 846 CAHs that would not meet the distance requirement if required to re-enroll, 306 were located a drive of 15 or fewer miles from their nearest hospitals or other CAHs (and, therefore, had 15 or fewer miles of their routes going through mountainous terrain or on secondary roads.) Figure 1 illustrates the distribution of driving distances for these CAHs. Of these CAHs, 235 were between 10–14 miles from their nearest hospitals or other CAHs. The other 71 CAHs were less than a 10-mile drive from their nearest hospitals or other CAHs.

**Figure 1: The Distribution of Driving Distances for CAHs That Would Not Meet the Distance Requirement That Are a Drive of 15 or Fewer Miles From Their Nearest Hospitals or Other CAHs**



Source: OIG analysis of CAHs' distances to their nearest hospitals or other CAHs.

The remaining 540 CAHs were located between 15 and up to 35 miles from their nearest hospitals or other CAHs. These CAHs had 15 or fewer miles of their routes going through areas of mountainous terrain or

areas where only secondary roads were available.  Figure 2 illustrates the
distribution of driving distances for these CAHs and the average number
of miles of their routes that traveled though areas of mountainous terrain
or were on secondary roads.  On average, the routes from these CAHs to
their nearest hospitals or other CAHs traveled through approximately
5 miles of mountainous terrain or secondary roads.

**Figure 2:  The Distribution of Driving Distances for CAHs That Were
Between 15 and up to 35 Miles From Their Nearest Hospitals or Other CAHs
and the Average Numbers of Miles of Their Routes That Were Through
Mountainous Terrain or on Secondary Roads**



Source:  OIG analysis of CAHs' distances to their nearest hospitals or other CAHs.

CAHs that would not meet the distance requirement if required to re-enroll
were most often located near other CAHs.  Approximately 50 percent were
located nearest to other CAHs; 43 percent were located nearest to
acute-care hospitals; and the remaining 7 percent were located nearest to
other types of hospitals, such as psychiatric or rehabilitation hospitals.  For
an example of CAHs' locations relative to those of other CAHs and
hospitals in an average State, see Appendix C.

Most of the CAHs and hospitals that were located near CAHs that would
not meet the distance requirement if required to re-enroll provided
emergency services in 2011.  Approximately 93 percent of CAHs and
hospitals (including acute-care hospitals and other types of hospitals)
located near these CAHs provided emergency services.  Most hospitals
that were near CAHs and that did not provide emergency services were

psychiatric hospitals.  Table 2 provides the number of all CAHs and hospitals that were near CAHs and that did not provide emergency services.

**Table 2:  CAHs and Hospitals That Were Near CAHs and That Did Not Provide Emergency Services in 2011**

| Type of Hospital | Number That Did Not Provide Emergency Services |
|---|---:|
| Psychiatric hospital | 34 |
| Acute-care hospital | 15 |
| Long-term-care hospital | 4 |
| Rehabilitation hospital | 3 |
| CAH | 1 |

Source:  OIG analysis of CAHs and hospitals that are near CAHs and that do not provide emergency services.

### *Most CAHs that would not meet the location requirements are NP CAHs*

Of the 849 CAHs that would not meet the location requirements if required to re-enroll, 88 percent were NP CAHs.  NP CAHs did not have to meet the distance requirement when they were initially certified.  Further, NP CAHs are permanently exempt from meeting the distance requirement because of statutory provisions.  Table 3 provides the number of NP and non-NP CAHs that would not meet the location requirements if required to re-enroll.

**Table 3:  Number of NP and Non-NP CAHs That Would Not Meet the Location Requirements If Required to Re-enroll in Medicare**

| | Number of CAHs That Would Not Meet the Distance Requirement | Number of CAHs That Would Not Meet the Rural Requirement | Total |
|---|---:|---:|---:|
| NP CAHs (n=994) | 749 | 2 | 751 |
| Non-NP CAHs (n=335) | 97 | 1 | 98 |
| **Total** | 846 | 3 | 849 |

Source:  OIG analysis of NP and non-NP CAHs.

NP and non-NP CAHs that would not meet the location requirements if required to re-enroll differed in several ways.  NP CAHs were located closer and had shorter driving times to their nearest hospitals than non-NP

CAHs.  Most CAHs located in metropolitan areas were NP CAHs. Further, most CAHs that would not meet location requirements and were owned by private, for-profit organizations were NP CAHs.

Table 4 describes these differences between NP and non-NP CAHs that would not meet the location requirements if required to re-enroll.

**Table 4:  Differences Between NP and Non-NP CAHs That Would Not Meet the Location Requirements If Required To Re-enroll**

|  | NP CAHs | Non-NP CAHs |
|---|---|---|
| Average distance to nearest hospital | 18.8 miles | 20.7 miles |
| Average time to nearest hospital | 29.3 minutes | 31.1 minutes |
| Located in metropolitan areas (n= 173) | 151 (87%) | 22 (13%) |
| Owned by private, for-profit entities (n= 49) | 40 (82%) | 9 (18%) |

Source:  OIG analysis of differences between NP and non-NP CAHs.

### *For 62 CAHs, it was not possible to determine whether they would meet the location requirements if required to re-enroll*

For 62 CAHs, it was not possible to determine whether they would meet the distance requirement if required to re-enroll because CMS's guidance at the time of our analysis did not reference a uniform definition of "mountainous terrain" and not all States have a definition of "mountainous terrain."  USGS's Web site stated that the agency does not have an official definition despite CMS's naming USGS as a source of this information in guidance to State survey agencies.  Additionally, Department of Transportation staff of at least one State that did not have a definition would not provide OIG a subjective determination of what they consider to be mountainous terrain.

## Medicare and beneficiaries could realize substantial savings if CMS were to decertify some CAHs

Medicare and beneficiaries could realize substantial savings if CMS decertified some CAHs that would not meet the location requirements if required to re-enroll in Medicare.  Medicare would reimburse decertified CAHs at the rates set by prospective payment systems and fee schedules rather than at 101 percent of costs.  Rates set by the prospective payment systems and fee schedules are typically lower than the rates that CAHs receive for most services.

### *Medicare could realize substantial savings if CMS were to decertify some CAHs*

Because services provided at CAHs are typically reimbursed at rates that are higher than the base rates, Medicare could realize substantial savings if CMS were to decertify some CAHs that would not meet the location requirements.  For example, if CMS had decertified all CAHs located 15 or fewer miles from their nearest hospitals or other CAHs, Medicare could have saved an estimated $268 million in 2011.  Additionally, if CMS had decertified half of all CAHs that would not meet the location requirements, Medicare could have saved an estimated $373 million in 2011.  On average, Medicare could have saved approximately $860,000 per decertified CAH in 2011.[50]

### *Beneficiaries could realize substantial savings in coinsurance if CMS were to decertify some CAHs*

Because coinsurance amounts for services provided at CAHs are calculated on the basis of charges rather than final costs, beneficiaries pay more for services at these facilities than they likely would for the same services at acute-care hospitals.  For example, if CMS had decertified all CAHs located 15 or fewer miles from their nearest hospitals or other CAHs, beneficiaries could have saved an estimated $181 million in coinsurance in 2011.  Additionally, if CMS had decertified half of the CAHs that would not meet the location requirements, beneficiaries could have saved an estimated $200 million in coinsurance in 2011.  On average, beneficiaries could have saved an estimated $485,000 in coinsurance per decertified CAH, or approximately $400 per CAH beneficiary who received outpatient services, in 2011.[51]

---

[50] This amount includes payments for inpatient and selected outpatient services.
[51] This amount includes coinsurance for selected outpatient services.

## CONCLUSION AND RECOMMENDATIONS

Sixty-four percent of CAHs would not meet the location requirements if required to re-enroll in Medicare.  Most of these CAHs are NP CAHs that would not meet the distance requirement.  CMS is not authorized to decertify these CAHs because NP CAHs are statutorily exempt from meeting the distance requirement.  Further, prior to April 2013, CMS did not evaluate whether non-NP CAHs continued to meet the location requirements after they enrolled in Medicare.

Medicare and beneficiaries could realize substantial savings if CMS were authorized to reassess whether all CAHs should retain their certifications and concluded that some should be decertified.  For example, we calculated that Medicare and beneficiaries could have saved more than $1.3 million per decertified CAH in 2011.  These savings would come from paying the decertified CAH at the rates set by prospective payment systems and fee schedules.  These CAHs would have the option to remain enrolled in Medicare as acute-care hospitals.

Because the CAH certification results in increased spending for both Medicare and beneficiaries, CMS should ensure that the only CAHs to retain the critical access certification are those that continue to serve beneficiaries who would otherwise be unable to reasonably access hospital services.

To do this, we recommend that CMS:

### Seek Legislative Authority To Remove Necessary Provider CAHs' Permanent Exemption From the Distance Requirement, Thus Allowing CMS To Reassess These CAHs

NP CAHs' permanent exemption from the distance requirement prevents CMS from periodically reassessing these CAHs.  NP CAHs may have provided beneficiaries needed access to hospital services when originally certified, and many of them may continue to do so now.  However, CMS should periodically reassess whether these CAHs are still providing this access and are deserving of increased financial support from Medicare and beneficiaries.

### Seek Legislative Authority to Revise the CAH Conditions of Participation To Include Alternative Location-Related Requirements

The CAH Conditions of Participation currently include two location-related requirements:  the distance and rural requirements.  However, most CAHs are NPs that were granted their CAH certifications because they met State-defined location-related requirements.  To ensure

EXHIBIT A

23

that CMS can evaluate whether these and other CAHs serve beneficiaries who would otherwise be unable to reasonably access hospital services, CMS should include alternative location-related Conditions of Participation by which to further evaluate CAHs that would otherwise lose their certifications because they did not meet the distance or rural requirements.  For example, CMS could allow CAHs to keep their certifications if they serve communities with high poverty rates, even if they don't meet the location requirements.

Including these alternative location-related requirements would allow CMS to make better-informed decisions about which CAHs should retain their certifications.  We strongly encourage CMS to include only requirements that it can assess in a uniform manner on a national level. For guidance on alternative location-related requirements, CMS could reference States' NP criteria.

Under separate cover, we have referred to CMS the CAHs that would not meet the location requirements if required to re-enroll.  CMS could prioritize reassessing these CAHs after it updates the CAH Conditions of Participation.  CMS could also conduct an evaluation of these CAHs, outside the current reassessment schedule, to determine whether these CAHs should retain their certifications.

### Ensure That It Periodically Reassesses CAHs' Compliance With All Location-Related Conditions of Participation

In March 2013, CMS began requiring that CAHs submit to periodic reassessment of the distance and location requirements.  CMS should ensure that these periodic reassessments continue and that these reassessments include any additional location-related requirements that it may add to the CAH Conditions of Participation in the future.

While performing these periodic reassessments, CMS may determine that some CAHs should be decertified.  CMS could grant a transition period during which decertified CAHs would gradually move from cost-based payments to the prospective payment systems and fee schedules.

### Ensure That It Applies Its Uniform Definition of "Mountainous Terrain" to All CAHs

In April 2013, CMS published a uniform definition of "mountainous terrain."  CMS should ensure that it uses this definition during periodic reassessments of CAHs' compliance with the CAH Conditions of Participation, as well as during the certification of new CAHs.

## AGENCY COMMENTS AND OFFICE OF INSPECTOR GENERAL RESPONSE

CMS concurred with our first, third, and fourth recommendations, but did not concur with our second recommendation. CMS's responses to our recommendations indicate a desire to balance preserving beneficiary access to care with promoting payment efficiency. OIG also believes that future management of CAHs should balance these competing objectives and urges CMS to take all of the actions described in our recommendations.

CMS concurred with our first recommendation—seek legislative authority to remove necessary provider CAHs' permanent exemptions—thus allowing CMS to reassess whether these CAHs should retain their critical access certifications. However, the actions described by CMS did not address the main point of our recommendation, which was to remove the permanent exemption status from all NP CAHs. CMS indicated that it supports the plan outlined in the President's FY 2014 budget to decertify all CAHs that are fewer than 10 miles from the nearest hospital or CAH. If CMS took only this action, it would have authority to reassess only 71 of the NP CAHs. We continue to recommend that CMS seek legislative authority to remove the necessary provider exemption from the remaining NP CAHs so it could reassess whether these CAHs should retain their certifications as well.

CMS did not concur with our second recommendation, which originally read "revise the CAH Conditions of Participation to include additional location-related requirements." CMS noted that the existing distance and rural requirements have been uniformly applied to all CAHs certified since January 2006 and stated that establishing new criteria could be duplicative and overly burdensome to implement. CMS also stated that it believes the CAH certification should not be tied to criteria that have the potential to change rapidly, such as the types of services offered.

We have revised our second recommendation to better reflect our intent and to acknowledge that creating alternative location requirements would require a legislative change. We now recommend that CMS seek legislative authority to revise the CAH Conditions of Participation to include alternative location-related requirements. Beneficiary access may depend on factors other than distance to another provider or rural location. CAHs that are providing important access to beneficiaries but are not meeting the current distance or rural requirements could possibly retain their certifications by meeting alternative location-related requirements. These requirements could be tied to stable characteristics, as opposed to rapidly fluctuating criteria, of nearby hospitals or the surrounding

communities.  Examples of such stable characteristics could include whether the nearby hospital was a specialty hospital or an acute-care hospital or whether the surrounding community had a high poverty rate. We continue to encourage CMS to reference States' NP criteria when developing additional location-related requirements.

CMS concurred with our third and fourth recommendations—to periodically reassess CAHs' compliance with all location-related Conditions of Participation and to apply its uniform definition of "mountainous terrain" to all CAHs.  CMS noted that it had recently issued two memorandums on these issues, one requiring that all non-NP CAHs be recertified periodically on the distance and rural requirements and one that establishes a uniform definition of "mountainous terrain."  CMS stated that these memorandums now represent CMS policy to which CMS regional offices, State survey agencies, and accrediting organizations with CMS-approved Medicare CAH accreditation programs will be expected to adhere when certifying and recertifying CAHs.  We look forward to seeing CMS's plans for ensured compliance with both of these new policies.

For the full text of CMS's comments, see Appendix D.

## APPENDIX A

**Distance and Rural Requirements**

The material in this appendix is quoted verbatim from the sources listed in the footnotes.

(b) *Standard:  Location in a rural area or treatment as rural*. The critical access hospital (CAH) meets the requirements of either paragraph (b)(1) or (b)(2) of this section or the requirements of either (b)(3) or (b)(4) of this section:

(1) The CAH meets the following requirements:

(i) The CAH is located outside any area that is a Metropolitan Statistical Area, as defined by the Office of Management and Budget, or that has been recognized as urban under the regulations in § 412.64(b), excluding paragraph (b)(3) of this chapter.[52]

- The term *urban area* means—

(A) A Metropolitan Statistical Area or a Metropolitan division (in the case where a Metropolitan Statistical Area is divided into Metropolitan Divisions), as defined by the Executive Office of Management and Budget; or

(B) For discharges occurring on or after October 1, 1983, and before October 1, 2007, the following New England counties are deemed to be parts of urban areas under section 601(g) of the Social Security Amendments of 1983 (Pub. L. 98-21, 42 U.S.C. 1395ww (note); Litchfield County, Connecticut; York County, Maine; Sagadahoc County, Maine; Merrimack County, New Hampshire; and Newport County, Rhode Island.[53]

(ii) The CAH has not been classified as an urban hospital for purposes of the standardized payment amount by the Centers for Medicare & Medicaid Services or the Medicare Geographic Classification Review Board under § 412.230(e) of this chapter, and is not among a group of

---

[52] 42 CFR 485.610(b).
[53] 42 CFR 412.64 (b)(ii).

hospitals that have been redesignated to an adjacent urban area under § 412.232 of this chapter.[54]

(2) The CAH is located within a Metropolitan Statistical Area (MSA), as defined by the Office of Management and Budget (OMB), but is being treated as being located in a rural area in accordance with § 412.103 of this chapter.[55]

- A prospective payment hospital that is located in an urban area (as defined in subpart D of this part) may be reclassified as a rural hospital if it submits an application in accordance with paragraph (b) of this section and meets any of the following conditions:

  (A) The hospital is located in a rural census tract of a MSA as determined under the most recent version of the Goldsmith Modification, the Rural-Urban Commuting Area codes, as determined by the Office of Rural Health Policy (ORHP) of the Health Resources and Services Administration, which is available via the ORHP Web site at:  http://www.ruralhealth.hrsa.gov or from the U.S. Department of Health and Human Services, Health Resources and Services Administration, Office of Rural Health Policy, 5600 Fishers Lane, Room 9A–55, Rockville, MD 20857.

  (B) The hospital is located in an area designated by any law or regulation of the State in which it is located as a rural area, or the hospital is designated as a rural hospital by State law or regulation.

  (C) The hospital would qualify as a rural referral center as set forth in § 412.96, or as a sole community hospital as set forth in § 412.92, if the hospital were located in a rural area.

  (D) For any period after September 30, 2004 and before October 1, 2006, a CAH in a county that, in FY 2004, was not part of a MSA as defined by the Office of Management and Budget, but as of FY 2005 was included as part of an

---

[54] 42 CFR 485.610(b).
[55] Ibid.

MSA as a result of the most recent census data and implementation of the new MSA definitions announced by OMB on June 6, 2003, may be reclassified as being located in a rural area for purposes of meeting the rural location requirement in § 485.610(b) of this chapter if it meets any of the requirements in paragraphs (a)(1), (a)(2), or (a)(3) of this section.[56]

(3) Effective for October 1, 2004 through September 30, 2006, the CAH does not meet the location requirements in either paragraph (b)(1) or (b)(2) of this section and is located in a county that, in FY 2004, was not part of a Metropolitan Statistical Area as defined by the Office of Management and Budget, but as of FY 2005 was included as part of such a Metropolitan Statistical Area as a result of the most recent census data and implementation of the new Metropolitan Statistical Area definitions announced by the Office of Management and Budget on June 3, 2003.[57]

(4) Effective for October 1, 2009 through September 30, 2011, the CAH does not meet the location requirements in either paragraph (b)(1) or (b)(2) of this section and is located in a county that, in FY 2009, was not part of a Metropolitan Statistical Area as defined by the Office of Management and Budget, but, as of FY 2010, was included as part of such a Metropolitan Statistical Area as a result of the most recent census data and implementation of the new Metropolitan Statistical Area definitions announced by the Office of Management and Budget on November 20, 2008.[58]

(c) *Standard: Location relative to other facilities or necessary provider certification.*  The CAH is located more than a 35-mile drive (or, in the case of mountainous terrain or in areas with only secondary roads available, a 15-mile drive) from a hospital or another CAH, or before January 1, 2006, the CAH is certified by the State as being a necessary provider of health care services to residents in the area.  A CAH that is designated as a necessary provider on or before December 31, 2005, will maintain its necessary provider designation after January 1, 2006.[59]

---

[56] 42 CFR 412.103.
[57] 42 CFR 485.610(b).
[58] Ibid.
[59] 42 CFR 485.610(c).

- *Mountainous terrain* is –

  (A) Located in a mountain range; and
  (B) Has either of the following characteristics:
       a. Consists of extensive sections of roads with steep grades (i.e., greater than 5 percent), continuous abrupt and frequent changes in elevation or direction, or any combination of horizontal and vertical alignment that causes heavy vehicles to operate at crawl speeds for significant distances or at frequent intervals; or
       b. The roads on the travel route are considered by the State Transportation or Highway agency to be located in mountainous terrain based on significantly more complicated than usual construction techniques required to achieve compatibility between the road alignment and surrounding rugged terrain.
  (C) A letter from the State Transportation or Highway agency specific to the travel route(s) in question is required to support the claim of mountainous terrain.[60]

- A *primary road* is -

  (A) A numbered federal highway, including interstates, intrastates, expressways or any other numbered federal highway; or
  (B) A numbered State highway with 2 or more lanes each way; or
  (C) A road shown on a map prepared in accordance with the U.S. Geological Survey's Federal Geographic Data Committee (FGDC) Digital Cartographic Standard for Geologic Map Symbolization as a "primary highway, divided by median strip."[61]

---

[60] CMS, *Clarification of the Critical Access Hospital (CAH) Criteria for Rural Location and Mountainous Terrain Distance Standard,* April 19, 2013 (S&C: 13-26-CAH). Accessed at http://cms.gov on April 25, 2013.
[61] CMS, *State Operations Manual*, Pub. No. 100-07, ch. 2, § 2256A. Accessed at http://cms.gov on July 7, 2011.

# APPENDIX B

## Detailed Methodology

## Determining Whether CAHs Would Meet the Distance and Rural Requirements

Critical Access Hospitals (CAH) would meet the distance requirement by being located:

- a drive of more than 35 miles from a hospital or another CAH or

- a drive of more than 15 miles from a hospital or another CAH in areas of mountainous terrain or areas where only secondary roads are available.

CAHs that would not meet the distance requirement are located:

- a drive of 15 or fewer miles from a hospital or another CAH or

- a drive of 35 or fewer miles from a hospital or another CAH, with 15 or fewer miles of the drive through mountainous terrain or on secondary roads.

CAHs would meet the rural requirements by:

- being located outside Metropolitan Statistical Areas (MSA),

- being located in rural census tracts of MSAs,

- being located in areas designated by State law or regulation as rural or by being designated as rural hospitals by State law or regulation, or

- qualifying as rural referral centers or sole community hospitals if they were located in rural areas.

CAHs that would not meet the rural requirements are located in MSAs and:

- are not located in areas designated as rural by State law or regulation and are not designated as rural hospitals by State law or regulation or

- would not qualify as rural referral centers or sole community hospitals if they were located in rural areas.

**Data Sources and Collection**

*Rural requirement*.

1. We identified MSAs using the U.S. Census Bureau's 2010 Topologically Integrated Geographic Encoding and Referencing system's (TIGER) MSA files.[62] These files are available online at http://www.census.gov/geo/www/tiger/shp.html.

2. We identified rural census tracts using the U.S. Department of Agriculture's Economics Research Service's Rural-Urban Commuting Areas (RUCA) codes. These codes are available online at http://www.ers.usda.gov/data/ruralurbancommutingareacodes/.

3. We identified areas or CAHs that are designated as rural because of State laws or regulations by surveying States' Departments of Rural Health.

4. We identified CAHs that would meet the rural requirement by meeting the rural referral center or sole community hospital criteria by conducting structured interviews with States' Departments of Rural Health.

**Data Analysis**

*Hospital locations*. We included 6,080 CAHs and hospitals in our analysis. Before plotting CAHs' and hospitals' locations, we "cleaned" each address to remove redundant characters and typographical errors. When we encountered ambiguities in the addresses, we relied on CAHs' and hospitals' Web sites to determine their correct addresses. When we were unable to confirm CAHs' or hospitals' addresses online, we called them directly.

To convert the CAHs' and hospitals' addresses into geographic coordinates, we used Texas A&M Geoservice's geocoder.[63] Geospatial software, like ArcGIS, does not recognize traditional street addresses. Instead, data must be entered into the software as geographic coordinates (i.e., latitude and longitude).

The geocoder was not able to accurately geocode the addresses of 363 CAHs and 820 hospitals, most of which are located in remote areas. We searched for these CAHs' and hospitals' names and addresses in

---

[62] TIGER files are digital spatial representations of census data.

[63] Texas A&M University Geoservices, *Geoservice's Geocoder*. Accessed at http://www.geoservices.tamu.edu/Services/Geocode/Default.aspx on October 23, 2012.

Google Maps and then visually confirmed their locations on the satellite images.  Once we confirmed a CAH's or hospital's location, we recorded the geographic coordinates of its main entrance (or, if we could not identify the main entrance, what appeared to be the middle of the length of road in front of the CAH or hospital) as provided by Google Maps.

_Distance requirement_.  To find the driving distances between CAHs and their nearest hospitals or other CAHs, we used ArcGIS's Network Analyst tool.  We identified multiple routes from each CAH to its nearest hospitals or other CAHs.  For analysis purposes, we selected either the shortest route that caused a CAH to not meet the distance requirement or the shortest overall route if all of the routes showed that a CAH would meet the distance requirement.

We used the North America Equidistant Conic coordinate system to conduct the analysis in ArcGIS.  North America Equidistant Conic was appropriate for our analysis because it reduces shape distortions far better than other geographic systems by accounting for the curvature of the earth. Limiting distortions is an important consideration when conducting a distance analysis, as they can lead to inaccuracies in distance measurements.

Additionally, to differentiate between primary and secondary roads, we used Shield Codes.  Shield Codes are numbers assigned to roadways that describe the type of road.  Because we defined "secondary road" as any road that is not a numbered Federal highway (including interstates, intrastates, expressways, or any other numbered Federal highway), we categorized primary roads as those roads with Shield Codes 1 or 2, which represent interstates and Federal highways.[64]

To identify CAHs that have more than 15 miles of their routes through mountainous terrain, we surveyed States' Departments of Transportation. We sent them detailed maps of all routes within their States that were more than 15 and up to 35 miles and had 15 or fewer miles on secondary roads. We asked States' Departments of Transportation to inspect each route and to identify the number of miles that travel through mountainous terrain.

_Emergency services at hospitals near CAHs_.  To determine whether CAHs that would not meet the distance requirement were located near hospitals or other CAHs with emergency departments, we used the 2011 NCH inpatient and outpatient file to identify CAHs and hospitals that had been

---

[64] Tom Tom, Data and Maps for ArcGIS, _U.S. and Canada Detailed Streets Metadata_, 2012.

paid for claims submitted under an emergency department revenue center
(0450, 0451, 0452, 0456, and 0459).

*Rural requirement*.  To identify CAHs that are located in rural census
tracts, we identified the census tract that each CAH is located in using
Texas A&M Geoservice's geocoder.  We then matched census tracts to
RUCA codes to identify CAHs located in rural census tracts.  Any census
tract with a RUCA code between 4 and 10 is classified as rural.[65]

Finally, we identified CAHs that:  (1) are located in areas designated as
rural by State law or regulation,  (2) are designated as rural hospitals by
State law or regulation, or (3) were granted the certification because they
proved that they would qualify as rural referral centers or sole community
hospitals if they were located in rural areas.  We used the results from our
surveys and structured interviews with States' Departments of Rural
Health to identify CAHs that would meet one of these criteria.

*Potential savings*.  We removed all professional services from the CAH
outpatient claims.[66]  To do this, we removed all services with revenue
center codes in the 095X, 096X, 097X, and 098X series.  We were not
able to remove professional services from the CAH inpatient claims, as
payment amounts for individual services are not available on the claims.
Approximately 31 percent of CAHs that would not meet the location
requirements had professional claims in their outpatient, and therefore
presumably inpatient, claims.

We used status indicator codes to identify outpatient clinic or emergency
department visits, significant procedures, services that were provided
along with significant procedures, imaging services, and services paid
under a fee schedule or payment system other than the outpatient
prospective payment system (OPPS).[67]  Specifically, we analyzed all
outpatient services with status indicators V, S, T, N, X, Q3, and A.[68]

The Centers for Medicare & Medicaid Services (CMS) pays outpatient
services with status indicator T at half of their regular rate when provided

---

[65] University of Washington, Rural Health Research Center, *RUCA Data*.  Accessed at
http://www.depts.washington.edu/uwruca/ruca-codes.php on October 23, 2012.
[66] We removed professional services from CAH outpatient claims to allow for more
accurate comparisons to the base rates for outpatient services.  Payments made under the
OPPS do not include professional services.
[67] Most of the services paid under a fee schedule or payment system other than the OPPS
were paid under the physicians' fee schedule.  We excluded any services that were
subject to carrier judgment (i.e., for which the Healthcare Common Procedure Coding
System coverage code was C).
[68] CMS, *Medicare Claims Processing Manual*, Pub. No. 100-04, ch. 4, §§ 10.1 and 10.4.
Accessed at http://cms.gov on January 3, 2011.

with other significant procedures (status indicators S or T) under the OPPS.[69]  To account for this in our analysis, we identified all services with a status indicator T that were part of a claim that included another significant procedure.  For claims that included services with status indicators S and T, we reduced the base rates by 50 percent for all services with status indicator T.  For claims that included only multiple services with status indicator T, we reduced the base rates by 50 percent for all services except the service with the highest reimbursements.  For this service, the base rate was not adjusted.

CMS pays outpatient services with status indicator Q3 either at the regular base rate or at a composite base rate, depending on the other services provided during the visit.[70]  For claims that had only one Q3 claim, we included them in our analysis at their regular base rates.  For claims that had more than one Q3 claim, when feasible, we applied the appropriate grouping logic to determine the composite base rate for those claims.

We used Current Procedural Terminology codes to identify outpatient laboratory services.[71]

Finally, when estimating the savings that Medicare and beneficiaries would have realized if Medicare had decertified half of all CAHs that would not meet the location requirements in 2011, we selected a random sample of 425 CAHs to include in the analysis.

---

[69] CMS, *Medicare Claims Processing Manual*, Pub. No. 100-04, ch. 4, §§ 10.4–10.5. Accessed at http://cms.gov on January 3, 2011.
[70] CMS, *Medicare Claims Processing Manual*, Pub. No. 100-04, ch. 4, § 10.2.1. Accessed at http://cms.gov on January 3, 2011.
[71] Current Procedural Terminology codes describe medical services and procedures.

## APPENDIX C

### Example of Critical Access Hospital Locations Relative to Those of Other Hospitals

We selected one representative region of the country to provide a visual example of critical access hospitals' (CAH) location relative to those of other hospitals.  The map below identifies all CAHs and hospitals in Missouri and surrounding States.  Missouri has 36 CAHs; 69 percent of them would not meet the location requirements if required to re-enroll in Medicare.  CAHs that would meet the location requirements are shown on the map as green checkmarks.  CAHs that would not meet the location requirements are shown as red "X" symbols.  Non-CAH hospitals are shown as black dots.



Source:  Office of Inspector General analysis of CAHs' and hospitals' locations, 2012.

# APPENDIX D

## Agency Comments

 DEPARTMENT OF HEALTH & HUMAN SERVICES

Centers for Medicare & Medicaid Services

JUN 1 7 2013

*Administrator*
Washington, DC 20201

TO:   Daniel R. Levinson
      Inspector General

FROM:   Marilyn Tavenner   /S/
        Administrator

SUBJECT:   Office of Inspector General (OIG) Draft Report: "Most Critical Access Hospitals Would Not Meet the Location Requirements" (OEI-05-12-00080)

Thank you for the opportunity to review and comment on the above-subject draft report. The OIG conducted an analysis of whether or not facilities currently certified as CAHs meet the location requirements specified in Section 1820 of the Social Security Act. OIG found that 849 CAHs, or 64 percent of all CAHs, would not meet the current location requirements if required to re-enroll. Eighty-eight percent of these 849 CAHs are necessary provider (NP), CAHs; (i.e., CAHs that were exempted from meeting the distance requirements on the basis of designation by their state as an NP). The NP designation was removed by law effective January 1, 2006 by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA). However, the MMA allowed existing NP CAHs to retain their NP designations indefinitely, as long as they continue to meet all other CAH requirements. OIG's report also notes that the President, in his September *2011 Plan for Economic Growth and Deficit Reduction* proposed eliminating the critical access certification for CAHs fewer than 10 miles from another hospital, and the President's proposed budget for FY 2014 includes this proposal.

The OIG estimated savings that the Medicare program and beneficiaries would realize if CAH status were removed for all CAHs, including NP CAHs, which do not meet the statutory location criteria. Basing its estimate on a review of 2011 Medicare claims data, the OIG estimates that Medicare and beneficiaries could have saved on average over $1.3 million per de-certified CAH in 2011 if payments were based on the inpatient and outpatient prospective payment systems fee schedules rather than the CAH payment methodology, which is based on 101 percent of a CAH's reasonable costs.

It also examined the availability of emergency services in the hospitals and CAHs nearest to those CAHs which would not satisfy the location requirements. It found that emergency services were available in 93 percent of these other facilities.

The OIG recommendations and CMS's responses to those recommendations are discussed below.

Page 2 – Daniel R. Levinson

### OIG Recommendation #1

Seek legislative authority to remove necessary provider CAHs' permanent exemption from the distance requirement, thus allowing CMS to reassess these CAHs.

### CMS Response

The CMS concurs.  The President's proposed FY 2014 budget would de-certify any CAHs located fewer than 10 miles from another hospital or CAH, and would also reduce Medicare payments to all remaining CAHs to 100 percent of their reasonable costs (down from the current 101 percent of reasonable costs).  If these changes were adopted, the President's budget estimated the savings over 10 years to be $1.4 billion from reducing reimbursement to 100 percent of reasonable costs and $690 million from eliminating the critical access certifications of CAHs located fewer than 10 miles from another hospital.

The CMS believes this proposal preserves beneficiary access to care while promoting payment efficiency.  This recommendation represents targeted reductions in cost-based reimbursement only to those CAHs that are not the sole providers of inpatient and emergency care in their communities.  Specifically, this recommendation ensures that the basic cost-based reimbursement structure for CAHs is preserved, and that only hospitals that are the sole source of emergency and basic inpatient care for their communities maintain CAH status.  Current CAHs that do not meet the distance criteria could convert to a Medicare-participating hospital and be paid under the same system as other Medicare participating hospitals.

### OIG Recommendation #2

Revise the CAH conditions of participation to include additional location-related requirements.

### CMS Response

We do not concur.  We note that the existing location and distance criteria already represent a uniform standard to which all CAHs certified since January 2006 have been subjected.  Establishing new criteria such as those that have been recommended could not only be duplicative of existing criteria, but could be administratively burdensome to implement.  Additionally, establishing criteria that are based on the services offered by other providers could be very challenging to implement since hospitals and CAHs exercise considerable flexibility in adding or removing services.  We believe a facility's Medicare certification as a CAH versus a hospital should not be tied to rapidly fluctuating criteria.

Finally, we note that a statutory change would be necessarily to eliminate the statutory grandfathered status of all NP CAHS, and also allow CMS to continue to exempt some existing NP CAHs from the distance requirement through rulemaking.

Page 3 – Daniel R. Levinson

### OIG Recommendation #3

Ensure that [CMS] periodically reassesses CAHs' compliance with all location-related conditions of participation.

### CMS Response

The CMS concurs. On March 15, 2013 we issued a memorandum, Survey and Certification (S&C-13-20), which among other things removed language from the state Operations Manual that indicated that assessment of compliance with the CAH location criteria would be made only for initial applicants for CAH status. The revised guidance now represents standard CMS policy which CMS regional offices, state survey agencies and accrediting organizations with CMS-approved Medicare CAH accreditation programs will all be expected to adhere to when conducting their periodic re-evaluations of a CAH's compliance with the Conditions of Participation. We also agree with OIG that a CAH which faces de-certification needs lead time in order to prepare for and effect an orderly transition to hospital certification.

### OIG Recommendation #4

Ensure that [CMS] applies its uniform definition of mountainous terrain to all CAHs.

### CMS Response

The CMS concurs. On April 19, 2013, we issued a memorandum (S&C-13-26), which revised the interpretive guidelines in the state Operations Manual for the CAH Condition of Participation standard that permits application of a shorter distance standard in those cases where more than 15 miles of the roads to a hospital or other CAHs that are in a mountain range and exhibit certain characteristics. The revised guidance now represents standard CMS policy which CMS regional offices, state survey agencies, and accrediting organizations with CMS-approved Medicare CAHs accreditation programs will all be expected to adhere to when conducting their review of initial applications for CAH status as well as their periodic re-evaluations of a CAH's compliance with the Conditions of Participation.

We appreciate the opportunity to comment on this draft report, and we will review carefully the list of CAHs the OIG has identified which may not meet the location requirements. We understand this list will be sent to us under a separate cover. We look forward to working with OIG on this and other issues.

EXHIBIT A

39

## ACKNOWLEDGMENTS

This report was prepared under the direction of Ann Maxwell, Regional Inspector General for Evaluation and Inspections in the Chicago regional office; Thomas Komaniecki, Deputy Regional Inspector General; and Laura Kordish, Deputy Regional Inspector General.

Lisa Minich served as the team leader for this study, and Elliot Curry and Brian Jordan served as the lead analysts. Central office staff who provided support include Clarence Arnold, Meghan Kearns, Christine Moritz, and Tasha Trusty.

# Office of Inspector General
## http://oig.hhs.gov

The mission of the Office of Inspector General (OIG), as mandated by Public Law 95-452, as amended, is to protect the integrity of the Department of Health and Human Services (HHS) programs, as well as the health and welfare of beneficiaries served by those programs. This statutory mission is carried out through a nationwide network of audits, investigations, and inspections conducted by the following operating components:

### Office of Audit Services

The Office of Audit Services (OAS) provides auditing services for HHS, either by conducting audits with its own audit resources or by overseeing audit work done by others. Audits examine the performance of HHS programs and/or its grantees and contractors in carrying out their respective responsibilities and are intended to provide independent assessments of HHS programs and operations. These assessments help reduce waste, abuse, and mismanagement and promote economy and efficiency throughout HHS.

### Office of Evaluation and Inspections

The Office of Evaluation and Inspections (OEI) conducts national evaluations to provide HHS, Congress, and the public with timely, useful, and reliable information on significant issues. These evaluations focus on preventing fraud, waste, or abuse and promoting economy, efficiency, and effectiveness of departmental programs. To promote impact, OEI reports also present practical recommendations for improving program operations.

### Office of Investigations

The Office of Investigations (OI) conducts criminal, civil, and administrative investigations of fraud and misconduct related to HHS programs, operations, and beneficiaries. With investigators working in all 50 States and the District of Columbia, OI utilizes its resources by actively coordinating with the Department of Justice and other Federal, State, and local law enforcement authorities. The investigative efforts of OI often lead to criminal convictions, administrative sanctions, and/or civil monetary penalties.

### Office of Counsel to the Inspector General

The Office of Counsel to the Inspector General (OCIG) provides general legal services to OIG, rendering advice and opinions on HHS programs and operations and providing all legal support for OIG's internal operations. OCIG represents OIG in all civil and administrative fraud and abuse cases involving HHS programs, including False Claims Act, program exclusion, and civil monetary penalty cases. In connection with these cases, OCIG also negotiates and monitors corporate integrity agreements. OCIG renders advisory opinions, issues compliance program guidance, publishes fraud alerts, and provides other guidance to the health care industry concerning the anti-kickback statute and other OIG enforcement authorities.

EXHIBIT A

# EXHIBIT B

# State Operations Manual
## Chapter 2 - The Certification Process

**Table of Contents**
*(Rev. 164, 11-04-16)*

**Transmittals for Chapter 2**

**Identification of Providers and Suppliers and Related Presurvey Activities**

2000 - Certification Surveys - Citations and Responsibility
2002 - Meaning of Providers and Suppliers
2003 - SA Identification of Potential Providers and Suppliers
2003A - Assisting Applicant Providers and Suppliers
2003B - Initial Certification "Kits"
2003C - Deemed Status Providers/Suppliers, Excluding CLIA
2004 - Provider-Based Determinations
2005 - Medicare Health Care Provider/Supplier Enrollment
2005A - Approval or Denial
    2005A1 - Enrollment Denial Based on MAC Review
    2005A2 - Approval or Denial of Certification Based on Survey Findings
    2005A3 - Reconsideration of Denial
    2005A4 - Deemed Providers/Suppliers, Excluding CLIA
2005B - Deemed Providers/Suppliers Except CLIA - Additional Information
2005C - Clinical Laboratory Improvement Amendments of 1988 (CLIA) Laboratories
2005D - Supplementary Applications
    2005D1 - Forms CMS-855A or the CMS-855B for Changes in Provider/Supplier Information
    2005D2 - Form CMS-855R
2005E - Changes of Ownership
    2005E1 - CHOW Occurs
    2005E2 - Change in Intermediary as Result of CHOW
    2005E3 - CHOWs Involving Multi-Regional Chain Organizations
    2005E4 - Change of Owners, but Not CHOW
2005F - Voluntary Terminations
2008 - Prioritizing SA Survey Workload - Initial Surveys and Recertifications
2008A - Surveys of New Providers and Suppliers

sends a letter to the CAH, see (Exhibit 134) "Transmitting Materials to Critical Access Hospitals."

A current Medicare provider who is requesting a change of status to a CAH sends an amended Form CMS-855A to the FI with specific information required by the FI.

Within 30 days, the intermediary will notify the SA indicating if the Form CMS-855A was approved or not approved. The State survey agency verifies that the facility has been properly designated as a CAH by the State government entity responsible for CAH designation prior to forwarding the application to the RO.

## 2255B - Pre-Survey Activity

**(Rev. 1, 05-21-04)**

The SA follows the procedures outlines in Appendix W, Survey Protocol for CAH Providers. The SA verifies requirements in the CAH CoPs in 42 CFR 485.608, 485.610, and 485.612 from facility files and any other documentation available at its office. If the prospective CAH has swing-bed approval, the SA determines that the swing-bed approval is current.

## 2255C - Arranging a CAH Survey

**(Rev. 1, 05-21-04)**

After the RO has authorized a survey, the SA follows the procedures outlined in Appendix W, Survey Protocol for CAH Providers. All CAH surveys are unannounced surveys.

## 2255D - Onsite Survey Activity

**(Rev. 1, 05-21-04)**

The SA follows the guidelines for the survey process in Appendix W.

## 2255E - Preparing a Statement of Deficiencies

**(Rev. 1, 05-21-04)**

The SA uses the "Statement of Deficiencies and Plan of Correction," Form CMS-2567, when citing deficiencies, and refers to Exhibit 7A, "Principles of Documentation," for procedural guidance. The SA sends the completed Form CMS-2567 to the facility. If there are deficiencies cited, the SA sends a letter, see Exhibit 151, "Request for a Plan of Correction Following an Initial CAH Survey." If there are swing-bed deficiencies, a separate Form CMS-2567 must be prepared.

## 2256 - RO Procedures for CAH Approval

EXHIBIT B

43

(Rev. 1, 05-21-04)

A prospective CAH must be surveyed by the SA and be in compliance with the CoPs for CAHS at 42 CFR Part 485 subpart F, before it can be approved for participation in Medicare as a CAH provider. The change from hospital to CAH is considered a change in status. A new provider agreement is not needed unless there is a change in ownership (CHOW) without the assumption of debt.

## 2256A - Verification Criteria
**(Rev. 143, Issued: 07-31-15, Effective: 07-31-15, Implementation:  07-31-15)**

If the provider is a hospital, CAH verification requires that the RO review the facility file to determine if the prospective CAH is in compliance with the hospital CoPs in 42 CFR Part 482 at the time it made application for designation as a CAH (see 42 CFR 485.612). If the provider is a closed hospital or a downsized hospital, it is not necessary that they meet hospital CoPs at the time of application or on conversion.

The RO will reverify compliance with 42 CFR 485.610(a) and (b) and has primary responsibility to verify compliance with 42 CFR 485.610(c) and (d).

**NOTE**: A hospital applying for CAH certification should **not** be surveyed until after the RO determined that the applicant is compliant with the CAH location and distance requirements. If the survey is conducted prior to the RO making a determination regarding the applicant's compliance with the location and distance requirements, and the RO finds that the applicant is noncompliant, the application must be denied. The applicant may submit a reapplication for CAH certification in connection with the initial enrollment application – using the guidance in Chapter 2 of the SOM, §2005A2.

**Rural location**

Among other requirements, pursuant to 42 CFR 485.610(b), all CAH applicants and existing CAHs, including necessary provider CAHs, must either be:

- Located in a rural area; or
- Treated as rural in accordance with 42 CFR 412.103

in order to be eligible for CAH designation and certification.

Only the CMS Regional Office makes the determination whether a CAH applicant or existing CAH meets the rural location requirement, following the instructions below. However, State Survey Agencies (SA) may wish to make informal assessments prior to conducting a survey. If the SA's informal assessment suggests the CAH applicant or existing CAH is not rural, it should consult with the RO before conducting a survey.

- **Located in a rural area – i.e., outside a Metropolitan Statistical Area (MSA)**

Under 42 CFR 485.610(b)(1)(i), a rural area is any area that is outside a MSA, as defined by the Federal Office of Management and Budget (OMB). In making a determination regarding the rural status of a CAH, the CMS RO first consults the latest OMB MSA delineations that have been adopted by CMS.

OMB conducts a comprehensive review of its MSA delineations once a decade and also conducts periodic updates between decennial censuses based on Census Bureau data. When OMB releases revised statistical area delineations, typically CMS adopts the new delineations in the next hospital Inpatient Prospective Payment System (IPPS) rule, which is usually proposed in April of each year, published as a final rule in August and effective on October 1st following the final rule publication date. If an IPPS final rule has been released during a time when OMB has not released revised statistical area delineations, the most recently-released OMB delineations adopted by CMS remain in effect. Accordingly, the RO must consult the MSA delineations used for the purpose of the final IPPS rule that is in effect at the time of:

- The Medicare Administrative Contractor's (MAC) determination that a hospital has submitted a complete application to convert to CAH certification; or
- At the time of the RO's recertification review of an existing CAH.

The most recent final IPPS rule~~s~~ can be found on CMS' Acute Inpatient PPS webpage:

http://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/AcuteInpatientPPS/index.html

ROs may use the following instructions to locate the OMB MSA delineations in effect at the applicable time for a rural location determination:

1. Go to the Acute Inpatient PPS webpage noted above.
2. Select the link for the IPPS final rule in effect at the applicable time for the initial applicant or at the time of the recertification decision for an existing CAH. For example, if a CAH is up for recertification and the RO is evaluating the CAH's compliance with the rural location requirement on February 1, 2016, the most recent OMB MSA delineations adopted by CMS would be those effective October 1, 2015 and the RO would select "FY 2016 IPPS Final Rule Home Page" from the list of IPPS rules on the left-hand column. On the other hand, if the RO is evaluating the existing CAH's compliance on September 10, 2015, it would select the FY 2015 IPPS Final Rule Home Page, since the FY 2016 rule would not go into effect until October 1, 2015.
3. Select the link for final rule data files. For example, on the FY 2015 IPPS Final Rule Home Page, select the link titled "FY 2015 Final Rule Data Files."
4. In the Downloads section at the bottom of the page, select the link for the "County to CBSA Crosswalk File."
5. Select the Excel file. For example, for the FY 2015 IPPS final rule, select the file titled "CBSAtoCountycrosswalk_FY15_FR.xlsx."

6. Search for the county in which the CAH is located. If the IPPS rule has adopted revised OMB statistical delineations, the revised information will be found in column "G", which is titled, "New CBSA" (Blanks are Rural)." Column G includes the CBSA code for each county. If the cell is blank, the county is a rural county. If all of Column G is blank, this means that the final IPPS rule did not include adoption of revised OMB statistical delineations, and that the delineations from a prior final rule remain in effect.

- **Even if the existing CAH or CAH applicant is located outside an MSA and therefore is in a rural area, it is also necessary to determine that it is also <u>not</u>:**

  - Located in an area that has been recognized as urban in accordance with 42 CFR 412.64(b), excluding §412.64(b)(3);

  - Classified as an urban hospital in accordance with 42 CFR 412.230(d) (NOTE: 42 CFR 412.230(d) became 412.230(d) in 2001); or

  - Redesignated to an adjacent urban area in accordance with 42 CFR 412.232.

  Financial staff in the RO should be able to provide information on whether the CAH applicant falls in one of the above three categories, since 42 CFR Part 412 are regulations developed primarily for payment purposes.

- **Located within an MSA, but treated as rural**

  Even if the CAH applicant is located in an MSA, it may nevertheless qualify to be "treated" as rural if it is a hospital that has been reclassified as rural in accordance with 42 CFR 412.103, i.e., it was reclassified based on:

  - Being located in a rural census tract of a MSA per the most recent version of the Goldsmith Modification or the Rural-Urban Commuting codes, as determined by the Office of Rural Health in the Health Resources and Services Administration. (See http://www.hrsa.gov/ruralhealth/policy/definition_of_rural.html);

  Or

  - It would qualify as a rural referral center or a sole community hospital if it were located in a rural area;

  Or

  - It is located in an area designated under any State law (including State regulation) as a rural area, or has been designated as a rural hospital under State law (including regulation).

Rural reclassifications are handled by the CMS RO Office of Financial Management. RO survey and certification staff should consult with their financial management counterparts

EXHIBIT B

46

to determine whether a reclassification has been made that would permit a CAH applicant or existing CAH to be treated as rural.

**In the case of an initial application for CAH status** by a hospital, the application must be denied if the hospital applicant is located within an MSA or has not been reclassified in a manner that allows it to be treated as rural. If the applicant subsequently succeeds in being reclassified as rural, it may submit a reapplication for CAH certification in connection with the initial enrollment application – using the guidance in Chapter 2 of the SOM, §2005A2 – on or after the effective date of its reclassification . If the hospital was surveyed for compliance with the CAH CoPs as part of its prior denied application, it must nevertheless be surveyed again; however, this survey does not require an on-site visit if the hospital is otherwise in substantial compliance with the CAH CoPs. (NOTE: This should be a rare occurrence as a hospital applying for CAH certification should **not** be surveyed until the RO has determined that the applicant is in compliance with the CAH location and distance requirements). The effective date of its CAH conversion must be no earlier than the date when the applicant demonstrates compliance with all requirements to be certified as a CAH.

**In the case of an existing CAH that is being recertified**, the RO first determines whether the CAH is outside of an MSA, using the OMB MSA delineations adopted by CMS and in effect at the time the RO is processing the CAH's recertification. If the CAH is no longer outside an MSA, the RO must consult with the RO Office of Financial Management to determine whether there is a reclassification in effect that permits the CAH to be treated as rural.

If the existing CAH previously was outside an MSA, but is now in an MSA and has not been reclassified as rural, the CAH may continue to retain its CAH status up to two years after the effective date of CMS's adoption of the OMB MSA delineations that changed the CAH's rural status. The CAH is responsible at all times for ensuring that it meets the requirement at §485.610(b) to be considered rural. Therefore, in order to continue participating in the Medicare program, during the two-year grace period the CAH is expected either to successfully be reclassified to be treated as rural or to have completed conversion to a Medicare-certified hospital, including demonstrating compliance with the hospital CoPs at 42 CFR Part 482. Note that a recertification review of the CAH's status and location by the RO is triggered any time:

- An SA conducts a full survey of a CAH, whether for recertification of a non-accredited CAH, for a validation survey of a deemed status CAH, or when following up on a prior complaint survey and the RO requires a full survey; or

- An accrediting organization reaccredits a deemed status CAH and recommends to the RO continued deemed status.

If the recertification review of the CAH takes place more than two years after the effective date of the CMS adoption of revised OMB MSA delineations that resulted in the CAH's loss of rural status and the CAH has not been reclassified to be treated as rural, the CAH is

substantially noncompliant with the CAH Status and Location CoP (§485.610) and the RO takes action to terminate the CAH's Medicare agreement.

**Examples:**

- Example 1: The RO is conducting a recertification review of a CAH in January, 2016. When CMS initially certified the CAH, it determined that the CAH was located outside of an MSA. However, for the purposes of this example, the OMB MSA delineations that were adopted by CMS and effective October 1, 2014 resulted in the CAH being located within an MSA. The CAH had a maximum of two years – up to and including October 1, 2016 - to retain its CAH certification status. However, the CAH did not seek reclassification to be treated as rural. After conducting its January 2016 review, the RO would notify the CAH that it no longer satisfies the CAH rural status requirement and could remain certified as a CAH only until October 1, 2016. The CAH would then have 10 months to either be reclassified as rural or to complete conversion to CMS-certified hospital status in order to avoid termination of its Medicare agreement.

- Example 2: The CAH in Example 1 was not reviewed for recertification until January 2017, a date more than two years after the effective date of its changed MSA status. Additionally, the CAH had not been reclassified as rural and had not converted to hospital certification. In this situation, the CMS RO would determine that the CAH does not satisfy the CAH rural status requirement and would take action to terminate the CAH's Medicare agreement.

- Example 3: For the purposes of this example only, revised OMB MSA delineations were released in May 2014, proposed for adoption by CMS as part of the IPPS rule in April 2015, adopted by CMS August 8, 2015, and became effective October 1, 2015. Furthermore, a MAC determined that an initial CAH applicant's application was complete and could be recommended to the RO and SA for approval as of June 5, 2015, contingent upon the CAH being certified by CMS. Also the CAH applicant was recommended for deemed status by a CMS-approved Medicare CAH accreditation program, with an August 15, 2015 accreditation effective date. In this case, the RO would use the OMB MSA delineations that CMS had most recently adopted as of June 5, 2015, i.e., those adopted by CMS effective October 1, 2014, in making its determination about rural status, and found that the CAH was outside an MSA and certified it as a CAH effective August 15, 2015. The RO does this even though OMB released more recent delineations in May 2014 and CMS has already adopted a rule incorporating the later OMB MSA delineations. Since the adoption of the later delineations is not effective until October 1, 2015, the RO must use the MSA delineations previously adopted by CMS and applicable on June 5, 2015.

- Example 4: Finally, using the CAH in Example 3, the CAH is now located inside an MSA based on revised OMB MSA delineations adopted by CMS effective October 1, 2015. As a result, the CAH no longer meets the rural location requirement as of October 1, 2015, but may retain its CAH status until October 1, 2017. Note that in this case the CAH is not due for reaccreditation and recertification until August 2018,

which is after the end of the grace period. If the CAH has neither been successfully reclassified as rural nor converted to a hospital by October 1, 2017, the RO would take action to terminate the CAH's Medicare agreement.

In all of the above examples, the CAH has primary responsibility for monitoring changes in its rural status resulting from CMS's adopted revised OMB MSA delineations, and taking appropriate action if it loses its rural status on the basis of the revised delineations.

**Necessary Provider Status and Rural Reclassification**

Necessary provider certification only provides an exemption from the CAH distance requirements relative to other CAHs and hospitals. Necessary provider CAHs are still required to meet the rural location requirement; therefore, if a necessary provider CAH is located within an MSA as a result of a change in the OMB MSA delineations adopted by CMS, it must follow the same procedures noted above as any other CAH.

**Location relative to other facilities or necessary provider certifications:**

In addition, the regulations at 42 CFR 485.610(c) specify that one of the following 3 minimum driving distances from other facilities requirements must be met:

- 35-Mile Distance: The CAH must be located more than a 35-mile drive from any hospital or other CAH; or

- 15-Mile Distance: In the case of mountainous terrain or in areas with only secondary roads available, the CAH must be located more than a 15-mile drive from any hospital or other CAH; or

- No Distance Requirement: In the case of a CAH that was designated by the State as being a necessary provider of health care services to residents in the area before January 1, 2006, there is no minimum distance requirement.

In determining whether a currently certified CAH or a CAH applicant meets the location requirements at §485.610(c), the proximity of IHS/Tribal hospitals or CAHs and non-IHS/Tribal hospitals or CAHs to each other is not considered.

The following examples clarify how determinations are to be made when IHS or Tribal hospitals or CAHs are in the vicinity of non-IHS or non-Tribal hospitals or CAHs:

- Example 1: Hospital A is seeking CAH certification and is a 10-mile drive from Hospital B, an IHS hospital. Hospital C is the next nearest hospital/CAH and is a 42-mile drive from Hospital A. The distance to Hospital B is not considered; Hospital A meets the minimum distance to another CAH or hospital requirement.

- Example 2: CAH A is a tribal facility that is being reviewed as part of the recertification process. It is a 17-mile drive from a non-tribal/non-IHS CAH (CAH B). It is also a 75-mile drive from an IHS hospital (Hospital C). The distance to CAH B is

not considered; CAH A continues to meet the minimum distance to another CAH or hospital requirement.

- Example 3: Hospital A is a tribal hospital seeking CAH certification and is a 33-mile drive along primary roads to an IHS hospital, Hospital B. It is also a 50-mile drive to Hospital C, a non-IHS/non-tribal hospital. The distance to Hospital B is considered; Hospital A does not meet the minimum distance to another CAH or hospital requirement.

If a CAH is located on an island and the location meets the following characteristics, the CAH is considered to be in compliance with the distance requirements relative to other hospitals and CAHs under §485.610(c):

- The island is entirely surrounded by water;
- The CAH is the only hospital or CAH on the island; and
- The island is not accessible by any roads.

CAHs located on islands that meet the criteria above are still required to comply with the rural location requirement under §485.610(b).

In demonstrating that it meets the standard for more than a 35-mile drive, a CAH applicant must document that there is no driving route from the applicant to any other CAH or hospital that is 35 miles or less in length.

**Application of the more than 15-mile drive standard, based on mountainous terrain**

Slope and ruggedness of the terrain around the CAH, together with absolute altitude (the distance above sea level), determine many of the fundamental characteristics of mountainous terrain.[1]  However, being located at a high elevation does not, in and of itself, constitute "mountainous terrain," nor does being located at the foot of a mountain or where mountains can be viewed. Further, the absolute altitude required to constitute mountainous terrain will vary in different regions. For example, the altitude of the Appalachian Mountains is considerably lower than that of the Rocky Mountains, yet the slope and ruggedness of the terrain in many portions of the Appalachians is mountainous. Furthermore, roads passing through mountainous terrain are characterized by certain typical engineering features. For the purposes of determining a CAH's eligibility for the 15-mile drive standard based on mountainous terrain, the roads on the travel route(s) to hospitals or other CAHs must meet the following criteria:

- Over 15 miles of the roads on the travel route(s) from the CAH to any hospital or another CAH must be located in a mountain range, identified as such on any official maps or other documents prepared for and issued to the public;

**and**

---

[1] United Nations Environment Programme World Conservation Monitoring Centre. (2002). *Mountain Watch*. Retrieved August 11, 2010, from http://www.unep-wcmc.org/mountains/mountain_watch/pdfs/.

- Since being located within a mountain range in and of itself does not mean that the drive to any other hospital or CAH includes travel through "mountainous terrain," the roads on the travel route(s) from the CAH to any other hospital or CAH must have either of the following characteristics:

  - Extensive sections of roads with steep grades (i.e., greater than 5 percent), continuous abrupt and frequent changes in elevation or direction, or any combination of horizontal and vertical alignment that causes heavy vehicles to operate at crawl speeds for significant distances or at frequent intervals.[2] (Horizontal alignment refers to the "straightness" of the roadway, vertical alignment refers to the roadway's "flatness," and crawl speed is the speed at which a truck has no power to accelerate on long, steep grades.[3,4] Thus, roads in mountainous terrain are commonly described as winding and steep);

or

  - Be considered mountainous terrain by the State Transportation or Highway agency, based on significantly more complicated than usual construction techniques that were originally required to achieve compatibility between the road alignment and surrounding rugged terrain. For example, because the changes in elevation and direction are abrupt in mountainous terrain, roadbeds may require frequent benching, side hill excavations, and embankment fills. [5]

A letter from the State Transportation or Highway agency specific to the travel route(s) in question is required to support the claim of mountainous terrain based on either of these sets of road characteristics.

It is not uncommon for there to be roads (or sections of roads) through mountainous areas that do not meet the criteria for "mountainous terrain." A CAH would qualify for application of the mountainous terrain criterion if there is a combination of mountainous and non-mountainous terrain between it and any other hospital or CAH, so long as there is no route to any hospital or other CAH with 15 or fewer miles of roads in mountainous terrain. When calculating the mountainous terrain travel distance to any hospital/other CAH, subtract the total distance represented by those sections of the travel route that are not considered "mountainous terrain." For example, if the route to the nearest hospital consisted of 12 miles in mountainous terrain, followed by 5 miles in non-mountainous terrain, followed by 4 miles in mountainous terrain, then the requirement for a total of more than 15 miles would be met (12 miles plus 4 miles – or 21 miles minus 5 miles – yield 16 total miles of mountainous terrain).

---

[2] Mannering, F. L., Washburn, S. S., & Kilareski, W. P. (2009). *Principles of Highway Engineering and Traffic Analysis.* Hoboken, NJ: John Wiley and Sons, Inc

[3] *Highway Capacity Manual: 2000 (U. S. Customary Units)* by Transportation Research Board (Dec. 2000). p 23-9.

[4] Donnell, E. T., Ni, Y., Adolini, M., & Elefteriadou, L. (2001). *Speed prediction models on two-lane rural highways.* Transportation Research Record, 1751, 44-55.

[5] *Mannering, F. L., Washburn, S. S., & Kilareski, W. P. (2009). Principles of Highway Engineering and Traffic Analysis. Hoboken, NJ: John Wiley and Sons, Inc.*

**Application of the more than 15-mile drive standard, based on secondary roads**

To be eligible for the lesser distance standard due to the <u>secondary road criteria</u> under §485.610(c) the CAH must document that there is a drive of more than 15 miles between the CAH and any hospital or other CAH where there are no primary roads. A primary road is:

- Any US highway, including any road:
  - In the National Highway System, as defined in 23 US Code §103(b); or
  - In the Interstate System, as defined in US Code §103(c); or
  - Which is a US-Numbered Highway (also called "US Routes" or "US Highways") as designated by the American Association of the State Highway and Transportation Officials (AASHTO), regardless of whether it is also part of the National Highway System;

  All US highways are readily identified via signage along the roads and on maps by the presence of "US" or "I" above the highway number, with the letters and number appearing on a distinctive, uniform shield background that is called the six point shield, with five points above and one below. Note: Although the National Highway System and the U.S. Numbered Highway system largely overlap, they are not identical. According to the American Association of the State Highway and Transportation Officials (AASHTO), which is responsible for designation of roads in the U.S. Numbered Highway system, the system is intended to facilitate the movement of interstate traffic in two or more States with the use of uniform markings.[6]

  Given the role all US highways are intended to play in interstate commerce, they are, by definition, primary roads.

  OR

- A numbered State highway with 2 or more lanes each way;

  OR

- A road shown on a map prepared in accordance with the U.S. Geological Survey's Federal Geographic Data Committee (FGDC) Digital Cartographic Standard for Geologic Map Symbolization as a "primary highway, divided by median strip."

A CAH may qualify for application of the "secondary roads" criterion if there is a combination of primary and secondary roads between it and any hospital or other CAH, so long as more than 15 of the total miles from the hospital or other CAH consists of areas in which only secondary roads are available. To apply the secondary roads criterion, measure the total driving distance between the CAH and each hospital or CAH located within a 35-mile drive and subtract the portion of that drive in which primary roads are

---

[6] *AASHTO Special Committee on U.S. Route Numbering. Retrieved June 17, 2014, from: http://route.transportation.org/Documents/HO1_Policy_Establ_Develop_USRN.pdf*

EXHIBIT B

52

available.  If the result is more than 15 miles for each drive to a hospital or CAH facility, the 15-mile criterion is met.

The RO will review Web-based map servers, such as Google Maps, or NationalAtlas.gov for example, to determine whether the provider meets the requirements of 42 CFR 485.610(c).  The RO will also review any documentation the provider may submit to demonstrate that it meets either the mountainous terrain or secondary roads criterion of §485.610(c), but such documentation must satisfy the requirements discussed above.  For example, CMS does not consider any issues raised by CAH applicants or other parties concerning the physical features of any specific US highway, or portion thereof, when making a CAH location determination.  Therefore, documentation submitted by the applicant indicating that a particular portion of a US highway has numerous curves, or a weight limitation, or narrow shoulders, etc. would not affect the RO's determination that the highway is a primary road.

## 2256B – Notification

**(Rev. 1, 05-21-04)**

When the facility is found to be in full compliance with the CoPs in 42 CFR Part 485, Subpart F, or has submitted an acceptable Plan of Correction, the RO notifies the facility in writing by sending letter, see Exhibit 150, "CAH Approval Notification," stating the facility has been approved for participation.  A copy of the notice letter is sent to the FI and SA.  Do not issue the letter until the facility is in compliance with all the CoPs.

## 2256C – Effective Dates

**(Rev. 1, 05-21-04)**

After the RO has reviewed and approved the SA recommendation for Medicare participation, the effective date for participation by a CAH will be one of the following:

- The last date of the initial survey by the SA, provided the prospective CAH is in full compliance with the CAH CoPs on that date; or

- The date that the prospective CAH submits an acceptable plan of correction to the SA.

## 2256D – RO Processing Complaints Against a CAH

**(Rev. 1, 05-21-04)**

When the RO or SA receives a complaint against a CAH regarding the CoPs in 42 CFR Part 485 subpart F, including the SNF requirements for a swing-bed CAH, the RO follows the normal complaint process for non-accredited hospitals.

## 2256E – RO Processing Denials or Terminations of a CAH

EXHIBIT B

# EXHIBIT C

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C2-21-16
Baltimore, Maryland 21244-1850



**Center for Clinical Standards and Quality/Survey & Certification Group**

<div align="right">

**Ref: S&C: 16-08-CAH**
**REVISED 09.02.16**

</div>

**DATE:**        **February 12, 2016**

**TO:**          State Survey Agency Directors

**FROM:**        Director
                 Survey and Certification Group

**SUBJECT:**     Critical Access Hospital (CAH) Recertification Checklist for Evaluation of
                 Compliance with the Location and Distance Requirements
                 *\*\*\*Revised to Clarify Type of Hospital when Evaluating Distance Requirements\*\*\**

<table>
<tr><td>

**Memorandum Summary**

CAH Recertification Checklist:  In order to routinely re-evaluate the compliance of currently
certified CAHs with the status and location requirements at 42 CFR 485.610, the Centers for
Medicare & Medicaid Services (CMS) has revised the attached CAH Recertification
Checklist:  Rural and Distance or Necessary Provider Verification for use by the CMS
Regional Office  (RO) staff when processing CAH recertifications. The revised checklist
includes:

- Procedures on determining whether a CAH that was certified by CMS prior to
  January 1, 2006 had been designated by the State as a necessary provider.
- Examples of documentary evidence to demonstrate necessary provider designation
  prior to January 1, 2006.

</td></tr>
</table>

**Background**

The Office of Inspector General (OIG) report entitled, *"Most Critical Access Hospitals Would
Not Meet the Location Requirements if Required to Re-enroll in Medicare,"* released August 19,
2013 (OEI-05-12-00080) recommended that CMS periodically reassess CAHs' compliance with
all location-related requirements at 42 CFR 485.610.  CMS concurred with the recommendation.
The OIG subsequently called on CMS to maintain evidence that it is routinely re-evaluating the
compliance of currently Medicare-certified CAHs with these status and location requirements.
In order to facilitate this, CMS has developed the *CAH Recertification Checklist: Rural and
Distance or Necessary Provider Verification* for use by the CMS RO staff.

This revision is to provide more clarity on what constitutes "a hospital" for evaluation of CAH
distance requirements.  Section 1820(c)(2)(B) of the Social Security Act (the Act) requires
CAHs to be located in a rural area *(as defined in section 1886(d)(2)(D)) or is being treated as
being located in a rural area pursuant to section 1886(d)(8)(E);* more than a 35-mile drive (15
miles in areas with only secondary roads or mountainous terrain) from a hospital *(as defined at*

<div align="right">

EXHIBIT C

</div>

<div align="right">

54

</div>

*Section 1861(e) of the Act);* or *another facility as described in subsection 1820(c) of the Act. The location requirements for a CAH originally evolved from Essential Access Community Hospitals (EACH) which required that the "location [must be] more than 35 miles from another <u>like</u> hospital (emphasis added)."  Public Law 105-33 of 1997.*

*The seven (7) state EACH program was replaced by the Medicare Rural Hospital Flexibility Program available in any state that chose to establish such a program. The program offered states the opportunity to designate rural nonprofit hospitals or facilities as a CAH. The legislation defines a Rural Health Network as an organization consisting of at least one CAH and at least one acute care hospital which had agreements regarding patient referrals and transfers. (Balanced Budget Act of 1997).*

*The rules regarding CAHs were further amended in 2004, to state that to qualify for CAH designation, a hospital must be located more than 35 miles from other "like hospitals" and be located in a rural area. (42 CFR § 412.92).  Consistent with the designation of "like hospitals," the* preamble for 69 FR § 49107 states, *"To qualify for CAH designation, a hospital must be located more than 35 miles from the nearest similar hospital and have an average length of stay not exceeding 4 days."*  The regulations at 42 CFR 485.610(b) and 485. 610(c) repeat this statutory requirement.

## Evaluation of Compliance of the Location and Distance Requirements

Annually, the RO must request from each State Agency (SA) a list of all CAHs expected to undergo a recertification survey over the next 12 months.  This list should include and identify both deemed and non-deemed CAHs.  For CAHs that are deemed, the SA reviews the deemed status tab in the Automated Survey Processing Environment (ASPEN) for accreditation dates of CAHs.  Prior to the date of an SA or Accrediting Organization (AO) CAH recertification survey, the RO must determine whether the CAH meets the status and location requirements. *Assessing the location requirements must include evaluating the distance of any acute care facilities from that of the CAH.* **Psychiatric hospitals, LTCHs, or Rehabilitation hospitals would not be considered an acute care hospital and therefore would not be considered a "like or similar" hospital when evaluating the location requirements. Only acute care hospitals or CAHs are included in the definition of similar or like hospitals when evaluating location requirements.** The RO must complete a *CAH Recertification Checklist:  Rural and Distance or Necessary Provider Verification* (copy attached) for evaluating, determining, and documenting compliance with the CAH location-related Conditions of Participation (CoPs).  The CAH Checklist contains detailed procedures to be followed.  The completed checklist must be placed in the CAH's file.

Once the RO has made the determination that a particular CAH is in current compliance with the rural status and distance requirements, it must contact the SA/AO to advise them that a recertification or reaccreditation survey may be conducted.  There is no standard regarding the amount of advance notice the RO needs to give the AO or the SA prior to their next survey; however, adequate notice should be given so that resources are not used unnecessarily.  The SA and AO may not conduct a recertification/reaccreditation survey of a CAH that does not meet the rural status and location requirements.

A CAH may request review of its CMS' determination that a CAH is not a necessary provider if, within 60 days of the date of a CMS letter that communicates the agency's determination that the

EXHIBIT C

55

CAH distance requirements have not been met, it submits supplementary evidence to the CMS RO for CMS' consideration.  The burden is on the CAH to provide qualifying evidence demonstrating that necessary provider designation was made by the state prior to January 1, 2006, and that the designation was applicable to the specific facility in question.

In the event that the CAH is not compliant with the rural status and distance requirements, the RO will send the CAH a letter notifying the CAH of its options.  The CAH will be allowed time to attempt to reclassify as rural, convert to hospital status, or have its Medicare participation terminated.

**Contact:**  Questions concerning this memorandum should be addressed to CAHSCG@cms.hhs.gov.

**Effective Date:**  Immediately. This policy should be communicated with all survey and certification staff, their managers and the State/Regional Office training coordinators within 30 days of this memorandum.

/s/
David R. Wright

Attachment(s): Critical Access Hospital Recertification Checklist:  Rural and Distance or Necessary Provider Verification and A Case Study- Reconsideration

cc:  Survey and Certification Regional Office Management

*The contents of this letter support actions to improve patient safety and increase quality and reliability of care and promote better outcomes.*

EXHIBIT C

56

EXHIBIT C

**57**

## <u>CRITICAL ACCESS HOSPITAL (CAH) RECERTIFICATION CHECKLIST</u>:
### Rural and Distance or Necessary Provider Verification

**Date:** _____        **CCN:** _____

CAH Name: _____

Address: _____

City/State/Zip/County: _____

Administrator: _____

**Last Survey Date:** _____

If deemed: Accrediting Organization (AO): _____

Accreditation expiration date: _____

**Rural Status:**

Does the Office of Management and Budget (OMB) Metropolitan Statistical Area (MSA) List adopted by the CMS indicate that the county is designated as rural?  Yes_____ No_____

If no, does the Division of Financial Management (DFM) confirm alternative rural status? Yes_____ No_____     Date confirmed by the DFM: _____

**Distance from other CAHs or Hospitals:**

Necessary Provider Designation:  Yes_____ No_____     [*Source*: _____]

**If NO, conduct a distance analysis to all nearby CAHs/Hospitals.**

Driving Distance ≥ 35 miles?  Yes_____ No_____

If no, does the CAH qualify for the ≥ 15 mile standard, based on secondary roads/mountainous terrain?   Yes_____ No_____   [*Source*: _____]

Describe why the 15 mile standard does/does not apply:

_____

_____

List name(s) and address(es) of all other CAHs and/or hospitals considered in the analysis:
*[Psych, LTCH, and Rehabilitation hospitals are not considered an acute care hospital and should not be included in the location analysis.]*

_____

_____

EXHIBIT C

58

**PROCEDURES:**

1.  Annually the Regional Office (RO) designee contacts the State Agency (SA) to request a list of all Medicare-certified CAHs that are scheduled for a recertification survey over the next 12 months.  The list should include and identify both deemed and non-deemed CAHs.  For CAHs that are deemed, the SA consults the deemed status tab in ASPEN for the accreditation end dates of those CAHs.  **NOTE:**  AOs conduct reaccreditation surveys every 3 years.

2.  Prior to the survey, the RO must:

    a.  **Follow the guidance in SOM Section 2256A for determining <u>rural</u> status**.

        i.   If the CAH is located outside a Metropolitan Statistical Area (MSA), as determined by consulting the latest Office of Management and Budget (OMB) MSA list **adopted by CMS**, the CAH has rural status.

        ii.  If the CAH is located in an MSA but the Division of Financial Management (DFM) has reclassified it as rural, place a copy of DFM's determination in the CAH's file.  The CAH is considered to have rural status.

        iii. If the CAH's location was previously outside an MSA, but subsequently CMS adopted a revised OMB MSA list that places the CAH inside an MSA, the CAH has two years from the effective date of CMS's adoption of the OMB MSA list to attempt to reclassify as rural.  Alternatively, the CAH may convert to Medicare IPPS hospital status.

        iv.  If the CAH's location was previously outside an MSA, but was not determined during the prior recertification, consult with RO management on the length of time to be provided to the CAH to either attempt to reclassify or convert to hospital status. (Generally up to one year can be provided.)

             NOTE – if the CAH is not located in an area that is considered rural, a termination enforcement action must be undertaken. Depending on the facts of the case, the termination action may become effective in one or two years.  The CAH may opt to convert to an IPPS hospital which would require the submission of an amended CMS Form 855A and a subsequent certification survey demonstrating compliance with the hospital CoPs at CFR 482.

    b.  **Determine whether the CAH was certified prior to January 1, 2006, in order to determine if the CAH is a <u>Necessary Provider</u> (NP) CAH.**  (A CAH that was Medicare-certified as a CAH after January 1, 2006 is not eligible to be an NP CAH.)  NP CAHs are exempt from the distance requirement.

EXHIBIT C

59

    **i.** If the NP CAH was certified by CMS prior to January 1, 2006, review the CAH file to confirm there is evidence of NP CAH status (for example, an NP Designation letter issued by the State prior to January 1, 2006).

    **ii.** If there is no documentation in the CAH's file, the RO may ask the State if there is documentation of State NP designation **performed prior to January 1, 2006.**

    **iii.** If the State provides the RO with a copy of the CAH's necessary provider designation documentation demonstrating State designation prior to January 1, 2006, the CAH is an NP CAH.

    **iv. If the RO designee determines that the CAH is an NP CAH, proceed to step 3.  Otherwise, proceed to step 2.c.**

**c. If the CAH is not an NP CAH**, **evaluate the road mileage <u>distance and road characteristics</u>** using ASPEN (ACO) and Google Maps for each identified CAH and nearby CAHs/Hospitals and make screen-prints of the findings.  The RO also checks whether the mountainous terrain criteria apply. (See Section 2256A for details.)

**d.** Attach all documentation from the above steps to this completed *Checklist.*

**3.** The RO saves the completed *Checklist* and attachments in the RO records.  The RO program lead is notified of the results of the determination, so that appropriate follow-up action may be taken.

**a. If the CAH is not an NP CAH and does not meet the distance and location requirements**, the RO enters the case in the RO tracking system (e.g. Auto Tally Millennium).  The RO sends the CAH a letter indicating its CAH status will be terminated.  The CAH may be allowed time (generally one year) to convert to hospital status in lieu of having its Medicare provider agreement terminated.  The letter will include appropriate appeal rights. The letter also will provide that CMS will review the NP CAH status determination if the CAH timely submits a request that contains qualifying supplementary information to the RO within 60 days of the date of the CMS letter, consistent with the requirements and procedures in step 4 of this Exhibit. The SA and AO are copied on the letter.  The RO also notifies CMS Central Office at CAHSCG@cms.hhs.gov.

**b. If the CAH is *either* an NP CAH *or* meets the distance requirements, but is located in an MSA and has not been reclassified as rural**, the RO enters the case in the RO tracking system (e.g. Auto Tally Millennium).  The RO sends the CAH a letter indicating its *CAH status will be terminated unless it can be reclassified as rural* within the applicable timeframe.  If the CAH is unable to be reclassified as rural within the applicable time frame, it may choose to convert to hospital status in lieu of

EXHIBIT C

60

having its Medicare participation terminated.  The SA and AO are copied
on the letter.  The letter advises that CAH applications for reclassification
must be submitted to the RO DFM, who evaluates and makes a
determination regarding the CAH's rural status.  The RO DFM sends the
Division of Survey and Certification (DSC) a copy of their determination
letter.

   **c.**  If the CAH **meets both the rural status and the distance and location
   requirements**, the RO notifies the SA/AO, which may then conduct a
   recertification/reaccreditation survey.  **No** notice is provided to the CAH
   **(to avoid announcing the survey).**

   **d.**  The RO files the above correspondence in the CAH file in the RO system
   of records.

4. **Process for Considering Supplementary Evidence of Necessary Provider Status:** A
   CAH may request the CMS RO to review the determination of its necessary provider CAH
   status if, within 60 days of the date of a CMS letter that communicates the agency's
   determination that the CAH distance requirements have not been met, it submits
   supplementary evidence to the CMS RO for consideration.  The burden is on the CAH to
   provide qualifying evidence demonstrating that NP designation was made by the State
   prior to January 1, 2006 and that the designation was applicable to the specific facility in
   question. Note that a CAH does not need to wait before submitting supplementary
   evidence, but may do so before the CAH is due for a recertification survey or at any other
   prior time. Some examples of potentially qualifying evidence include:

   a.  A letter, issued before January 1, 2006, from the appropriate State authority
       designating the CAH by name as a necessary provider.

   b.  An edition of the State's Rural Health Plan, published in 2005 or earlier,
       identifying the CAH by name as a necessary provider.

   c.  A State's Rural Health Plan, combined with supporting documented evidence
       that includes **all** of the following:
       (i)   An edition of the State's Rural Health Plan, published in 2005 or earlier,
             specifying the State's criteria for a CAH to qualify as a necessary
             provider; **and**
       (ii)  At the time of its CAH certification, which must have been prior to January
             1, 2006, the CAH met the State's criteria to qualify as a necessary
             provider in accordance with the applicable edition of the State's Rural
             Health Plan (published in 2005 or earlier).  Acceptable data sources used
             to support the documented evidence that the CAH met the necessary
             provider criteria in the State's Rural Health Plan includes, but are not
             limited to: Health Resources Services Administration (HRSA), U.S.
             Census Bureau, or data from the applicable State departments; **and**
       (iii) A signed statement by the appropriate State authority that the State
             considers the CAH to have been designated as a necessary provider
             before January 1, 2006. This statement may be from a date before or
             after January 1, 2006 when combined with the documented evidence
             cited above.

EXHIBIT C

d.   A State law or regulation with supporting documented evidence that includes **all** of the following:

    (i)   The law or regulation, enacted prior to January 1, 2006, specifically describes the requirements for necessary provider designation by the State in order to become a CAH, **and**

    (ii)   At the time of its CAH certification, which must have been prior to January 1, 2006, the CAH met the criteria in the law or regulation to qualify as a necessary provider, **and**

    (iii)   A signed statement by the appropriate State authority that the State considers the CAH to have been designated as a necessary provider before January 1, 2006. This statement may be from a date before or after January 1, 2006.

EXHIBIT C

62

**Critical Access Hospital (CAH) Necessary Provider Designation Documentation**

| Attachment – A Case Study |
|:---:|

## Background

Page Memorial Hospital (Page Memorial) is a Medicare-certified critical access hospital (CAH) located in the State of Virginia that is due for its CMS recertification survey.  The CMS Regional Office (RO) reviewed the CAH's compliance with the location and distance requirements under 42 CFR 485.610 and found that the CAH does not meet the requirements under §485.610(b) due to its proximity to a nearby *similar* hospital.  Page Memorial is located 25.8 miles from Warren Memorial Hospital and 33.1 miles from Shenandoah Memorial Hospital. The routes to these hospitals do not meet the criteria for the lesser 15 mile distance criteria for either "secondary roads" or "mountainous terrain".

CMS queried the State to obtain a list of all necessary provider CAHs in Virginia and Page Memorial was not on that list. The CMS RO does not have any documentation of Page Memorial's necessary provider status in the CAH's file nor was there evidence in the State's Rural Health Plan that the CAH was specifically designated (by name) by the State as a necessary provider.  As a result, Page Memorial was sent a notice letter for termination of its certification by the CMS RO.

In response to the CMS letter stating that the facility did not meet the criteria for CAH status, Page Memorial informed the CMS RO that it was indeed a necessary provider CAH, at which time the CMS RO requested additional evidence of that designation.

## The State's Rural Health Plan Criteria

While the facility Page Memorial was not able to find a letter from the State specifically naming the hospital as a CAH NP, it was able to (a) produce an edition of the State's Rural Health Plan pre-dating January 2006 that itemized the criteria for a hospital to be a necessary provider criteria and (b) produce evidence that the hospital met the criteria at the time.  In addition, the State confirmed that Page Memorial was designated by it as a necessary provider before January 1, 2006, prior to being certified by CMS as a CAH. The criteria in the State's pre-2006 Rural Health Plan were as follows:

> *To be classified as a necessary provider, a hospital must be the sole provider in a county and meet two of the following conditions.*
>
> 1. *Located in a nonmetropolitan county that is a federally designed Medically Underserved Area (MUA) or Health Professional Shortage Area (HPSA)*
> 2. *Hospital is located in a county where the percentage of poverty exceeds the state percentage as specified in the most recent U.S. census of population.*
> 3. *The percentage of the hospital's revenue from Medicare must exceed the state average for Medicare reimbursement.*
> 4. *Hospital is located in a county where the percentage of population 65 and older is greater than the state average as specified in the most recent U.S. census estimate of population and age.*
> 5. *Hospital is located in a county whose most recent three-year unemployment rate average exceeds the same three-year average rate for the state.*

EXHIBIT C

63

The following table lists the State's necessary provider criteria as well as the evidence that has
been provided by the CAH demonstrating that it met the state criteria for designation as a CAH
NP at the time of its request for certification of CAH NP status by CMS.  (as noted above, Page
Memorial is only required to meet the mandatory requirement of being the sole acute care
hospitals in its county and two additional requirements):

| State Necessary Provider Criteria | Evidence the CAH Met the State's Necessary Provider Criteria | Is the Evidence Sufficient? |
|---|---|---|
| ***Mandatory for all necessary provider CAHs in the State:***<br><br>Hospital must be the sole provider in a county | Per the Health Resources and Services Administration (HRSA), there is only one hospital in the county in which the CAH is located (http://www.pagecounty.virginia.gov/231/Medical) and the closed hospital list from UNC (a HRSA contractor), which now has data back to 2005, only found one closed hospital in Virginia, Lee Regional Medical Center in Lee County, Virginia. | Yes |
| Located in a nonmetropolitan county that is a federally designed Medically Underserved Area (MUA) or Health Professional Shortage Area (HPSA) | Data from HRSA's Data Warehouse indicates that the CAH was located in a nonmetropolitan county that is a Federally designated Medically Underserved Area (MUA) and a Health Professional Shortage Area (HPSA) at the time they were designated by the State as a necessary provider http://datawarehouse.hrsa.gov/GeoAdvisor/ShortageDesignationAdvisor.aspx | Yes |
| Hospital is located in a county where the percentage of poverty exceeds the state percentage as specified in the most recent U.S. census of population. | Data from the U.S. Census Bureau, Small Area Income and Poverty Estimates, 2000-2013 –indicates that the county in which the CAH was located has a poverty level above the State poverty level at the time they were designated by the State as a necessary provider http://www.census.gov/did/www/saipe/index.html | Yes |
| The percentage of the hospital's revenue from Medicare must exceed the state average for Medicare reimbursement. | This information must be obtained from the CAH and the State. | TBD |
| Hospital is located in a county where the percentage of population 65 and older is greater than the state average as specified in the most recent U.S. census estimate of population and age. | Data from the U.S. Census Bureau indicates that the CAH was located in a county in which the percentage of population 65 and older is greater than that State average at the time they were designated by the State as a necessary provider http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=CF | Yes |
| Hospital is located in a county whose most recent three-year unemployment rate average exceeds the same three year average rate for the state. | Data from the Virginia Labor Market Information indicates that the CAH was located in a county whose 3-year unemployment rate average is greater than the same three year average rate for the State at the time they were designated by the State as a necessary provider https://data.virginialmi.com/vosnet/analyzer/results.aspx?session=labforce | Yes |

2- CAH Necessary Provider Designation Documentation - Case Study

EXHIBIT C

As a result of the supporting information provided, it can be concluded that Page Memorial was designated as a necessary provider CAH before January 1, 2006 and as a result, currently meets the CAH location and distance requirements under §485.610(c).

# EXHIBIT D

5/18/2018                Podcasts | Newsroom | Office of Inspector General | U.S. Department of Health and Human Services

<u>Skip Navigation</u>


An official website of the United States government. <u>Here's how you know ></u>

<u>Change Font Size</u>

# Transcript for audio podcast: Critical Access Hospital Designations

From the Office of Inspector General of Department of Health and Human Services

<u>http://oig.hhs.gov</u>

[Ann Maxwell] I'm Ann Maxwell, the Regional Inspector General in Chicago for our Office of Evaluation and Inspections, speaking with program analyst Brian Jordan. Let's talk about your recently released evaluation of Critical Access Hospitals. First, what are Critical Access Hospitals?

[Brian Jordan] Critical access hospitals are small hospitals located in rural communities designated as critical in providing access to health care. There are more than 1,300 of these hospitals across the country, in 45 states. In 2011, these hospitals received 8.5 billion dollars to care for more than 2 million rural Medicare patients.

[Ann Maxwell] Why would a hospital want to be designated as a critical access hospital?

[Brian Jordan] They receive higher Medicare reimbursements for most services compared to regular hospitals. In fact, they are paid 101 percent of their costs.

[Ann Maxwell] What makes a hospital, a 'critical access hospital?'

[Brian Jordan] The Centers for Medicare & Medicaid Services, or CMS, makes this designation based on many requirements. Our evaluation focused on two location requirements. First, these hospitals must be located a certain driving distance from other hospitals. Second, they must be located in rural areas.

[Ann Maxwell] Can you talk about a type of critical access hospital called a 'necessary provider?'

[Brian Jordan] Sure. Necessary providers don't need to meet the distance requirement. Up until 2006, States could designate hospitals as necessary providers. States can no longer do this, but all existing necessary providers have a permanent exemption from ever having to meet the distance requirement. Approximately 75 percent, nearly 1000 critical access hospitals are necessary providers.

[Ann Maxwell] So tell me why you decided to evaluate critical access hospitals?

[Brian Jordan] We were concerned that some of these hospitals may not be providing critical access to rural patients because they were located very close to other hospitals that could provide similar services. Remember, necessary provider hospitals never had to meet the distance requirement. And, until March of 2013, CMS never went back to check that other critical access hospitals still met the location requirements. With new hospitals being built and towns expanding, some of these hospitals might no longer qualify for critical access hospital status.

Since we pay these hospitals more to provide this critical access to rural patients, we wanted to know if these increased payments are tax dollars well spent.

[Ann Maxwell] What did you find?

EXHIBIT D

66

[Brian Jordan] Almost two-thirds of existing critical access hospitals, over 800 of them, wouldn't have met the location requirements in 2011. Most of the hospitals that would not meet the requirements were necessary providers. More than 300 critical access hospitals were less than 15 miles from the closest hospital!

[Ann Maxwell] How much could Medicare and beneficiaries save if CMS dedesignated some of these hospitals?

[Brian Jordan] A lot of money! In 2011, Medicare and beneficiaries could have saved more than 1.3 million dollars for each dedesignated critical access hospital. By dedesignating critical access hospitals less than 15 miles from the nearest hospital, Medicare would have saved 449 million dollars.

[Ann Maxwell] Huge savings! So, what did you recommend?

[Brian Jordan] Because the designation means increased spending for both Medicare and beneficiaries, we recommend that CMS periodically check if each critical access hospital still provides services that rural beneficiaries can't easily get somewhere else, and therefore deserves the increased financial support from Medicare and beneficiaries. We also recommend that necessary providers be required to meet the distance requirement.

[Ann Maxwell] So if CMS followed your recommendations, would it result in two-thirds of all critical access hospitals being dedesignated?

[Brian Jordan] Not necessarily. These hospitals are costly for Medicare and beneficiaries, but we have to balance cost concerns with hospital access for rural beneficiaries. With that balance in mind, we recommend that CMS create alternative location related requirements for critical access hospitals that don't meet the distance or rural requirements. For example, CMS could allow critical access hospitals to keep their designations - if they serve communities with high poverty rates.

[Ann Maxwell] Thank you, Brian for sharing this important work on Critical Access Hospitals.

[Brian Jordan] Thank you, Ann.

Top

Return to Podcasts

EXHIBIT D

67

# EXHIBIT E

# Department of Health and Human Services

## OFFICE OF
## INSPECTOR GENERAL

# MEDICARE COULD HAVE SAVED BILLIONS AT CRITICAL ACCESS HOSPITALS IF SWING-BED SERVICES WERE REIMBURSED USING THE SKILLED NURSING FACILITY PROSPECTIVE PAYMENT SYSTEM RATES

*Inquiries about this report may be addressed to the Office of Public Affairs at*
*Public.Affairs@oig.hhs.gov.*



Daniel R. Levinson
Inspector General

March 2015
A-05-12-00046

# *Office of Inspector General*

http://oig.hhs.gov

The mission of the Office of Inspector General (OIG), as mandated by Public Law 95-452, as amended, is to protect the integrity of the Department of Health and Human Services (HHS) programs, as well as the health and welfare of beneficiaries served by those programs. This statutory mission is carried out through a nationwide network of audits, investigations, and inspections conducted by the following operating components:

## *Office of Audit Services*

The Office of Audit Services (OAS) provides auditing services for HHS, either by conducting audits with its own audit resources or by overseeing audit work done by others. Audits examine the performance of HHS programs and/or its grantees and contractors in carrying out their respective responsibilities and are intended to provide independent assessments of HHS programs and operations. These assessments help reduce waste, abuse, and mismanagement and promote economy and efficiency throughout HHS.

## *Office of Evaluation and Inspections*

The Office of Evaluation and Inspections (OEI) conducts national evaluations to provide HHS, Congress, and the public with timely, useful, and reliable information on significant issues. These evaluations focus on preventing fraud, waste, or abuse and promoting economy, efficiency, and effectiveness of departmental programs. To promote impact, OEI reports also present practical recommendations for improving program operations.

## *Office of Investigations*

The Office of Investigations (OI) conducts criminal, civil, and administrative investigations of fraud and misconduct related to HHS programs, operations, and beneficiaries. With investigators working in all 50 States and the District of Columbia, OI utilizes its resources by actively coordinating with the Department of Justice and other Federal, State, and local law enforcement authorities. The investigative efforts of OI often lead to criminal convictions, administrative sanctions, and/or civil monetary penalties.

## *Office of Counsel to the Inspector General*

The Office of Counsel to the Inspector General (OCIG) provides general legal services to OIG, rendering advice and opinions on HHS programs and operations and providing all legal support for OIG's internal operations. OCIG represents OIG in all civil and administrative fraud and abuse cases involving HHS programs, including False Claims Act, program exclusion, and civil monetary penalty cases. In connection with these cases, OCIG also negotiates and monitors corporate integrity agreements. OCIG renders advisory opinions, issues compliance program guidance, publishes fraud alerts, and provides other guidance to the health care industry concerning the anti-kickback statute and other OIG enforcement authorities.

EXHIBIT E

69

# *Notices*

---

## THIS REPORT IS AVAILABLE TO THE PUBLIC
### at http://oig.hhs.gov

Section 8M of the Inspector General Act, 5 U.S.C. App., requires that OIG post its publicly available reports on the OIG Web site.

## OFFICE OF AUDIT SERVICES FINDINGS AND OPINIONS

The designation of financial or management practices as questionable, a recommendation for the disallowance of costs incurred or claimed, and any other conclusions and recommendations in this report represent the findings and opinions of OAS.  Authorized officials of the HHS operating divisions will make final determination on these matters.

# EXECUTIVE SUMMARY

> *Medicare could have saved billions over a 6-year period at Critical Access Hospitals if swing-bed services were reimbursed using the skilled nursing facility prospective payment system rate.*

## WHY WE DID THIS REVIEW

Congress established the Rural Flexibility Program, which created Critical Access Hospitals (CAHs) to ensure that beneficiaries in rural areas have access to a range of hospital services. CAHs have broad latitude in the types of inpatient and outpatient services they provide, including "swing-bed" services, which are the equivalent of services performed at a skilled nursing facility (SNF). Medicare reimburses CAHs at 101 percent of their reasonable costs for providing services to beneficiaries rather than at rates set by Medicare's prospective payment system (PPS) or Medicare's fee schedules.

CAHs must meet the requirements set forth in the CAH Conditions of Participation (CoP) to receive CAH certification, although before January 1, 2006, States had discretion to designate a hospital that did not meet the distance requirement as a "necessary provider" CAH. As a result, the number of hospitals classified as CAHs and the corresponding total Medicare reimbursement for swing-bed services at CAHs increased. Effective January 1, 2006, States were prohibited from creating new "necessary provider" CAHs, but existing "necessary provider" CAHs were allowed to retain their CAH status indefinitely, as long as they continued to meet all other CAH requirements. In a 2005 report to Congress, the Medicare Payment Advisory Commission stated that cost-based reimbursement has led to more rapid cost growth among CAHs than other rural hospitals. This cost growth was related specifically to post-acute skilled care services provided in swing-beds.

This growth continued, and CAH swing-bed usage increased from about 789,000 days in calendar year (CY) 2005 to about 914,000 days in CY 2010. Medicare's annual expenditures for these services almost doubled during that 6-year period; expenditures exceeded $1.1 billion in CY 2010.

Since September 2011, the Office of Management and Budget (OMB) has proposed to reduce CAH reimbursements and to eliminate the certification for CAHs located within 10 miles of another hospital. In fiscal year (FY) 2015, OMB estimated $1.7 billion in savings over 10 years if Medicare reduced CAH reimbursements from 101 percent of reasonable costs to 100 percent.

This report estimates potential savings by comparing reimbursement methodologies at CAHs and other facilities offering similar SNF-type services.

Our objectives were to determine (1) how much swing-bed usage at CAHs has increased over a 6-year period, (2) how much average swing-bed reimbursement rates at CAHs differ from rates at alternative facilities, (3) whether similar care was available at alternative facilities, and (4) whether Medicare would have saved on payments for swing-bed services at CAHs if it had paid SNF PPS rates.

## BACKGROUND

For a hospital to be designated as a CAH, it must meet certain CoP.  Some of these CoP requirements include:  (1) being located in a rural area, (2) either being at a certain distance from other hospitals or being grandfathered as a State-designated necessary provider, (3) having 25 or fewer beds used for inpatient care or swing-bed services, and (4) having an annual average length of stay for a patient that does not exceed 96 hours.

Medicare beneficiaries in inpatient status at CAHs may transition or "swing" from receiving inpatient services to receiving SNF services without physically changing beds within the hospital.  Because these services are provided in an inpatient setting, beneficiaries typically do not incur a copay while in swing-bed status.  Unlike CAH swing-bed services, which are reimbursed at 101 percent of "reasonable cost," Medicare pays for SNF services provided in SNFs at predetermined daily rates (under the SNF PPS).  The daily rates vary on the basis of the resource utilization group to which a beneficiary is assigned.  These payment rates represent payment in full for all costs (routine, ancillary, and capital-related) associated with furnishing covered SNF services to beneficiaries.  Similarly, Medicare pays SNF services provided in non-CAHs at the same SNF PPS daily rates.

Over the last couple of years, the Office of Inspector General has performed several reviews at CAHs.  In one such review, we determined that nearly two-thirds of CAHs would not meet the location requirement if required to re-enroll; a vast majority would not be able to meet the distance requirement.  That report concluded that Medicare and beneficiaries would have saved $449 million if Congress granted Centers for Medicare & Medicaid Services (CMS) the authority to reassess whether all CAHs should maintain their certification based on location and distance requirements and CMS implemented procedures to reassess.  That report also concluded that only CAHs that serve beneficiaries who would be otherwise unable to reasonably access hospital services should remain certified.

## HOW WE CONDUCTED THIS REVIEW

We reviewed swing-bed Medicare claims data at CAHs and claims data at alternative facilities providing care at the skilled nursing level that submitted claims to CMS for services provided from CYs 2005 through 2010.  Alternative facilities included acute care hospitals authorized and offering swing-bed services and SNFs.  We determined the swing-bed usage at CAHs for the 6-year period.  We also compared the average swing-bed reimbursement at CAHs to reimbursement at alternative facilities.  The daily CAH swing-bed cost to Medicare is not known because these costs are reported by hospitals in the aggregate rather than separately.  To compute an average daily swing-bed cost at CAHs, we divided total yearly swing-bed costs by total swing-bed service days.  We then compared the CAH average daily cost to the alternative facility average daily cost.

From a sampling frame of the 1,200 CAHs that submitted swing-bed claims, we randomly sampled 100 CAHs to determine whether beneficiaries would have access to the same SNF services provided by CAHs at alternative facilities.  Specifically, we reviewed FY 2010 cost

report information submitted by sampled CAHs and alternative facilities within 35 miles of the sampled CAH facilities.

Finally, we calculated and estimated the potential savings to Medicare on payments for swing-bed services at CAHs if it had paid using SNF PPS rates by comparing the difference in per diem amounts for CAHs and alternative facilities.

## WHAT WE FOUND

Swing-bed usage at CAHs has significantly increased from CYs 2005 through 2010; Medicare spending for swing-bed services at CAHs steadily increased to, on average, almost four times the cost of similar services at alternative facilities.  Of the 100 CAHs we sampled, 90 had alternative facilities within a 35-mile radius with alternative skilled nursing care available.  On the basis of our sample results, we estimated that swing-bed services provided at 1,080 of the 1,200 (or 90 percent) of the CAHs in our sampling frame could have been provided at alternative facilities within 35 miles of the CAHs during CY 2010.  We estimated that Medicare could have saved $4.1 billion over a 6-year period if payments for swing-bed services at CAHs were made using SNF PPS rates.

## WHAT WE RECOMMEND

We recommend that CMS seek legislation to adjust CAH swing-bed reimbursement rates to the lower SNF PPS rates paid for similar services at alternative facilities.

## CMS COMMENTS AND OUR RESPONSE

In written comments on our draft report, CMS agreed with our finding that CAHs' swing-bed utilization has increased but disagreed with our recommendation because of concerns with our findings on the availability of skilled nursing services at nearby alternative facilities and our calculation of savings.  We also received and considered technical comments from the Department of Health and Human Services' (HHS) Health Resources and Services Administration (HRSA), which is authorized to advise the Secretary of HHS on Medicare regulatory issues in rural communities.

After considering CMS's and HRSA's comments, we have adjusted our report language as appropriate to clarify certain points.  However, because (1) the sample design achieved its intended purpose, (2) the type and intensity of services provided in a CAH swing bed or in a SNF bed at an alternative facility are the same, and (3) recent swing-bed utilization research shows that discharges from CAHs are sent equally to SNFs or kept in swing beds and that patient characteristics are comparable regardless of discharge destination, we maintain our findings and recommendation are valid.

# TABLE OF CONTENTS

INTRODUCTION ..........................................................................................................1

    Why We Did This Review .........................................................................................1

    Objectives ................................................................................................................2

    Background ...............................................................................................................2

        Critical Access Hospitals and Swing-Bed Services....................................2
        Swing-Bed Services Are Reimbursed Differently at Critical Access Hospitals......3
        Prior Reviews Related to Critical Access Hospitals ...................................3

    How We Conducted This Review ..............................................................................3

FINDINGS ...................................................................................................................4

    Swing-Bed Usage at Critical Access Hospitals Has Increased Since 2005 .......................5

    The Average Swing-Bed Reimbursement Is Much Higher
        at Critical Access Hospitals Than at Alternative Facilities .............................6

    Beneficiaries Had Access to the Similar Skilled Nursing Facility Services
        at Alternative Facilities Within 35 Miles of Critical Access Hospitals ...........................7

    Medicare Could Save Billions in the Reimbursement of Swing-Bed Services .................8

RECOMMENDATION ................................................................................................8

CMS COMMENTS AND OFFICE OF INSPECTOR GENERAL RESPONSE ...........................8

    Sampled Hospitals ...................................................................................................9

    Level of Beneficiary Care .........................................................................................9

    Accessibility and Cost of Alternative Facilities...........................................................10

APPENDIXES

    A:  Audit Scope and Methodology ............................................................................11

    B:  Mathematical Calculation Plan ...........................................................................13

    C:  Statistical Sampling Methodology ........................................................................14

    D:  Sample Results and Estimates ............................................................................15

E:  Summary of Sample Results—Alternative Skilled Nursing Care
      Available During Calendar Year 2010 .....................................................................16

F:  Mathematical Calculation of Potential Medicare Savings
      for Critical Access Hospital Swing-Bed Services ...................................................19

G:  Related Office of Inspector General Reports............................................................20

H:  CMS Comments...........................................................................................................21

# INTRODUCTION

## WHY WE DID THIS REVIEW

Congress established the Rural Flexibility Program,[1] which created Critical Access Hospitals (CAHs) to ensure that beneficiaries in rural areas have access to a range of hospital services. CAHs have broad latitude in the types of inpatient and outpatient services they provide, including "swing-bed" services, which are the equivalent of services performed at a skilled nursing facility (SNF).[2]  Medicare reimburses CAHs at 101 percent of their reasonable costs[3] for providing services to beneficiaries rather than at rates set by Medicare's prospective payment system (PPS) or Medicare's fee schedules.[4]

CAHs must meet the requirements set forth in the CAH Conditions of Participation (CoP)[5] to receive CAH certification, although before January 1, 2006, States had discretion to designate a hospital that did not meet the distance requirement[6] as a "necessary provider" CAH.[7]  As a result, the number of hospitals classified as CAHs and the corresponding total Medicare reimbursement for swing-bed services at CAHs increased.  Effective January 1, 2006, States were prohibited from creating new "necessary provider" CAHs, but existing "necessary provider" CAHs were allowed to retain their CAH status indefinitely, as long as they continued to meet all other CAH requirements.[8]  In a 2005 report to Congress, the Medicare Payment Advisory Commission stated that cost-based reimbursement has led to more rapid cost growth among CAHs than other rural hospitals.  This cost growth was related specifically to post-acute skilled care services provided in swing-beds.[9]

---

[1] Balanced Budget Act (BBA) of 1997, P.L. No. 105-33 § 4201.  The BBA amended several sections of the Social Security Act, including sections 1814(l), 1820, 1834(g), and 1861(mm).

[2] A "swing-bed" is a hospital bed that may be used as needed to furnish either an acute or a SNF level of care.

[3] "Reasonable costs" are the direct and indirect costs associated with providing services to Medicare beneficiaries (42 CFR § 413.9(b)(1)).

[4] Social Security Act, §§ 1814(l) and 1834(g), 42 U.S.C. §§ 1395f(l) and 1395m(g).  Before January 1, 2004, Medicare reimbursed CAHs at 100 percent of reasonable costs.

[5] 42 CFR §§ 485.601–485.647.

[6] Facilities wishing to be certified as CAHs must be either (1) located more than a 35-mile drive from a hospital or another CAH or (2) located more than a 15-mile drive from a hospital or another CAH in areas of mountainous terrain or areas where only secondary roads are available (Social Security Act, § 1820(c)(2)(B)(i); 42 U.S.C. § 1395i-4(c)(2)(B)(i)).

[7] BBA, § 4201; Social Security Act, § 1820(c)(2)(B)(i)(II); 42 U.S.C. § 1395i-4(c)(2)(B)(i)(II).

[8] Medicare Prescription Drug, Improvement, and Modernization Act of 2003, P.L. No. 108-173 § 405(h); Social Security Act, §§ 1820(c)(2)(B)(i)(II) and 1820(h)(3); 42 U.S.C. §§ 1395i-4(c)(2)(B)(ii)(II) and 1395i-4(h)(3).

[9] Medicare Payment Advisory Commission, *Report to the Congress:  Issues in a Modernized Medicare Program*, chapter 7, "Critical Access Hospitals," June 2005.

---

This growth continued, and CAH swing-bed usage increased from about 789,000 days in calendar year (CY) 2005 to about 914,000 days in CY 2010. Medicare's annual expenditures for these services almost doubled during that 6-year period; expenditures exceeded $1.1 billion in CY 2010.

Since September 2011, the Office of Management and Budget (OMB) has proposed to reduce CAH reimbursements and to eliminate the certification for CAHs located within 10 miles of another hospital.[10] In fiscal year (FY) 2015, OMB estimated $1.7 billion in savings over 10 years if Medicare reduced CAH reimbursements from 101 percent of reasonable costs to 100 percent.[11]

This report estimates potential savings by comparing reimbursement methodologies at CAHs and other facilities offering similar SNF-type services.

## OBJECTIVES

Our objectives were to determine (1) how much swing-bed usage at CAHs has increased over a 6-year period, (2) how much average swing-bed reimbursement rates at CAHs differ from rates at alternative facilities, (3) whether similar care was available[12] at alternative facilities, and (4) whether Medicare would have saved on payments for swing-bed services at CAHs if it had paid SNF PPS rates.

## BACKGROUND

### Critical Access Hospitals and Swing-Bed Services

For a hospital to be designated as a CAH, it must meet certain Medicare CoP. Some of these CoP requirements include: (1) being located in a rural area, (2) either being at a certain distance from other hospitals or being grandfathered as a State-designated necessary provider, (3) having 25 or fewer beds used for inpatient care or swing-bed services,[13] and (4) having an annual average length of stay for a patient that does not exceed 96 hours.

---

[10] OMB, *Living Within Our Means and Investing in the Future: The President's Plan for Economic Growth and Deficit Reduction*, September 2011.

[11] OMB, *Fiscal Year 2014 Budget of the U.S. Government*, 2013, p. 196.

[12] For this review, we defined whether similar care was available at alternative facilities by determining whether sufficient bed capacity was available in the aggregate at alternative facilities to cover the number of bed days at sampled CAHs.

[13] Before January 1, 2004, CAHs were permitted to have no more than 15 acute care inpatient beds, unless they were authorized by the State to have swing beds, in which case they could have no more than 25 total beds, as long as no more than 15 beds were used as acute care inpatient beds at any given time. Effective January 1, 2004, CAHs were permitted to have up to 25 beds to be used in any combination to provide acute care inpatient and extended care services (Medicare Prescription Drug, Improvement, and Modernization Act of 2003, P.L. No. 108-173 § 405(e); Social Security Act, §§ 1820(c)(2)(B)(iii) and 1820(f)(3); 42 U.S.C. §§ 1395i-4(c)(2)(B)(iii) and 1395i-4(f)).

---

**Swing-Bed Services Are Reimbursed Differently at Critical Access Hospitals**

Medicare beneficiaries in inpatient status at CAHs may transition or "swing" from receiving inpatient services to receiving SNF services without physically changing beds within the hospital. Because these services are provided in an inpatient setting, beneficiaries typically do not incur a copay while in swing-bed status. Unlike CAH swing-bed services that are reimbursed at 101 percent of "reasonable cost," Medicare pays for SNF services provided in SNFs at predetermined daily rates (under the SNF PPS).[14] The daily rates vary on the basis of the resource utilization group to which a beneficiary is assigned. These payment rates represent payment in full for all costs (routine, ancillary, and capital-related) associated with furnishing covered skilled nursing services to beneficiaries. Similarly, Medicare pays SNF services provided in non-CAHs at the same SNF PPS daily rates.[15]

**Prior Reviews Related to Critical Access Hospitals**

Over the last couple of years, the Office of Inspector General has performed several reviews at CAHs. In one such review,[16] we determined that nearly two-thirds of CAHs would not meet the location requirement if required to re-enroll; a vast majority would not be able to meet the distance requirement. That report concluded that Medicare and beneficiaries would have saved $449 million if Congress granted the Centers for Medicare and Medicaid Services (CMS) the authority to reassess whether all CAHs should maintain their certification based on location and distance requirements and CMS implemented procedures to reassess. That report also concluded that only CAHs that serve beneficiaries who would be otherwise unable to reasonably access hospital services should remain certified.

**HOW WE CONDUCTED THIS REVIEW**

We reviewed swing-bed Medicare claims data at CAHs and claims data at alternative facilities providing skilled-nursing-level care that submitted claims to CMS for services provided from CYs 2005 through 2010. Alternative facilities included acute care hospitals authorized and offering swing-bed services and SNFs.

We calculated the swing-bed usage at CAHs for a 6-year period. We then compared the average swing-bed reimbursement at CAHs to reimbursement at alternative facilities. The daily CAH swing-bed cost to Medicare is not known because these costs are reported by hospitals in the aggregate rather than separately. To compute an average daily swing-bed cost at CAHs, we divided total yearly swing-bed costs by total swing-bed service days. We then compared the CAH average daily cost to the alternative facility average daily cost.

---

[14] Social Security Act, § 1888(e); 42 U.S.C. § 1395yy(e).

[15] Social Security Act, § 1888(e)(7); 42 U.S.C. § 1395yy(e)(7).

[16] *Most Critical Access Hospitals Would Not Meet the Location Requirements If Required To Re-enroll in Medicare* (OEI-05-12-00080), issued August 2013.

From a sampling frame of the 1,200 CAHs that submitted swing-bed claims, we randomly sampled 100 CAHs to determine whether beneficiaries would have access to the similar SNF services provided by CAHs at alternative facilities. Specifically, we reviewed FY 2010 cost report information submitted by sampled CAHs and alternative facilities within a 35-mile radius of the sampled CAH facilities. We defined similar SNF care to be available if sufficient bed capacity was available in the aggregate at alternative facilities to cover the number of bed days at sampled CAHs.

Finally, we calculated and estimated the potential savings to Medicare on payments for swing-bed services at CAHs if it had paid using SNF PPS rates by comparing the difference in per diem amounts for CAHs and alternative facilities.

We conducted this performance audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

Appendix A contains the details of our scope and methodology, Appendix B contains our mathematical calculation plan, Appendix C contains our sample design and methodology, Appendix D contains our sample results and estimates, Appendix E contains the results of our analysis of bed availability at sampled CAHs, Appendix F contains the mathematical calculation of potential Medicare savings for CAH swing-bed services, and Appendix G contains a list of our previously issued reports on CAHs.

## FINDINGS

Swing-bed usage at CAHs has significantly increased from CYs 2005 through 2010, and Medicare spending for swing-bed services at CAHs steadily increased to, on average, almost four times the cost of similar services at alternative facilities. Of the 100 CAHs we sampled, 90 had alternative facilities within 35 miles with alternative skilled nursing care available. On the basis of our sample results, we estimated that swing-bed services provided at 1,080 of the 1,200 (or 90 percent) of the CAHs in our sampling frame could have been provided at alternative facilities within 35 miles of the CAHs during CY 2010. We estimated that Medicare could have saved $4.1 billion over a 6-year period if payments for swing-bed services at CAHs were made using SNF PPS rates.

## SWING-BED USAGE AT CRITICAL ACCESS HOSPITALS HAS INCREASED SINCE 2005

Medicare CAH swing-bed usage has increased from about 789,000 days in CY 2005 to about 914,000 days in CY 2010 (Figure 1).

**Figure 1:  Swing-Bed Usage at Critical Access Hospitals**



The increase in swing-bed days was due primarily to an increase in the number of CAHs throughout the Nation from CYs 2004 to 2006. This increase was likely caused by the fact that the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 granted CAHs more flexibility in their use of beds as swing-beds, thus increasing reimbursement and grandfathering of previously State-designated "necessary provider" CAHs.  Additionally, federally funded research shows that some CAHs have placed an increased focus on swing-bed care.[17]  The research suggests that using swing-beds has a positive financial impact on a hospital because of the benefits of cost-based reimbursement in helping support a hospital's fixed costs and offset losses from other lines of business, such as uncompensated care.

---

[17] North Carolina Rural Health Research & Policy Analysis Center, *Why Use Swing Beds?  Conversations with Hospital Administrators and Staff*, findings brief, April 2012.

**THE AVERAGE SWING-BED REIMBURSEMENT IS MUCH HIGHER AT CRITICAL ACCESS HOSPITALS THAN AT ALTERNATIVE FACILITIES**

For the 6-year period reviewed, Medicare spent, on average, almost four times more for swing-bed services at CAHs than for similar services at alternative facilities (Figure 2).

**Figure 2:  Comparison of Average Swing-Bed Reimbursement per Day**



Specifically, swing-bed reimbursement at CAHs ranged from $868 per day in CY 2005 to $1,261 per day in CY 2010.  In contrast, the daily average reimbursements for similar services at alternative facilities ranged from $275 to $273 over the same time period.  Swing-bed reimbursement at CAHs also continued to steadily increase while reimbursement for similar services at alternative facilities stayed steady (Figure 3).

**Figure 3:  Average Swing-Bed Reimbursement per Day Over Time**



## BENEFICIARIES HAD ACCESS TO THE SIMILAR SKILLED NURSING FACILITY SERVICES AT ALTERNATIVE FACILITIES WITHIN 35 MILES OF CRITICAL ACCESS HOSPITALS

We reviewed cost report information for the sampled CAHs and for alternative facilities within a 35-mile radius of the sampled CAHs.  We determined that there was available capacity[18] at alternative facilities to service the needs of beneficiaries at 90 of the 100 sampled CAHs (see Appendix E).

For example, one sampled CAH used 3,222 swing-bed days during CY 2010.  Using hospital and SNF cost-report utilization data, we determined that within a 35-mile radius of this CAH, 61 alternative facilities offering similar services existed with an available capacity of 432,299 SNF or swing-bed days during CY 2010.  Therefore, Medicare beneficiaries had access to the similar SNF services at alternative facilities for this sampled CAH.

On the basis of our sample results, we estimated that for 1,080 of the 1,200 CAHs that offered swing-bed services during CY 2010, beneficiaries had access to the similar SNF services within a 35-mile radius at alternative facilities.  Having the bed availability for beneficiaries at alternative facilities could provide Medicare with a less costly alternative for providing health care to beneficiaries.  This less costly alternative would also be a low-risk alternative because it would not limit beneficiary access to care.

---

[18] Using cost report information, we derived available capacity at alternative facilities by subtracting total used beds from total beds for the year.  Given cost report data limitations and potential variation in patient numbers on a daily, weekly, or monthly basis, availability at these intervals could not be determined.

## MEDICARE COULD SAVE BILLIONS IN THE REIMBURSEMENT OF SWING-BED SERVICES

Medicare pays almost four times more for swing-bed services provided at CAHs than it pays to alternative facilities for the skilled nursing needs of Medicare beneficiaries.  Also, about 90 percent of CAHs are located within a 35-mile radius of at least one alternative facility that offers similar SNF services.  We estimated that Medicare could have saved a total of $4.1 billion over the 6-year period covered by our audit if payments for swing-bed services were reimbursed using the SNF PPS rates rather than 101 percent of costs (Figure 4).

**Figure 4:  Estimated Amounts That Medicare Could Have Saved Over 6 Years**



### RECOMMENDATION

We recommend that CMS seek legislation to adjust CAH swing-bed reimbursement rates to the lower SNF PPS rates paid for similar services at alternative facilities.

### CMS COMMENTS AND OFFICE OF INSPECTOR GENERAL RESPONSE

In written comments on our draft report, CMS agreed with our finding that CAHs' swing-bed utilization has increased but disagreed with our recommendation because of concerns with our findings on the availability of skilled nursing services at nearby alternative facilities and our calculation of savings.  CMS's comments are included in their entirety as Appendix H.  We also received and considered technical comments from the Department of Health and Human Services' (HHS) Health Resources and Services Administration (HRSA), which is authorized to advise the Secretary of HHS on Medicare regulatory issues in rural communities.

After considering CMS's and HRSA's comments, we have adjusted our report language as appropriate to clarify certain points.  However, because (1) the sample design achieved its intended purpose, (2) the type and intensity of services provided in a CAH swing bed or in a SNF bed at an alternative facility are the same, and (3) recent swing-bed utilization research shows that discharges from CAHs are sent equally to SNFs or kept in swing beds and that patient characteristics are comparable regardless of discharge destination, we maintain our findings and recommendation are valid.

**SAMPLED HOSPITALS**

CMS stated that our sample of 100 CAHs may not have adequately represented the total population of 1,200 CAHs that provide swing-bed services, resulting in an overestimation of the number of CAHs for which alternative facilities are within 35 miles.  Additionally, CMS stated that we did not make a distinction in our sample between Necessary Provider (NP) CAHs, which do not have to meet distance requirements, and CAHs not designated as NP CAHs, which must meet distance requirements.

Because each CAH had an equal chance of being selected, our sampling approach did not bias the estimates we made to the total 1,200 CAHs that provide swing-bed services.  Our objective did not require us to make a distinction between NP CAHs and other CAHs.  Rather, it was designed to determine whether similar SNF services were available within a 35-mile radius of the sampled CAHs and to make inferences about the total 1,200 CAHs that provide swing-bed services.  Our sample design achieved its intended purpose.

**LEVEL OF BENEFICIARY CARE**

CMS stated that our report assumed "the same case mix for patients at CAHs and alternative facilities, therefore not considering differences in the type and intensity of services provided to the two groups of patients."  Specifically, CMS stated that our report did not take into account the differences in patient populations.  CMS indicated that patients who receive care in swing-beds "are likely more 'medically complex' than patients receiving care at alternative facilities."  CMS stated that it is "unclear whether the level of care provided to CAH swing bed patients and to patients of alternative facilities is equivalent and whether beds at alternative facilities were available on a daily, weekly, or monthly basis."

The type and intensity of services provided to a patient in a CAH's swing-bed or in a SNF bed at an alternative facility are the same.[19]  Recent federally funded research on swing-bed utilization shows that post-acute patients discharged from CAHs are sent equally to SNFs or kept in swing-beds; patient characteristics are comparable regardless of hospital type or post-acute care discharge destination.[20]

---

[19] Social Security Act, §§ 1883(a)(1) and (d); 42 U.S.C. §§ 1395tt; 42 CFR § 409.20(a).

[20] North Carolina Rural Health Research & Policy Analysis Center, *Discharge to Swing Bed or Skilled Nursing Facility:  Who Goes Where?* findings brief, February 2014.

Our analysis was not designed to, and did not, make the distinction between swing-beds and SNF beds.  Regarding the availability of beds and variation in patient numbers on a daily, weekly, or monthly basis, our analysis did not take into account these short intervals because of limitations in the cost report data.  However, our evidence shows that for almost all sampled CAHs, the number of beds available on a yearly basis at alternative facilities far exceeded the swing-bed days used at CAHs.  (See Appendix E.)  For 89 of the 90 sampled CAHs that had sufficient alternative care, alternative facilities had more than twice as many beds as the CAHs and more than 60 times the number of days available.

## ACCESSIBILITY AND COST OF ALTERNATIVE FACILITIES

CMS stated that, because our report used a radius measurement to determine distances from alternative facilities, our report does not reflect the distances beneficiaries may need to travel, and, thus, the true accessibility of the facilities.  Additionally, CMS stated that our cost estimates excluded transportation costs of moving a patient to an alternative facility, which would decrease the savings from using an alternative facility.

We recognize that using a radius measurement generally does not reflect the actual distances beneficiaries may need to travel.  For the 100 sampled CAHs, we identified a total of 1,770 alternative facilities within a 35-mile radius.  It was impractical to measure exact actual distances from sampled CAHs to all of these alternative facilities and build this analysis into our methodology.  However, the excess capacity we noted indicates that there were ample alternative facilities within reasonable driving distances at practically all sampled CAHs.

We also recognize that our cost estimates excluded transportation costs to move patients to an alternative facility, as we explained in Appendix A.  These transportation costs can vary greatly, they are difficult to quantify, and the extent of their impact is unknown.  For simplification purposes and because of this uncertainty, we excluded these costs from our analysis.

## APPENDIX A:  AUDIT SCOPE AND METHODOLOGY

**SCOPE**

We reviewed Medicare payments for SNF services at CAHs, Non-Critical Access Hospitals, and traditional SNFs for CYs 2005 through 2010 and computed the average daily per diem rate for each category.

We did not review the overall internal control structure of any organization.  Our objective did not require a review of internal controls.

We conducted our audit work from January through September 2013.

**METHODOLOGY**

To accomplish our objective, we:

- reviewed applicable Federal laws, regulations, and guidance;

- extracted data from CMS's National Claims History (NCH) file for CYs 2005 through 2010 for CAH swing-bed and alternative facility skilled nursing claims;

- calculated and compared average payments to CAHs for swing-bed services, as well as average payments to alternative facilities for similar skilled nursing services (Appendix B);

- selected a random sample of CAHs nationwide and determined whether alternative SNF service care was available within 35 miles[21] during CY 2010 (Appendix C);

- estimated the number of CAHs with swing-beds that had alternative skilled nursing care available (Appendixes D and E);

- estimated the savings to Medicare for swing-bed service payments (Appendix F);[22] and

- discussed the results of our review with CMS.

---

[21] In determining availability of alternative care, we used a 35-mile radius measurement from the sampled CAH. While consistent with the general 35-mile rural flexibility distance requirement, using a radius measurement may yield a result somewhat different from that computed using a driving-distance measurement.  For simplicity purposes, we did not take into account the other distance requirements, such as the 15-mile limit in mountainous terrain.

[22] The comparison of average daily per diem rates computed for CAHs to rates at alternative facilities did not take into account any potential additional costs for transporting beneficiaries to an alternative facility.  For this reason, our estimated potential savings may be overstated by the amount of the transportation costs.

We conducted this performance audit in accordance with generally accepted government auditing standards.  Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives.  We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## APPENDIX B:  MATHEMATICAL CALCULATION PLAN

**DESCRIPTION OF MATHEMATICAL CALCULATION**

For CYs 2005 through 2010, we estimated the difference between Medicare payments to CAHs for swing-bed services (reimbursed at 101 percent of costs) and Medicare payments to alternative facilities for similar services reimbursed using the PPS rates.

**MATHEMATICAL CALCULATION METHODOLOGY**

From CMS's NCH file, we identified swing-bed reimbursement to CAHs and reimbursement to alternative facilities for similar services.  To estimate the potential cost savings for swing-bed reimbursement, we performed the following steps for each year of our audit period:

**Step 1**—We calculated the average payment to CAHs with swing-bed services by:

- identifying total Medicare CAH swing-bed service payments,

- identifying the total number of CAH swing-bed service days, and

- dividing the total payments by the total days.

**Step 2**—We calculated the average payment to alternative facilities by:

- identifying total Medicare alternative facility skilled nursing service payments,

- identifying the total number of alternative facility skilled nursing service days, and

- dividing the total payments by the total days.

**Step 3**—We estimated potential Medicare savings for CAH swing-bed services by (Appendix F):

- calculating the difference in the average payment amount for CAH swing-bed services (step 1) and the average payment amount for skilled nursing services at alternative facilities (step 2),

- multiplying the difference in the average payment amounts by the total CAH swing-bed days for each year covered by our audit, and

- adding the estimated differences in Medicare payments for each year to obtain a total estimated savings for CYs 2005 through 2010.

## APPENDIX C:  STATISTICAL SAMPLING METHODOLOGY

**POPULATION**

The population consisted of the 1,200 CAHs that provided swing-bed services to Medicare beneficiaries from January 1 through December 31, 2010.

**SAMPLING FRAME**

The sampling frame was an Excel file extracted from CMS's NCH file containing 1,200 CAHs that provided swing-bed services from January 1 through December 31, 2010.

**SAMPLE UNIT**

The sample unit was one CAH that provided swing-bed services.

**SAMPLE DESIGN**

We used a simple random sample.

**SAMPLE SIZE**

We selected a random sample of 100 CAHs.

**SOURCE OF RANDOM NUMBERS**

We generated the random numbers with the Office of Inspector General, Office of Audit Services (OIG/OAS), statistical software.

**METHOD OF SELECTING SAMPLE ITEMS**

We consecutively numbered the sampling frame.  After generating 100 random numbers, we selected the corresponding frame items.

**ESTIMATION METHODOLOGY**

We used the OIG/OAS statistical software to estimate the number of CAHs with swing-bed services that had alternative care available within 35 miles of the CAHs during CY 2010.

## APPENDIX D:  SAMPLE RESULTS AND ESTIMATES

### Table 1:  Sample Results

| Frame Size | Sample Size | Alternative Facility Bed Availability |
|:---:|:---:|:---:|
| 1,200 | 100 | 90 |

### Table 2:  Estimated Number of Critical Access Hospitals With Swing-Beds That Had Alternative Skilled Nursing Care During Calendar Year 2010
### (*Limits Calculated for a 90-Percent Confidence Interval*)

| | |
|---|---|
| Point estimate | 1,080 |
| Lower limit | 1,007 |
| Upper limit | 1,131 |

**APPENDIX E:  SUMMARY OF SAMPLE RESULTS—ALTERNATIVE SKILLED NURSING CARE AVAILABLE DURING CALENDAR YEAR 2010**

| Sample Number | Number of CAH Swing-Bed Days Used | Number of Bed Days Available at Alternative Facilities[23] | Sufficient Alternative Beds Available?[24] |
|---|---|---|---|
| 1 | 596 | 268 | NO |
| 2 | 2,278 | 0 | NO |
| 3 | 2,889 | 117,240 | YES |
| 4 | 1,405 | 144,526 | YES |
| 5 | 3,437 | 111,559 | YES |
| 6 | 439 | 6,994 | YES |
| 7 | 7,204 | 29,615 | YES |
| 8 | 860 | 0 | NO |
| 9 | 867 | 13,140 | YES |
| 10 | 4,063 | 65,356 | YES |
| 11 | 1,626 | 112,712 | YES |
| 12 | 4,634 | 67,491 | YES |
| 13 | 2,354 | 256,501 | YES |
| 14 | 2,698 | 130,752 | YES |
| 15 | 2,836 | 184,258 | YES |
| 16 | 3,345 | 174,374 | YES |
| 17 | 4,199 | 208,705 | YES |
| 18 | 1,511 | 383,476 | YES |
| 19 | 3,222 | 432,299 | YES |
| 20 | 1,548 | 153,367 | YES |
| 21 | 1,834 | 143,663 | YES |
| 22 | 1,902 | 387,649 | YES |
| 23 | 1,243 | 129,098 | YES |
| 24 | 2,745 | 78,861 | YES |
| 25 | 3,217 | 102,626 | YES |
| 26 | 2,913 | 244,687 | YES |
| 27 | 1,940 | 127,322 | YES |
| 28 | 4,344 | 108,298 | YES |
| 29 | 3,844 | 111,629 | YES |
| 30 | 2,816 | 125,554 | YES |
| 31 | 1,235 | 122,519 | YES |
| 32 | 3,418 | 124,293 | YES |
| 33 | 2,188 | 23,534 | YES |

[23] Using cost report information, we derived available capacity at alternative facilities by subtracting total used beds from total beds for the year.

[24] We compared the number of swing-bed days used at sampled CAHs to the total number of beds available at alternative facilities within 35 miles of the sampled CAHs. A higher number of beds at alternative facilities than at sampled CAHs indicated sufficient bed capacity—denoted with a "YES." In contrast, a higher number of swing-bed days at CAHs than at alternative facilities indicated not enough bed capacity—denoted with a "NO."

| Sample Number | Number of CAH Swing-Bed Days Used | Number of Bed Days Available at Alternative Facilities | Sufficient Alternative Beds Available? |
|---|---|---|---|
| 34 | 751 | 9,266 | YES |
| 35 | 6,092 | 91,317 | YES |
| 36 | 3,357 | 53,336 | YES |
| 37 | 2,468 | 59,497 | YES |
| 38 | 3,656 | 62,936 | YES |
| 39 | 3,233 | 2,899 | NO |
| 40 | 1,389 | 30,245 | YES |
| 41 | 2,273 | 44,338 | YES |
| 42 | 4,772 | 243,532 | YES |
| 43 | 4,426 | 51,477 | YES |
| 44 | 6,445 | 50,011 | YES |
| 45 | 4,071 | 179,033 | YES |
| 46 | 1,977 | 0 | NO |
| 47 | 545 | 128,315 | YES |
| 48 | 1,597 | 70,383 | YES |
| 49 | 1,603 | 87,020 | YES |
| 50 | 2,203 | 90,309 | YES |
| 51 | 2,366 | 84,512 | YES |
| 52 | 954 | 87,524 | YES |
| 53 | 5,571 | 91,251 | YES |
| 54 | 4,946 | 68,138 | YES |
| 55 | 3,571 | 177,125 | YES |
| 56 | 3,346 | 262,102 | YES |
| 57 | 3,213 | 62,355 | YES |
| 58 | 2,664 | 0 | NO |
| 59 | 3,656 | 12,577 | YES |
| 60 | 1,283 | 30,908 | YES |
| 61 | 1,077 | 44,503 | YES |
| 62 | 2,851 | 78,239 | YES |
| 63 | 3,143 | 182,010 | YES |
| 64 | 2,160 | 22,570 | YES |
| 65 | 3,215 | 11,235 | YES |
| 66 | 4,894 | 46,342 | YES |
| 67 | 1,490 | 4,715 | YES |
| 68 | 4,410 | 112,690 | YES |
| 69 | 1,667 | 85,003 | YES |
| 70 | 1,435 | 100,837 | YES |
| 71 | 1,111 | 63,297 | YES |
| 72 | 1,618 | 47,710 | YES |
| 73 | 693 | 14,993 | YES |
| 74 | 1,247 | 120,093 | YES |
| 75 | 1,360 | 91,495 | YES |
| 76 | 2,373 | 0 | NO |

| Sample Number | Number of CAH Swing-Bed Days Used | Number of Bed Days Available at Alternative Facilities | Sufficient Alternative Beds Available? |
|---|---|---|---|
| 77 | 2,210 | 0 | NO |
| 78 | 3,455 | 86,005 | YES |
| 79 | 700 | 56,568 | YES |
| 80 | 772 | 0 | NO |
| 81 | 3,584 | 39,673 | YES |
| 82 | 1,317 | 56,373 | YES |
| 83 | 4,575 | 11,237 | YES |
| 84 | 1,554 | 27,501 | YES |
| 85 | 458 | 0 | NO |
| 86 | 962 | 136,876 | YES |
| 87 | 3,243 | 91,283 | YES |
| 88 | 1,726 | 248,685 | YES |
| 89 | 1,244 | 286,682 | YES |
| 90 | 2,374 | 10,531 | YES |
| 91 | 4,411 | 41,485 | YES |
| 92 | 4,724 | 74,253 | YES |
| 93 | 4,870 | 80,303 | YES |
| 94 | 3,289 | 92,937 | YES |
| 95 | 3,773 | 100,894 | YES |
| 96 | 4,954 | 64,685 | YES |
| 97 | 1,384 | 85,124 | YES |
| 98 | 1,865 | 196,270 | YES |
| 99 | 2,301 | 3,646 | YES |
| 100 | 2,688 | 9,634 | YES |

**APPENDIX F:  MATHEMATICAL CALCULATION OF POTENTIAL MEDICARE SAVINGS FOR CRITICAL ACCESS HOSPITAL SWING-BED SERVICES**

| CY | CAH Claims Total Days | CAH Claims per Diem | Alternative Facilities Claims per Diem | Difference in per Diem | Total Potential Medicare Savings for CAH Swing-Bed Services |
|---|---|---|---|---|---|
| | A | B | C | D = (B - C) | E = (A x D) |
| 2005 | 788,609 | $867.95 | $275.41 | $592.54 | $467,282,377 |
| 2006 | 882,690 | 919.75 | 280.19 | 639.56 | 564,533,216 |
| 2007 | 890,085 | 1,016.76 | 264.77 | 751.99 | 669,335,019 |
| 2008 | 894,286 | 1,082.40 | 261.71 | 820.69 | 733,931,577 |
| 2009 | 890,379 | 1,170.43 | 263.66 | 906.77 | 807,368,966 |
| 2010 | 913,523 | 1,261.12 | 273.75 | 987.37 | 901,985,204 |
| Totals | 5,259,572 | | | | $4,144,436,359 |

### APPENDIX G:  RELATED OFFICE OF INSPECTOR GENERAL REPORTS

| Report Title | Report Number | Date Issued |
|---|---|---|
| *Medicare Beneficiaries Paid Nearly Half of the Costs for Outpatient Services at Critical Access Hospitals* | OEI-05-12-00085 | 10/7/2014 |
| *Services Provided by Critical Access Hospitals in 2011* | OEI-05-12-00081 | 12/20/2013 |
| *Most Critical Access Hospitals Would Not Meet the Location Requirements If Required To Re-enroll in Medicare* | OEI-05-12-00080 | 08/14/2013 |
| *Review of Select Medicare Conditions of Participation and Costs Claimed at Richards Hospital From October 1, 2004, Through September 30, 2007* | A-05-08-00083 | 05/09/2011 |
| *Review of Select Medicare Conditions of Participation and Costs Claimed at Hillsboro Area Hospital From April 1, 2004, Through June 30, 2006* | A-05-07-00082 | 04/08/2010 |
| *Review of Select Medicare Conditions of Participation and Costs Claimed at St. Vincent Frankfort Hospital From July 1, 2003, Through June 30, 2006* | A-05-08-00008 | 12/16/2009 |
| *Review of Select Medicare Conditions of Participation and Costs Claimed at Aspirus Keweenaw Hospital From August 1, 2004, Through September 30, 2006* | A-05-07-00083 | 09/23/2009 |

## APPENDIX H: CMS COMMENTS

 DEPARTMENT OF HEALTH & HUMAN SERVICES

Centers for Medicare & Medicaid Services

**Administrator**
Washington, DC  20201

**Date:**  NOV 13 2014

**To:**  Daniel R, Levinson
Inspector General
Office of the Inspector General

**From:**  Marilyn Tavenner
Administrator
Centers for Medicare & Medicaid Services

**Subject:**  Medicare Could Have Saved Billions at Critical Access Hospitals if Swing-Bed Services were Reimbursed Using the Skilled Nursing Facility Prospective Payment System Rates (A-05-12-00046)

The Centers for Medicare & Medicaid Services (CMS) appreciates the opportunity to review and comment on the Office of the Inspector General's (OIG) draft report.  CMS is committed to improving the quality of health care for all Medicare beneficiaries and ensuring that rural Americans have access to high quality and affordable care in their communities, while promoting payment efficiency and protecting taxpayer dollars.

CMS concurs with the OIG's findings that Critical Access Hospitals' (CAHs) swing bed utilization has increased during the OIG's study period.  However, CMS has several concerns related to the report that should be addressed.

While CMS concurs that changes should be made to CAH designation and payment systems that balance access to care with payment efficiency, CMS cannot concur with the OIG's recommendation based on methodological concerns.  The OIG's findings overestimate savings by failing to incorporate important factors such as the level of care needed by swing bed patients, transportation fees to alternative facilities, and the use of point-to-point mileage distances instead of road miles.

CMS has concerns with the methodology used in the OIG report to determine the findings on availability of skilled nursing services at nearby alternative facilities and the calculation of cost savings.  CMS believes the report's sample of 100 CAHs may not adequately represent the total population of 1,200 CAHs that provide swing bed services, resulting in an overestimation of the number of CAHs for which alternative facilities are within 35 miles.  In addition, the OIG does not make the distinction in its sample between Necessary Provider (NP) CAHs, which do not have to meet the distance requirements, and CAHs not designated as NP CAHs, which do have to meet the distance requirements.  The sample set does not indicate the proportion that fall into each category and whether they were proportionally represented in the sample.

Page 2 – Daniel R. Levinson

The OIG draft report also assumes the same case mix for patients at CAHs and alternative facilities, therefore not considering differences in the type and intensity of services provided to the two groups of patients. The draft report does not account for differences in patient populations; patients receiving care in swing beds are likely more "medically complex" than patients receiving care at alternative facilities.[1] It is also unclear whether the level of care provided to CAH swing bed patients and to patients of alternative facilities is equivalent and whether beds at alternative facilities are available on a daily, weekly, or monthly basis.

The OIG's finding that 90 out of the 100 sample cases have an alternative facility furnishing SNF services within 35 miles of a CAH does not indicate whether the alternative facilities are easily accessible by the CAH population. In contrast to the distance requirement for CAHs based on driving distances, the OIG report used a radius measurement to determine distances from alternative facilities. CMS believes that a radius measurement does not reflect the distances beneficiaries may need to travel, and thus, the true accessibility of the facilities. In addition, the report does not take into account the burden on patients of being treated farther from home and family, and being transferred in an ambulance to a new facility. The OIG's cost estimations exclude transportation costs of moving a patient to an alternative facility as opposed to using a CAH swing bed, which would decrease the savings from using an alternative facility.

**OIG Recommendation**
The OIG recommends that CMS seek legislation to adjust CAH swing-bed reimbursement rates to the lower SNF PPS rates paid for similar services at alternate facilities.

**CMS Response**
CMS does not concur with the OIG findings based on the methodological issues discussed above. However, CMS concurs that changes should be made to CAH designation and payment systems that balance beneficiary access to care while promoting payment efficiency. The President's FY2015 Budget proposes a reduction in CAH payments from 101 to 100 percent of reasonable costs. It also proposes to prevent CAHs that are within 10 miles of another hospital or CAH from maintaining certification as a CAH and receiving payments based on a cost-based reimbursement structure. These facilities instead would have the option of either no longer participating in Medicare or converting to a Medicare-participating hospital and be paid under the applicable prospective payment system, which includes the SNF PPS for swing bed services. The President's budget proposal preserves beneficiary access to care while promoting payment efficiency. The basic cost-based reimbursement structure for CAHs would be preserved for facilities that are the sole source of these types of services for their communities.

---

[1] http://www.shepscenter.unc.edu/rural/pubs/finding_brief/FB105.pdf

# EXHIBIT F

# State Operations Manual
## Appendix W - Survey Protocol, Regulations and Interpretive Guidelines for Critical Access Hospitals (CAHs) and Swing-Beds in CAHs

*(Rev. 165, 12-16-16)*

**Transmittals for Appendix W**

**INDEX**

### Survey Protocol

Introduction
Regulatory and Policy Reference
Tasks in the Survey Protocol
Survey Team
Task 1 - Off-Site Survey Preparation
Task 2 - Entrance Activities
Task 3 - Information Gathering/Investigation
Task 4 - Preliminary Decision Making and Analysis of Findings
Task 5 - Exit Conference
Task 6 - Post-Survey Activities

### Regulations and Interpretive Guidelines for CAHs

§485.608  Condition of Participation: Compliance With Federal, State, and Local Laws and Regulations
§485.610 Condition of Participation: Status and Location
§485.612 Condition of Participation: Compliance With CAH Requirements at the Time of Application
§485.616 Condition of Participation: Agreements
§485.618 Condition of Participation: Emergency Services
§485.620 Condition of Participation: Number of Beds and Length of Stay
§485.623 Condition of Participation: Physical Plant and Environment
§485.627 Condition of Participation: Organizational Structure
§485.631 Condition of Participation: Staffing and Staff Responsibilities
§485.635 Condition of Participation: Provision of Services
§485.638 Condition of Participation: Clinical Records
§485.639 Condition of Participation: Surgical Services

EXHIBIT F

98

§485.641 Condition of Participation: Periodic Evaluation and Quality Assurance Review

§485.643 Condition of Participation: Organ, Tissue, and Eye Procurement

§485.645 Special Requirements for CAH Providers of Long-Term Care Services ("Swing-Beds")

EXHIBIT F

used in the decision to admit versus place in observation status. This would not only call the observation bed status into question, but could also violate the CAH's provider agreement requirement that prohibits differential treatment of Medicare beneficiaries. (See 42 CFR 489.53(a)(2)).

If a CAH maintains beds that are dedicated to observation services, the CAH must be able to provide evidence, such as the clinical criteria for admission to that unit and how patients in the unit meet those criteria, to demonstrate that its observation beds are not being used for inpatient services. CMS expects there to be a reasonable relationship between the size of the CAH's inpatient and observation operations. For example, a 10-bed observation unit in a 25-bed CAH might be disproportionately large, and the surveyor must determine whether the observation unit is actually functioning as an inpatient overflow unit. A CAH observation unit that routinely operates at a high occupancy rate could also be an indicator of the need to probe further.

**Other Types of Beds**

Other bed types that do not count toward the 25 inpatient bed limit include, but are not limited to:

- Examination or procedure tables;

- Stretchers;

- Operating room tables;

- Beds in a surgical recovery room used exclusively for surgical patients during recovery from anesthesia;

- Beds in an obstetric delivery room used exclusively for OB patients in labor or recovery after delivery of newborn infants;

- Newborn bassinets and isolettes used for well-baby boarders (**NOTE**: If the baby is being held for treatment at the CAH, his or her bassinet or isolette **does** count towards the CAHs 25-bed limit);

- Stretchers in emergency departments; and

- Inpatient beds in Medicare-certified distinct part rehabilitation or psychiatric units.

**Beds Used for Hospice Services**

A CAH can dedicate beds to a hospice under arrangement, but the beds must count as part of the maximum bed count. The computation contributing to the 96 hour annual average length of stay does not apply to hospice patients. The hospice patient can be admitted to the CAH for any care involved in their hospice treatment plan or for respite care.

EXHIBIT F

100